UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DC2NY, Inc. d/b/a BESTBUS,
1401 Church Street NW
Washington, D.C.  20005

      Plaintiff,

vs.

ACADEMY BUS, LLC,
111 Patterson Avenue
Hoboken, NJ  07030

      Defendant.

Case No:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff DC2NY, Inc. d/b/a BestBus (hereinafter "BestBus" or "Plaintiff"), by and through its attorneys, hereby files this Complaint for compensatory and punitive damages against Defendant Academy Bus, LLC ("Academy" or "Defendant"), and states as follows:

### PRELIMINARY STATEMENT

1.      BestBus, a District of Columbia corporation, provides express bus services from the District of Columbia to New York City and other locations in the mid-Atlantic area. In 2012, Academy, a bus operator organized under the laws of New Jersey, sought to expand its operations by purchasing a District of Columbia to New York route, and it approached BestBus for possible acquisition.

2.      When the purchase negotiations between BestBus and Academy broke down in 2013, Academy decided to pursue its goal by driving BestBus out of business. As part of that plan, Academy entered into a contract, the Transportation Service Agreement ("TSA"), with

BestBus, under which it became BestBus's exclusive provider of buses and drivers, for a premium charge. In return, Academy promised to provide top-of-the-line buses to BestBus alone, for specified routes in the mid-Atlantic corridor, and it agreed not to compete with BestBus in any existing or future motor coach routes.

3.     From 2013 to 2017, Academy deliberately violated the TSA in numerous ways in order to drive BestBus out of business. When BestBus complained about these breaches, Academy repeatedly assured BestBus, through false and misleading telephone calls and emails, that they would be corrected. By violating contractual terms and causing BestBus to lose customers, while simultaneously promising BestBus that it would correct breaches it had no intention of correcting, Academy caused BestBus to lose significant profits.

4.     Sometime in the spring of 2014, Academy began negotiations for the purchase of Go Bus, a bus company that operated a bus line between New York and Boston and that also supplied buses to Vamoose, a BestBus competitor in the D.C.-New York market. At this time, BestBus was also actively seeking to expand its operations into the New York-Boston market. Through false and misleading telephone calls and emails, as well as face-to-face meetings, Academy professed to help BestBus in its venture. Secretly, however, Academy aggressively pursued and completed the purchase of Go Bus, utilizing the proprietary information it had obtained from BestBus and acquiring the New York-Boston route for itself. BestBus did not become aware of Academy's deception until 2017. When Academy acquired Go Bus in late 2014, it began operating the New York-Boston route that BestBus had hoped to obtain, and it continued operating this route from 2014 up through the present.  With the purchase of Go Bus, Academy was also able to advance its plan to enter the D.C.-New York market and drive BestBus out of it. In late 2014, Academy, through Go Bus, began providing buses and drivers to

2

Vamoose, a direct BestBus competitor in the D.C.-New York market. The buses and drivers

Academy provided to Vamoose through Go Bus were often superior in quality and competence

to those it provided to BestBus, thus driving customers from BestBus to Vamoose. Once again,

when BestBus complained to Academy about the quality of the buses and drivers it was

receiving, Academy responded with false and misleading emails and telephone calls that it would

address the problem.

5.      In January 2017, because BestBus was continuing to lose profits as a result of

Academy's contractual breaches and high prices, BestBus legally terminated the TSA. BestBus

subsequently sought buses from another supplier, Panorama Bus Tours. In the summer of 2017,

just as BestBus was finalizing the terms of a contract with Panorama, Panorama suddenly

hesitated to finalize the arrangement. BestBus later learned that Academy had telephoned

Panorama's President and threatened never to do business with Panorama again if Panorama did

business with BestBus.

6.      Under the TSA, Academy was obligated to pay BestBus service rebates on an

annual basis. Academy failed to pay these rebates for the years 2013, 2014, 2016 and 2017.

BestBus began asking Academy for payment in March 2016, and repeatedly thereafter, with no

success.

7.      Academy also failed to repay a $40,000 loan, plus interest, that was owed to

BestBus by New World Tours. Academy acquired New World Tours in 2011, and wrongfully

withheld this $40,000 sum, plus interest, from BestBus, despite repeated requests from BestBus

for repayment. In November 2014, Academy told BestBus it would refund the money once the

contract was terminated. Notwithstanding this obligation, after termination of the contract in

January 2017, Academy made no payment. Although BestBus ultimately obtained the $40,000

by setting off this amount against its final payment to Academy, it was wrongfully denied the interest that would have accrued during the time payment was withheld.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff BestBus, formerly known as "DC2NY Inc.," was, at all times relevant to the actions complained of herein, a corporation organized under the laws of the District of Columbia.

9.      Defendant Academy is a corporation organized under the laws of New Jersey.

10.     Academy does substantial business in the District of Columbia.

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. In addition, this Court has federal question jurisdiction over this action pursuant to 18 U.S.C. § 1964(c).

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Academy is a resident of the District of Columbia and because a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred in the District of Columbia.

13.     This Court has personal jurisdiction over the defendant corporation because Academy regularly transacts business in the District of Columbia by providing charter and express bus services to and from the District of Columbia, and by contracting with groups and individuals to supply charter and express bus services to and from the District of Columbia. Moreover, many of the actions complained of herein – such as the provision of subpar buses and incompetent drivers – took place in the District of Columbia, because the buses picked up and discharged passengers in the District of Columbia and surrounding areas. In addition, the actions

4

complained of herein were intended to affect the market of consumers who travel to and from the

District of Columbia area. Finally, emails and telephone calls made by Academy to BestBus

were knowingly made to, and received in, the District of Columbia, in furtherance of Academy's

effort to establish a foothold in the market for express bus services to and from the District of

Columbia and to drive BestBus out of business.

14.     Academy tortiously injured BestBus in the District of Columbia by using

BestBus's proprietary information to position itself, through Go Bus, as a competitor in the

market for express bus services to and from the District of Columbia and other East Coast

destinations.

## STATEMENT OF FACTS

**A.      The Transportation Services Agreement**

15.     Prior to 2011, BestBus utilized New World Tours, a Virginia-based company to

provide it with buses for its express bus services.

16.     On or about May 2011, Academy purchased New World Tours. From that point

on until January 2017, BestBus acquired its buses exclusively from Academy.

17.     Sometime in the summer of 2012, Academy indicated that it was interested in

purchasing BestBus, because it wanted to expand into the market for express bus services

between D.C. and New York. Over the next year, the two companies explored the possibility of a

sale of BestBus's equity interests to Academy.

18.     During this time, BestBus provided Academy with a notebook containing

confidential proprietary financial information. Prior to delivery of the notebook, BestBus and

Academy signed a "Confidentiality and Non-Disclosure Agreement" ("NDA"), under which

Academy agreed "to hold Confidential Information in strict confidence" and "not to use any Confidential Information for any purpose except for the [potential purchase of BestBus]."

19.     BestBus and Academy were unable to come to agreement on the terms of a sale, and talks regarding acquisition of BestBus by Academy were terminated in the summer of 2013. Frustrated by its failure to acquire BestBus for the purchase price it sought, Academy initiated an alternative plan to drive BestBus out of business and enter the D.C.-New York market for express bus services.

20.     On June 28, 2013, Academy and BestBus entered into the TSA, under which Academy agreed to provide motor coach transportation services for BestBus's operations between D.C. and New York; between Vienna and Springfield, VA, and New York; between D.C. and Rehoboth Beach and Dewey Beach, DE; between Vienna, VA, and D.C. and New York; and between New York and Wilmington, Rehoboth Beach, and Dewey Beach, DE. The routes to which the TSA was applicable were outlined in Schedule A of the Agreement; these routes were subject to being updated "upon the Parties' mutual agreement from time to time."

21.     The initial term of the TSA was five (5) years, to commence upon execution of the TSA by both parties. The TSA was signed by both parties on June 28, 2013.

22.     The Preamble to the TSA (which is expressly "incorporated herein and made a part hereof" through Paragraph 1 of the Agreement) states that "[BestBus] desires to utilize Academy as [BestBus's] sole and exclusive transportation provider for motor transportation services between the points, places and locations described in Schedule A (as the same may be amended from time to time to meet additional motor coach service requirements) and Academy wishes to provide such services exclusively to [BestBus]."

23.     Schedule A(2) of the TSA states, "It is in the best interest of the Parties to promote and grow the [BestBus] business."

24.     Paragraph 2 of the TSA states that "Academy shall serve as [BestBus's] exclusive motor coach transportation provider, and Academy shall provide such services exclusively for [BestBus] and shall not operate any other 'line run' motor coach business in competition with any existing or future [BestBus] line run during the term of this Agreement." Under the exclusivity provisions set forth in this paragraph and the Preamble, BestBus agreed to pay Academy top dollar (as outlined in Schedule B of the TSA) for the market advantage of having exclusive access to Academy's superior top-of-the-line buses, and Academy agreed not to provide any of BestBus's competitors with buses, for existing and future routes, nor would Academy itself compete with BestBus in existing and future routes.

25.     Paragraph 3 of the TSA requires Academy to "provide all motor coach transportation services needed by [BestBus] in accordance with the terms set forth herein."

26.     Paragraph 6 of the TSA provides that "[BestBus] shall receive a service rebate from Academy based upon a percentage amount of the fees paid to Academy annually hereunder, calculated in the manner described in Schedule A(2)."

27.     Paragraph 7 of the TSA requires Academy to "provide professional, experienced and qualified licensed drivers consistent with federal motor carrier regulations" and to "remain in compliance with all applicable [Federal Motor Carrier Safety Administration] laws and regulations concerning its equipment [and] employees ...."

28.     Paragraph 8 of the TSA requires Academy to "direct its driver employees to adhere to ... professionalism, courtesy and respect in dealings with the public."

29.     Paragraph 12(A)of the TSA requires Academy to pay attorneys' fees and other legal expenses "resulting or arising from or connected with: (i) Academy's breach or alleged breach of any material term or condition of this Agreement."

30.     Paragraph 15 of the TSA states, "This Agreement shall be determined in accordance with New Jersey law."

### B.     Actions and Omissions by Academy

31.     In 2014, Academy purchased Go Bus, a New York bus company. Through the acquisition, Academy planned to use Go Bus to gain a foothold in the D.C.-New York market for express bus services and to drive BestBus out of business.

32.     Go Bus provided buses to Vamoose Bus, a direct competitor of BestBus in the D.C.-New York market. Once it acquired Go Bus, Academy used Go Bus's existing relationship with Vamoose to begin supplying buses to Vamoose, on the same D.C.-New York route for which it was supplying buses to BestBus. On numerous occasions, the buses that Academy/Go Bus supplied to Vamoose were newer models and better buses than the ones Academy supplied to BestBus for the same routes. Academy/Go Bus continued supplying buses to Vamoose through 2017.

33.     Between 2014 and 2017, BestBus regularly complained that Academy was supplying its competitor with buses of superior quality, in blatant violation of the TSA. In meetings, emails, and telephone calls throughout 2014 and 2015, Academy reassured BestBus that the situation was short-term and that BestBus would experience no negative effects. A misleading and deceptive email dated August 6, 2014, from Thomas Scullin, Chief Operating Officer of Academy, to BestBus executives Asi Ohana and Richard Green, stated that under an existing contractual obligation between Go Bus and Vamoose, Academy was obligated to

8

provide buses to Vamoose. In fact, no such contract between Go Bus and Vamoose existed, yet
Academy continued to supply superior buses to Vamoose up through 2017.

34.     Because Academy deliberately supplied BestBus with older buses, BestBus
suffered more numerous bus breakdowns and passenger service problems (such as inoperative
WiFi and electrical outlets on the buses) than it would have experienced had it received
Academy's newer bus models. Throughout the years 2013 to 2017, BestBus regularly received
complaints from passengers about inadequate or non-functional WiFi, inoperative electrical
outlets, defective toilets, and bus breakdowns that caused unnecessary delays. Many of these
complaints were posted on social media outlets such as Yelp and Facebook, thus diminishing
BestBus's public reputation in a highly competitive market, leading to a decrease in the number
of BestBus passengers and causing BestBus financial harm. In addition, BestBus regularly
reimbursed passengers who had such complaints, thus increasing the business losses it suffered.

35.     When BestBus requested that Academy supply it with the newest buses it had in
its fleet, Academy repeatedly reassured BestBus that it would correct the situation, but it did not
do so. On April 7, BestBus passengers were loaded onto a new model bus at Dupont Circle, but
then were inexplicably told by the driver that they would have to transfer to an older model bus
at Union Station, prior to the trip to New York. When Richard Green asked Academy about this
incident -- and why BestBus was still getting older buses when they were paying a premium for
top quality buses -- David Bolen, Regional Director for Academy, assured him, in an email dated
April 14, 2016, "that [Academy] will do their best not to have a repeat of April 7." In fact,
Academy took no steps to change its behavior and continued to supply BestBus with older buses.

36.     Between 2014 and 2017, BestBus regularly forwarded customer complaints about
older buses, including breakdowns and defective WiFi service, to Academy. Through these

9

complaints, Academy knew that its actions and omissions were actually interfering with BestBus's business relationship with passengers and causing BestBus a loss in business, but it took no corrective measures.

37.     In meetings, emails, and telephone calls, Academy repeatedly misled BestBus to believe that the issues identified in customer complaints would be rectified. In a July 31, 2015 email sent to Richard Green, Thomas Scullin of Academy addressed concerns Mr. Green had raised about Wi-Fi service, stating, "[W]e have sought proposals from several vendors that work with other transportation companies. We hope to be in a position within two weeks to present alternatives." No such alternatives were ever presented. Three months later, as WiFi issues continued, Academy's David Bolen "apologize[d] for the Wi-Fi concerns," in an email dated October 26, 2015. In this email to BestBus executives, Mr. Bolen again misled BestBus into believing that the issue would be solved, stating, "[W]e are hoping to make an upgrade with the Eye-Fi service . . . and we hope that any known issues will be eliminated." Six months later, the Wi-Fi problems persisted, as did Academy's false reassurances. In an April 14, 2016 email sent to Richard Green, David Bolen again promised BestBus that he was "working on upgrading the Wi-Fi on the BestBus assigned units." In fact, Academy never upgraded the Wi-Fi service, and BestBus continued to have WiFi problems with the buses it received from Academy, causing it serious financial loss through a decrease in the number of BestBus passengers.

38.     On multiple occasions between 2013 and 2017, Academy buses that arrived to service a BestBus route did not display any signs indicating that they were BestBus buses. On some occasions, the buses displayed paper or digital signs for Vamoose. On other occasions, the buses displayed paper or digital signs for Go Bus. This improper signage created brand confusion and offered advertisement for BestBus competitors on BestBus routes, resulting in a

serious loss of business to BestBus. When BestBus complained about these branding concerns to Academy, Academy misled BestBus into believing the problem would be corrected. In an email dated August 9, 2016, sent to Richard Green and Asi Ohana, David Bolen of Academy stated that "the BestBus digital signage is on the buses," and that the drivers of the buses would be instructed to change the digital signs. He also stated that "we will strive to minimize the probability of performance lapses." In fact, Academy did nothing to correct the problem, and it persisted until 2017. In addition, through BestBus's complaints, Academy knew that its actions and omissions were actually interfering with BestBus's business relationship with passengers, causing BestBus to lose passengers and business.

39.     Throughout the years 2013 through 2017, the drivers assigned to BestBus routes regularly failed to exhibit the level of professionalism, decorum, courtesy, and respect to which Academy had contractually obligated itself under the TSA. On many occasions, the drivers did not know the routes to which they were assigned; some had to be guided by passengers; others meandered off onto side routes that resulted in significant delays. Some drivers did not clean their buses between runs and failed to help passengers load their luggage into buses; others left luggage behind on the sidewalk and did not discover their oversight until arriving at their destination hours later. On one occasion, a bus driver deliberately pulled onto the highway from a rest stop, leaving a number of passengers behind, despite being told by others on the bus that there were people missing. On a number of occasions, drivers were surly and uncommunicative with passengers.

40.     When BestBus complained to Academy about the incompetence and unprofessional behavior of drivers, Academy falsely promised that the problem would be corrected. In an email dated Jauary 23, 2015, sent to Richard Green, Thomas Scullin of

11

Academy promised to take a number of steps to improve driver performance, including additional training for drivers and "a greater effort to keep BestBus 'preferred' drivers on the line service." Six months later, when driver problems persisted, a June 8, 2015 email to Richard Green from David Bolen promised that Academy Operations would take more care in the future to assign competent drivers to BestBus routes. Despite these promises, Academy did not give drivers additional training and took no other steps to improve driver performance, and driver problems continued into 2017, causing serious financial loss to BestBus.

41.     Through BestBus's complaints, Academy knew that its failure to correct the behavior of its drivers was actually interfering with BestBus's business relationship with passengers. The unprofessional behavior of bus drivers that Academy provided to BestBus had a negative impact on BestBus' business, resulting in serious financial loss.

## C.     The NY-Boston Route and Academy's Acquisition of Go Bus

42.     In early May 2014, as part of its rebranding from DC2NY to BestBus, BestBus publicly announced that it was planning to expand its services to and between a variety of northeastern cities. Boston, Philadelphia, and Baltimore were among the cities that BestBus considered as possible destinations.

43.     In early May 2014, BestBus executives met with Academy executives to discuss BestBus's expansion to Boston. Academy officials professed a willingness to help BestBus in this venture. BestBus executives travelled to Boston and Cambridge to scout routes and stops, meeting with various Academy representatives in Boston, in anticipation of launching a New York-Boston route. BestBus made clear to Academy that it needed and expected Academy's continued support for the Boston venture, given Academy's obligations under the TSA "to promote and grow the BestBus business." Throughout the time that BestBus attempted to secure

a New York-Boston route, Academy officials represented that they would help BestBus. BestBus relied on these representations in their efforts to expand into Boston and did not seek help from other sources. Through these meetings and communications, Academy knew that BestBus had some expectation of a prospective business relationship with passengers seeking bus services between Boston and New York.

44.     Through emails, telephone calls, and meetings with BestBus executives, Academy officials deliberately misled BestBus into believing that it was doing everything it could to help BestBus obtain a New York-Boston route. A September 25, 2013 email sent from Tom Scullin to Michael Curreri, Terminal Manager in Boston, was copied to Richard Green, and was intended to introduce Mr. Green to Mr. Curreri. In this email, Mr. Scullin stated, "We have a solid business relationship with Richard's company, so please assist him." On May 13, 2014, Dave Bolen of Academy sent an email to Richard Green and Asi Ohana, updating them on which stops might be available in Boston, and urging them to seek approval for curbside pickup at the Alewife Station. Such communications were intended to reassure BestBus that Academy was operating on its behalf in Boston, when in fact, Academy was doing just the opposite.

45.     At the very time that Academy was professing to assist BestBus in its efforts to obtain a New York-Boston line run, Academy was secretly engaged in acquiring the New York-Boston line run for itself. In late spring and early summer, Academy was actively negotiating the purchase of Go Bus, another line run provider of express bus services that had an established New York-Boston route and that was already using the stops BestBus had targeted. Upon information and belief, Academy used the proprietary information it had obtained from BestBus during the 2012-13 purchase negotiations to facilitate its acquisition and subsequent operation of Go Bus, in violation of the non-disclosure agreement (NDA) it had signed.In its 2014 application

to the Surface Transportation Board, seeking approval of its Go Bus purchase, Academy made

clear that it intended to take over and continue Go Bus's regular-route service between New

York and Boston. By engaging in these actions, Academy knew that it was certain or

substantially certain to interfere with BestBus's ability to obtain a New York-Boston route and

with BestBus's expectation of a business relationship with those passengers.

46.     At no time during its discussions with BestBus about a possible New York-

Boston expansion did Academy inform BestBus about its negotiations with Go Bus. It was only

in 2017, when it acquired a copy of Academy's Surface Transportation Board application, that

BestBus understood the extent of Academy's deception in the spring and early summer of 2014.

47.     With the subsequent purchase of Go Bus in or about the summer of 2014,

Academy took over Go Bus's New York-Boston route, thus positioning itself as a competitor in

the very market that it was contractually obligated to help BestBus secure, depriving BestBus of

that market, and causing BestBus serious financial loss.

48.     Academy's deceptive assertions that it was helping BestBus acquire a Boston

route, and its subsequent purchase of Go Bus, resulted in severe financial loss to BestBus.

**D.     Termination and Pre-Termination Actions by Academy**

49.     Paragraph 17 of the TSA states that "either Party may terminate this Agreement

for any reason upon 90 days written Notice to the other Party."

50.     By letter dated October 7, 2016, BestBus informed Academy that, due to

Academy's refusal to abide by the terms of the TSA and its refusal to lower the rental rates for

its buses, BestBus would terminate the contract in 90 days.

51.     Academy agreed to terminate the TSA on January 5, 2017.

14

52.     On December 22, 2016, two weeks prior to termination of the TSA, Go Bus announced on Facebook that it would be servicing routes between D.C. and Virginia and New York beginning on January 6, 2017, and that tickets for those Go Bus routes were "on sale now."

53.     During the last week that the TSA was in force, Academy put Go Bus flyers on the seats of buses that it provided for BestBus, advertising its own service at a lower rate than the rate being offered by BestBus in order to lure customers away from BestBus.

54.     Once Academy launched its competing route, it was required to load passengers at a different District of Columbia area location than the BestBus stop. Nevertheless, Academy pulled its buses over to the BestBus stop and offered BestBus customers boarding buses a free ride with Go Bus, if they did not ride with BestBus that day.

55.     These actions by Academy were intended to interfere with BestBus's relationship with its passengers, or were certain or substantially certain to do so, and they resulted in serious financial loss to BestBus.

56.     Once BestBus terminated its relationship with Academy, it sought a new supplier of buses. In May 2017, BestBus approached Panorama Bus Tours, a New York bus company, and negotiated a business deal, under which Panorama agreed to supply buses for BestBus's D.C.-New York route. On the eve of finalizing this arrangement, Panorama suddenly hesitated and stopped returning BestBus's calls and emails. BestBus later learned that Panorama's sudden change of heart was the result of a phone call Panorama had received from Academy. Upon information and belief, in this phone call, Academy executive Dave Bolen told Panorama president Michelle Petelicki that Academy President Francis Tedesco wanted her to understand the following message: if Panorama did business with BestBus, they would never do business

with Academy again. By communicating this threat through Mr. Bolen, Academy intended to

interfere with BestBus's business relationship with its passengers.

**E.     Academy's Failure to Pay Service Rebates**

57.     Schedule A(2) of the TSA requires Academy to pay BestBus a service rebate,

calculated as a percentage of the amount of revenue that BestBus generates each calendar year,

within sixty (60) days after the end of each calendar year. The schedule sets forth a rebate

formula, under which the percentage Academy is required to pay increases with the amount of

annual revenue earned.

58.     Pursuant to Schedule A(2), Academy owed BestBus the following rebates:

    (a)     For the calendar year 2013:   $13,706.40

    (b)     For the calendar year 2014:   $37,806.10

    (c)     For the calendar year 2015:   $84,792.70

    (d)     For the calendar year 2016:   $88,073.16

    (e)     For the calendar year 2017:   $    714.89

59.     The only rebate that Academy paid was for the calendar year 2015. That payment,

for $84,792.70, was made in August 2016, six months after it was due. On February 20, 2017,

BestBus demanded payment of all outstanding rebates. Academy has refused to pay any of the

outstanding rebate amounts that it owes. All in all, Academy has wrongfully withheld

$140,300.55, exclusive of interest.

**F.     Academy's Wrongful Failure to Pay Back the $40,000 Loan**

60.     In 2008, as part of its business arrangement with New World Tours, BestBus

loaned $40,000 to New World Tours. When Academy purchased New World Tours, it acquired

the obligation to replay the $40,000 BestBus loan along with the obligation to pay interest on

that loan. Beginning in October 2014, and regularly thereafter, BestBus asked Academy to return its $40,000 plus interest.

61.     On November 24, 2014, Academy representative Frank Bondroff informed BestBus that Academy considered the $40,000 a "security deposit," and that it would continue to hold the money "against potential default by [BestBus] in future payments of the transportation services that Academy provides to [BestBus] ticket holders." Mr. Bondroff further informed BestBus that the money would be refunded upon termination of the contract.

62.     At no time prior to this email had Academy ever requested, nor had BestBus ever agreed to provide, a security deposit as part of their business arrangement.

63.     After termination of the TSA, Academy wrongfully continued to hold the $40,000. On January 31, 2017, in its final payment to Academy under the TSA, BestBus deducted $40,000 from the total it owed.

64.     While BestBus thus eventually obtained the principal on its $40,000 loan, it was deprived of almost five years of interest on the loan, due to Academy's wrongful retention of the funds. The total interest owed, calculated at a 27% per annum rate, is $50,952.33.

## COUNT I: VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)

65.     BestBus repeats and realleges the allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66.     At all relevant times, Academy was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

67.     Go Bus is an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

17

68.     At all relevant times, Go Bus was engaged in, and its activities affected, interstate commerce, including the business of providing express bus transportation between the District of Columbia and New York, within the meaning of 18 U.S.C. § 1962(c).

69.     Academy conducted or participated, directly or indirectly, in the conduct, management, or operation of Go Bus's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

70.     As explained herein, after being thwarted in its effort to purchase BestBus in 2012, Academy engaged in a willful, knowing, and malicious scheme to drive BestBus out of business and to gain access to the market for express bus services between the District of Columbia and New York. Academy deliberately misled BestBus into believing that it was interested in a mutually exclusive relationship with BestBus in the D.C.-New York and New York-Boston markets for express bus services, under which both companies would benefit. In fact, Academy was solely interested in acquiring its own foothold in both markets, and in driving BestBus out of business as a competitor in those markets.

71.     In furtherance of its scheme, in 2013, Academy entered into a contract with BestBus, under which it secured BestBus' promise to use only Academy buses, for which Academy charged top dollar. In 2014, while promising to help BestBus enter the New York-Boston market, Academy secretly purchased Go Bus, a company that already had a presence in the New York-Boston market and that had an existing relationship with Vamoose, a direct competitor of BestBus in the D.C.-New York market. Also in furtherance of its scheme, as described herein, Academy transmitted, by means of wire communication in interstate or foreign commerce, messages intended to mislead BestBus into believing that Academy was actively helping it in Boston, and to conceal the reality that Academy was acquiring Go Bus.

18

72. Academy used Go Bus's existing relationship with Vamoose to supply Vamoose with top-of-the-line buses and drivers, the very buses and drivers that it was contractually obligated to supply exclusively to BestBus. At the same time, Academy supplied BestBus with inferior buses and drivers, resulting in diminished service on BestBus routes, a loss of passenger confidence in BestBus, and a drop in BestBus's business and profits. Throughout the time that Academy was supplying Vamoose with superior buses through Go Bus, Academy transmitted, by means of wire communication in interstate or foreign commerce, messages intended to mislead BestBus into believing that Academy would correct the service issues BestBus repeatedly identified. In fact, Academy took no steps to correct those issues.

73. Following BestBus' lawful termination of the TSA in 2017, Academy knowingly and intentionally threatened Panorama Bus Tours against doing business with BestBus, thereby unlawfully interfering with BestBus's ability to secure buses for its D.C.-New York route in order to drive BestBus out of business and eliminate it as a competitor. As described herein, in a telephone call during the summer of 2017, Academy threatened Panorama that if it supplied buses to BestBus, Panorama would never do business with Academy again.

74. The injuries to BestBus were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. BestBus was the ultimate and intended victim of Academy's unlawful scheme. BestBus has been and will continue to be injured in its business and property in an amount to be determined at trial.

75. Pursuant to 18 U.S.C. § 1964(c), BestBus is entitled to recover treble damages plus costs and attorneys' fees from Academy.

## COUNT II: BREACH OF CONTRACT

76.     BestBus repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     The TSA, executed by BestBus and Academy on June 28, 2013, is a valid contract under both District of Columbia and New Jersey law. Pursuant to Paragraph 15 of the TSA, it is to be interpreted according to New Jersey law.

78.     By engaging in the actions set forth in Paragraphs 31 through 64 of this Complaint, Academy wrongfully, deliberately, and continuously breached numerous provisions of the TSA, including but not limited to Paragraphs 1 (including the Preamble), 2, 3, 6, 7, 8 and the attached Schedules.

79.     As a direct result of Academy's breach of the TSA, BestBus suffered financial losses, including but not limited to: lost profits due to Academy's wrongful provision of buses to Vamoose on routes served by BestBus between 2015 and 2017; profits BestBus would have earned for operating a New York-Boston route between 2015 and 2017; wrongfully withheld service rebates, plus interest, owed to BestBus by Academy; and attorneys' fees and costs.

## COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

80.     BestBus repeats and realleges the allegations set forth in paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.     BestBus had a business relationship with its passengers, for whom it provided bus services in exchange for set fees. Academy knew about BestBus's existing business relationship.

82.     Academy intentionally, maliciously, and continuously interfered with BestBus's relationship with its passengers in numerous ways, including, but not limited to: providing BestBus with subpar buses for its line runs; offering superior buses to a BestBus competitor; sending unprofessional and incompetent bus drivers to service BestBus routes; failing to properly

identify the buses it provided as BestBus buses; placing flyers on the seats of BestBus buses, advertising cheaper rates with competitors; and driving competitor buses to BestBus's stops and offering BestBus passengers free rides to their destinations if they switched companies.

83. When Academy engaged in these actions, it knew that the actions outlined in paragraph 63 were certain or substantially certain to interfere with BestBus's business relationship with its passengers. In fact, Academy was regularly informed by BestBus of passenger complaints related to some of these actions, but it persisted in them anyway.

84. As a direct result of Academy's deliberate and intentional actions, BestBus suffered harm to its relationship with existing and future passengers.

85. As a direct result of Academy's deliberate and intentional actions, BestBus suffered severe harm to its business, including, but not limited to: damages due to lost income; lost future profits; the loss of present and future goodwill; harm to reputation; and attorneys' fees and costs.

## COUNT IV: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

86. BestBus repeats and realleges the allegations set forth in paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87. BestBus was actively working to expand its bus service to include a line run between Boston and New York, and it had the expectation of a business relation with future passengers on this route. Academy knew about BestBus's anticipated business relations with future New York-Boston passengers.

88. Academy intentionally, maliciously and deceptively interfered with BestBus's expectation of business relations with passengers on the New York-Boston route by breaching its contractual obligation "to grow and promote the [BestBus] business" and "not [to] operate any

21

other 'line run' motor coach business in competition with any existing or future [BestBus] line run." Academy professed to be helping BestBus secure a New York-Boston route while secretly negotiating the purchase of Go Bus, an existing operator in that market, and subsequently operating Go Bus on the New York-Boston route.

89.     By engaging in the actions alleged in paragraph 69, Academy knew that it was certain or substantially certain to interfere with BestBus's expected business relationship with New York-Boston passengers.

90.     As a direct result of Academy's deceptive, deliberate, and intentional actions, BestBus failed to acquire a New York-Boston route and suffered harm to its prospective business relationship with future passengers on that route.

91.     As a direct result of Academy's deceptive, deliberate, and intentional actions, BestBus suffered severe harm, including but not limited to: damages due to lost income; lost future profits; the loss of present and future goodwill; harm to reputation; and attorneys' fees and costs.

## COUNT V: CONVERSION

92.     BestBus repeats and realleges the allegations set forth in paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     When Academy acquired New World Tours in 2011, it exercised dominion and control over the outstanding $40,000 loan that BestBus had provided to New World Tours in 2008.

94.     Academy informed BestBus that it considered the money a security deposit and would return it upon termination of the TSA. Notwithstanding this assertion, which BestBus refuted, Academy refused to return the $40,000 after the TSA was terminated.

22

95.     As a direct result of Academy's wrongful retention of BestBus' money, BestBus

suffered financial damages due to the lost interest it might have accrued on $40,000 between

2012 and 2017.

### COUNT VI: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

96.     BestBus repeats and realleges the allegations set forth in paragraphs 1 through 95

as if fully set forth herein.

97.     Under the TSA, Academy pledged "to promote and grow the BestBus business,"

to provide top-quality buses exclusively to BestBus and not to its competitors, to provide top-

quality for BestBus routes, and to refrain from competing in the markets in which BestBus

operated.

98.     Academy's deceptive, intentional, and continuous actions and omissions, as set

forth above, deprived BestBus of its reasonable expectations under the TSA, and its rights to

receive the fruits of the TSA. In addition, Academy's actions were unfair, not decent or

reasonable, and dishonest, and were based upon a desire to position itself as the premier provider

of bus services in the markets in which BestBus operated or hoped to operate, at the expense of

BestBus.

99.     As a direct result of Academy's deceptive, intentional, and continuous actions and

omissions, BestBus suffered severe harm, including but not limited to: damages due to lost

income; lost future profits; the loss of present and future goodwill; harm to reputation; and

attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1.  Damages in an amount to be determined.

2.  Attorneys' fees and costs.

3.  Punitive damages.

4.  Such further relief as the Court deems just and equitable.

Dated:  September 13, 2018

Respectfully submitted,

By: _Ursula Werner_
Ursula Werner
DC Bar No. 440225
uwerner@potomaclaw.com

**POTOMAC LAW GROUP, PLLC**
1300 Pennsylvania Ave. NW
Suite 700
Washington, DC  20004
Telephone: (240) 328-2522

*Attorney for Plaintiff BestBus*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

.

DC2NY, Inc. d/b/a BESTBUS,
1401 Church Street NW
Washington, D.C.  20005

     Plaintiff,

     vs.

ACADEMY BUS, LLC,
111 Patterson Avenue
Hoboken, NJ  07030

     Defendant.

Case No:

**JURY TRIAL DEMANDED**

### DISCLOSURE OF CORPORATE AFFILIATIONS
### PURSUANT TO LCvR 7.1

I, the undersigned, counsel of record for Plaintiff DC2NY, Inc., d/b/a BESTBUS, certify

that, to the best of my knowledge and belief, there are no parent companies, subsidiaries or

affiliates of Plaintiff DC2NY, Inc., d/b/a BESTBUS, that have any outstanding securities in the

hands of the public. These representations are made in order that judges of this Court may

determine the need for recusal.

Dated:  September 13, 2018            Respectfully submitted,


By: _Ursula Werner_
Ursula Werner
DC Bar No. 440225
uwerner@potomaclaw.com

**POTOMAC LAW GROUP, PLLC**
1300 Pennsylvania Ave. NW
Suite 700
Washington, DC  20004
Telephone: (240) 328-2522

*Attorney for Plaintiff BestBus*

2