# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DC2NY, INC., | : | |
| Plaintiff, | : | Civil Action No.: 18-2127 (RC) |
| v. | : | Re Document No.: 6 |
| ACADEMY BUS, LLC, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

DC2NY, Inc., which does business under the trade name BestBus, filed this lawsuit against Academy Bus, LLC, asserting a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, as well as contract and tort claims. As the Court will explain below, though, BestBus's complaint is deficient in a number of ways: the complaint fails to allege the pattern of activity required for a RICO claim; its contract claims are asserted against the wrong party; its tortious interference claims do not identify specific business opportunities that were impeded; and its conversion claim merely alleges the failure to repay a debt. Because none of BestBus's claims survive these defects, the Court grants Academy Bus's motion to dismiss.

## II. BACKGROUND[1]

BestBus is a D.C. corporation that provides express bus services to a number of locations in the mid-Atlantic area between D.C. and New York City. *See* Compl. ¶ 1, ECF No. 1. BestBus does not, however, own its own buses or employ its own drivers, so until 2011, it used a Virginia company named New World Tours to provide buses and drivers. *Id.* ¶ 15. In 2011, New World Tours was bought by Academy Bus, a limited liability company organized under the laws of New Jersey. *Id.* ¶¶ 9, 16. In the aftermath of that sale, Academy Bus expressed interest in acquiring BestBus, and the two companies were in negotiations for about a year. *Id.* ¶ 17. During those discussions, BestBus provided Academy Bus with certain "confidential proprietary financial information" and the parties entered into a "Confidential and Non-Disclosure Agreement" ("NDA"). *Id.* ¶ 18.

When the parties were ultimately unable to reach a sale agreement, BestBus opted to pursue an alternative plan. *Id.* ¶ 19. In June 2013, it negotiated an exclusivity arrangement with Academy Bus that was memorialized in a Transportation Service Agreement ("TSA"). *Id.* ¶¶ 2, 20. As a formal matter, Academy Bus, LLC was not a party to that Agreement, though. *See* Def.'s Mot. to Dismiss, Ex. 1 at 1–6, ECF No. 6–2. The contracting parties were instead BestBus (using its legal name, DC2NY, Inc.) and Academy Express LLC, which the Agreement referred to simply as "Academy," *see id.*, and which BestBus now claims is merely an alter ego of Academy Bus, *see* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 5, ECF No. 7.

The TSA stated that BestBus "desire[d] to utilize Academy as [its] sole and exclusive transportation provider for motor transportation services between the points, places and locations

---

[1] At the motion to dismiss stage, the Court accepts the plaintiff's factual allegations as true. *See, e.g., United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

described in Schedule A" of the Agreement, and that "Academy wishe[d] to provide such services exclusively to" BestBus. Def.'s Mot. to Dismiss, Ex. 1 at 1; Compl. ¶ 22. Schedule A in turn listed six different routes, which together involved eight different locations: Vienna, Virginia; Springfield, Virginia; DuPont Circle in D.C.; Union Station in D.C.; Wilmington, Delaware; Rehoboth Beach, Delaware; Dewey Beach, Delaware; and Penn Station in New York City. Def.'s Mot. to Dismiss, Ex. 1 at 7.

The TSA further provided that "Academy . . . shall not operate any other 'line run' motor coach business in competition with any existing or future [BestBus] line run during the term of th[e] Agreement," which was five years. Compl. ¶¶ 21, 24; *see also* Def's Mot. to Dismiss, Ex. 1 at 1. The Agreement also required "Academy . . . to provide professional, experienced and qualified licensed drivers consistent with federal motor carrier regulations" and to "direct its driver employees to adhere to [a] level of professionalism, courtesy and respect in dealings with the public." Def.'s Mot. to Dismiss, Ex. 1 at 2. And the Agreement stated that "Academy [would] pay [BestBus]" an annual "service rebate," to be calculated based on "the total annual revenue . . . paid to Academy by [BestBus] in connection with" the Agreement. *Id.* at 7–8; *see also id.* at 2; Compl. ¶ 26. Either party could terminate the TSA "for any reason upon 90 days written Notice to the other Party." Def.'s Mot. to Dismiss, Ex. 1 at 5. Any disputes, the Agreement stated, would be governed by New Jersey law. *Id.*

According to BestBus, the execution of the TSA was the first step in Academy Bus's "plan to drive BestBus out of business and enter the D.C.-New York market for express bus services." Compl. ¶ 19. In furtherance of that goal, Academy Bus did not make the vast majority of the rebate payments that it owed under the TSA. *See id.* ¶ 57–59. It also refused to repay BestBus a $40,000 loan obligation it had inherited through its purchase of New World

3

Tours. *See id.* ¶¶ 60–61. Eventually, Academy Bus informed BestBus that it considered the $40,000 a security deposit that it would hold "against potential default by BestBus in future payments" under the TSA. *Id.* ¶ 61.

The second step of Academy Bus's plan allegedly took place in 2014, when it purchased Go Bus, a New York company that "provided buses to Vamoose Bus, a direct competitor of BestBus in the D.C.-New York market." Compl. ¶¶ 31–32. BestBus claims that Academy Bus "used the proprietary information it had obtained from BestBus" during the parties' prior purchase negotiations in order "to facilitate its acquisition and subsequent operation of Go Bus," in violation of the parties' NDA. *Id.* ¶ 45. Then following its purchase of Go Bus, Academy Bus "used Go Bus's existing relationship with Vamoose to begin supplying buses to Vamoose, on the same D.C.-New York route for which it was supplying buses to BestBus." *Id.* ¶ 32. And Academy Bus provided Vamoose with "newer models and better buses than the ones [it] supplied to BestBus for the same routes." *Id.* Limited to the older buses, "BestBus suffered . . . numerous bus breakdowns and passenger service problems"—far more "than it would have experienced had it received [the] newer bus models." *Id.* ¶ 34.

These problems were exacerbated by the fact that the drivers whom Academy Bus assigned to BestBus routes "regularly failed to exhibit . . . professionalism, decorum, courtesy, and respect." *Id.* ¶ 39. "On many occasions, the drivers did not know the routes to which they were assigned." *Id.* A number of them "were surly and uncommunicative with passengers." *Id.* And "[s]ome . . . did not clean their buses between runs" or "help passengers load their luggage." *Id.*

As one would expect, these problems with the buses and drivers "diminish[ed] BestBus's public reputation." *Id.* ¶ 34. The company had to "regularly reimburse[] passengers who had . . .

4

complaints," which led to increased business losses. *Id.* BestBus complained to Academy Bus about these issues multiple times, and Academy Bus repeatedly indicated that it would make improvements. *See id.* ¶¶ 38, 40. Such promises ultimately proved empty, though. *See id.*

While all of this was going on, BestBus was also trying to expand into the New York to Boston market. *See id.* ¶ 43. And "BestBus made clear to Academy [Bus] that it needed and expected [Academy Bus's] continued support for [this] venture, given [Academy Bus's] obligations under the TSA." *Id.* In response, Academy Bus "officials represented that they would help BestBus." *Id.* But "[t]hrough emails, telephone calls, and meetings with BestBus executives," those officials "deliberately misled BestBus into believing that [Academy Bus] was doing everything it could to help BestBus obtain a New York-Boston route." *Id.* ¶ 44. In reality, Academy Bus was focused on its recent purchase of Go Bus, which already had its own established New York to Boston route. *Id.* ¶ 45. Academy Bus took over that route, thereby "positioning itself as a competitor in the very market" that BestBus was seeking to enter. *Id.* ¶ 47.

Eventually, BestBus decided to terminate the TSA, consistent with the Agreement's ninety-day notice provision. *See id.* ¶¶ 50–51. During the ensuing ninety-day period, Go Bus announced that it would begin servicing its own D.C. to New York routes, *see id.* ¶ 52, and Academy Bus allegedly put "Go Bus flyers on the seats of the buses that it provided for BestBus, advertising its own [forthcoming] service at a lower rate than the rate being offered by BestBus." *Id.* ¶ 53. Then after the ninety-day period passed, BestBus negotiated an agreement with Panorama Bus Tours for the supply of buses on BestBus's D.C. to New York route. *Id.* ¶ 56. But "[o]n the eve of finalizing this arrangement," an Academy Bus representative called Panorama with a threat: "if Panorama did business with BestBus," the representative said,

5

Panorama "would never do business with Academy [Bus] again." *Id.* "Panorama suddenly hesitated and stopped returning BestBus's calls and emails." *Id.*

This lawsuit, which asserts six claims, followed. BestBus's first claim is a civil RICO claim premised on the allegation that Academy Bus committed multiple acts of wire fraud in furtherance of its scheme to drive BestBus out of business. *See id.* ¶¶ 65–75. Its next two claims are contract claims: One alleges breaches of a number of the TSA's provisions. *See id.* ¶¶ 76–79. The other alleges that Academy Bus violated its contractual duty of good faith and fair dealing. *See id.* ¶¶ 96–99. The final three claims are tort claims. The first alleges tortious inference with business relations, the second alleges tortious interference with *prospective* business relations, and the third alleges that Academy Bus unlawfully converted the proceeds of the $40,000 loan it inherited from New World Tours. *See id.* ¶¶ 80–95. BestBus ultimately deducted the $40,000 principal from the final payment it made to Academy Bus when it terminated the TSA, but BestBus argues that it is still entitled to interest that accrued during the time that the loan went unpaid. *Id.* ¶¶ 63–64. Academy Bus responded to BestBus's complaint by filing a motion to dismiss for failure to state a claim. That motion is now ripe for disposition.

### III. ANALYSIS

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard; it asks whether the plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To defeat such a motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This means that there must be "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations, in other words, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

In light of these standards, a Rule 12(b)(6) motion "must rely solely on matters within the pleadings." *Pernice v. Bovim*, 183 F. Supp. 3d 84, 87 (D.D.C. 2016) (citing Fed. R. Civ. P. 12(d)). This includes "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint," and materials suitable for judicial notice, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), as well as "[d]ocuments that a defendant attaches to [its] motion to dismiss . . . if they are integral to [the plaintiff's] claim[s], they are referred to in the complaint, and their authenticity is undisputed," *Pernice*, 183 F. Supp. 3d at 87. Thus, here, the Court may consider the copy of the TSA that Academy has attached to its motion, even though the Agreement was not attached as an exhibit to the complaint. Before getting to the TSA, however, the Court begins its analysis below with BestBus's RICO claim. The Court then turns to the two contract claims and closes with the three tort claims. As the Court will explain, all six claims must be dismissed.

**A. The RICO Claim**

Among other things, "RICO makes it 'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'" *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 153 (D.D.C. 2016) (quoting 18 U.S.C. § 1962(c)). The Act then "provides a 'private right of action for treble damages to any person injured in his business by

reason" of such conduct. *Leonard v. George Washington Univ. Hosp.*, 273 F. Supp. 3d 247, 257 (D.D.C. 2017) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)); *see also* 18 U.S.C. § 1964(c). To assert a civil RICO claim, a plaintiff must allege four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Zernik v. U.S. Dep't of Justice*, 630 F. Supp. 2d 24, 27 (D.D.C. 2009) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991)). Together, the latter two elements "requir[e] the commission of at least two predicate racketeering offenses over a ten year period." *W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'Ship v. Mkt. Square. Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (citing 18 U.S.C. § 1961(5)). "These predicate offenses are acts punishable under certain state and federal criminal laws, including mail and wire fraud." *Id.* (citing 18 U.S.C. § 1961(1)(B)).

Here, BestBus's RICO claim is grounded in the notion that Academy Bus used Go Bus (the alleged RICO "enterprise") to engage in a scheme aimed at driving BestBus out of business and accumulating its own share of the bus services market. *See* Compl. ¶¶ 65–70. In pursuit of that scheme, BestBus says, Academy made multiple false communications that amounted to wire fraud and constituted RICO predicates. *See id.* ¶¶ 71–72. In its motion to dismiss, Academy Bus argues that BestBus's claim does not satisfy any of the four RICO elements. The Court, however, need address only one of Academy Bus's arguments—the one concerning the third "pattern" element. The requisite pattern of activity is not alleged in the complaint, so BestBus's RICO claim must be dismissed.

The pattern requirement includes two sub-elements: relatedness and continuity. *E.g.*, *Watson v. Faris*, 139 F. Supp. 3d 456, 460 (D.D.C. 2015) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). These sub-elements require a plaintiff to allege "that the racketeering

8

predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S at 239. To determine whether this kind of pattern has been established, the D.C. Circuit has provided six factors that courts should consider: "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *W. Assocs.*, 235 F.3d at 633 (quoting *Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995)). These factors "do[] not establish a rigid test, but rather present[] a flexible guide for analyzing RICO allegations on a case by case basis." *Id.* That said, "[i]n some cases . . . some factors will weigh so strongly in one direction as to be dispositive." *Edmonson*, 48 F.3d at 1265. And as a result, at least one near bright-line rule has emerged: "if a plaintiff alleges only a single scheme, a single injury, and few victims, it is 'virtually impossible'" for the plaintiff to state a RICO claim. *W. Assocs.*, 235 F.3d at 634 (quoting *Edmonson*, 48 F.3d at 1265).

That is the problem with BestBus's claim here. The complaint alleges only one scheme: "to drive BestBus out of business and . . . gain access to the market for express bus services" from D.C. to New York, and from New York to Boston. Compl. ¶ 70. It names only one victim: BestBus. *Id.* ¶ 74 ("BestBus was the ultimate and intended victim of Academy's unlawful scheme."). And it identifies only one injury—to BestBus's "business and property." *Id.* As a matter of law, this limited range of activity does not constitute a pattern within the meaning of RICO. *See, e.g.*, *W. Assocs.*, 235 F.3d at 634–35; *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014); *Busby v. Capitol One, N.A.*, 772 F. Supp. 2d 268, 282 (D.D.C. 2011); *Zernik*, 630 F. Supp. 2d at 27.

BestBus nonetheless argues that, "given how readily Academy [Bus] resorted to threats and fraudulent misrepresentation to solidify its foothold in the D.C.-New York market, it is entirely possible that Academy [Bus] . . . engaged in such behavior in other markets" as well. Pl.'s Opp'n at 14. BestBus therefore says it should be given the opportunity to pursue discovery to uncover further misconduct. *See id.* All this amounts to, however, is unsupported speculation, which is insufficient to defeat a motion to dismiss. *See, e.g.*, *Twombly*, 550 U.S. at 555–56. And indeed, "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Watson*, 139 F. Supp. 3d at 460 (quoting *W. Assocs.*, 235 F.3d at 634). "This caution stems from the fact that '[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'" *W. Assocs.*, 235 F.3d at 637 (alteration in original) (quoting *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000)). "[I]f the pattern requirement has any force whatsoever," then, "it is to prevent . . . ordinary commercial fraud from being transformed into a federal RICO claim." *Id.* (omission in original) (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 685 (4th Cir. 1989)).

Here, BestBus has not adequately distinguished this case from the ordinary business dispute, and as far as specific factual allegations go, it has alleged actions in furtherance of only a "single discrete goal." *E. Sav. Bank*, 31 F. Supp. 3d at 13 (quoting *Edmonson*, 48 F.3d at 1265). Thus, even if BestBus has alleged predicate acts that amount to "racketeering activity," it has not alleged a *pattern* of such activity. The Court therefore must dismiss its RICO claim.

## B. The Contract Claims[2]

BestBus's next two claims are grounded in contract, and, given the TSA's choice-of-law clause, the parties agree that they are governed by New Jersey law. The first claim alleges that Academy Bus breached several provisions of the TSA, *see* Compl. ¶¶ 76–79, and the second alleges that Academy Bus breached its contractually implied duty of good faith and fair dealing, *see id.* ¶¶ 96–99; *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) ("[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing.").

Academy Bus contends that each of these claims should be dismissed for a variety of reasons. But before getting to those arguments, Academy Bus makes a threshold challenge that applies to both claims: it contends that BestBus sued the wrong party. Recall that the sole named Defendant in this case is Academy Bus, LLC. The TSA, however, on its face, does not name Academy Bus, LLC as one of the contracting entities. Instead, the document memorializes an agreement with "Academy Express LLC," Mot. to Dismiss, Ex. 1 at 1, 6, an entity that BestBus has not served and does not mention in the complaint. Academy Bus acknowledges that it is associated with Academy Express; in fact, Academy Bus is apparently Academy Express's sole

---

[2] Having dismissed the only federal question raised in BestBus's complaint, the Court is obligated to ensure that it has jurisdiction over the remaining common law claims. According to BestBus, those claims fall within the Court's diversity jurisdiction, *see* 28 U.S.C. § 1332—the theory being that BestBus is a citizen of D.C., Academy Bus is a citizen of New Jersey, and greater than $75,000 is in dispute. *See* Compl. ¶¶ 8–9, 11. To demonstrate Academy Bus's citizenship, BestBus submitted New Jersey state records indicating that the initial members of "Academy Bus, L.L.C." were all residents of New Jersey. *See* Pl.'s Opp'n, Ex. 2 at 3, ECF No. 7-4; *see also CostCommand, LLC v. WH Admin'rs, Inc.*, 820 F.3d 19, 21 (D.C. Cir. 2016) ("Unincorporated associations, including LLCs, have the citizenship of each of their members."). For jurisdictional purposes, the Court may consider these records without even determining whether they are suitable for judicial notice. *See, e.g.*, *Akpan v. Cissna*, 288 F. Supp. 3d 155, 160 (D.D.C. 2018) (citing *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). And because Academy Bus neither challenges the records' accuracy, nor claims to now have a member that is a citizen of D.C., the Court is satisfied that diversity jurisdiction is proper.

member.  *See* Def.'s Mem. Supp. Mot. to Dismiss at 3, ECF No. 6-1.  But the argument is that "a contract *between the parties*" is an essential element of any breach of contract claim.  *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 160 (3d Cir. 2018) (emphasis added).  And here, it seems no contract existed between BestBus and Academy Bus.

For its part, BestBus does not dispute the basic facts underlying this argument, but it contends that "there is a very strong likelihood" that Academy Bus and Academy Express are alter egos, which would permit the Court to pierce the corporate veil and hold Academy Bus liable for Academy Express's alleged breaches of the TSA.  Pl.'s Opp'n at 5.  This alter ego issue, BestBus says, is a question of fact that should not be resolved at the motion to dismiss stage.  *See id.*

As an abstract matter, that may be correct, but BestBus's problem is that the complaint alleges no facts that could support an alter ego finding.  Indeed, as the Court already noted, the complaint never references Academy Express.  BestBus's opposition to the motion to dismiss addresses the subject, but a plaintiff "cannot overcome a 12(b)(6) motion by adding new information . . . in a brief."  *Hawkins v. Wash. Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 109 (D.D.C. 2018); *see also Coyer v. Hemmer*, 901 F. Supp. 872, 883–84 (D.N.J. 1995) (dismissing breach of contract claim grounded in alter ego theory under New Jersey law because complaint included no relevant factual allegations beyond conclusory statements).

In any event, even if the Court were to take into account BestBus's new factual allegations (some of which are supported by public records of which the Court could take judicial notice), those new facts would still fall far short of supporting an alter ego theory of liability.  Under New Jersey law, "[t]o pierce the corporate veil of a parent corporation, a party must establish two elements: (1) the subsidiary was dominated by the parent corporation, and (2)

adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law." *FDASmart, Inc. v. Dishman Pharms. & Chems. Ltd.*, 152 A.3d 948, 953 (N.J. Super. Ct. App. Div. 2016) (citing *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 468 A.2d 150 (N.J. 1983)). At most, BestBus addresses only the first of these elements. Citing New Jersey Treasury Department records, BestBus contends that Academy Bus and Academy Express "have an 'identity of interest.'" Pl.'s Opp'n at 5 (quoting *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Hotelco, C.A.*, 342 F. Supp. 3d 1, 16 (D.D.C. 2018)). BestBus's new facts do not, however, go to the second element, which requires that the parent entity "abuse[] the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron*, 468 A.2d at 164. Here, BestBus alleges that Academy Bus made fraudulent statements, but there are no allegations of fraud in the use of the corporate form.

Thus, even if the Court were to set aside the fact that the issue was not raised until the opposition brief, the Court would still hold that BestBus had not properly stated a claim for relief under an alter ego theory. And without alter ego, BestBus cannot prevail on either the breach of contract claim or the duty of good faith and fair dealing claim. Because no contract appears to have existed between BestBus and Academy Bus, both of those claims must be dismissed.[3]

### C. The Tort Claims

BestBus's final three claims are tort claims. The first alleges tortious interference with business relations, the second alleges tortious interference with *prospective* business relations, and the third is a claim for conversion. For each of these claims, the Court must first make a

---

[3] As a last resort, BestBus requests leave to amend the complaint and add Academy Express LLC as a defendant. *See* Pl.'s Opp'n at 15. Under Local Civil Rules 7(i) and 15.1, however, a motion for leave to file an amended pleading in this district must "be accompanied by an original of the proposed pleading as amended." Because BestBus has not yet complied with this requirement, it would be premature for the Court to grant leave at this time.

choice-of-law determination. *See Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) ("Under proper conflict of laws principles, the Court is to conduct the choice of law analysis for each distinct issue being adjudicated."). BestBus argues that all three claims should be governed by D.C. law, while Academy Bus says that New Jersey law should apply.

In diversity cases, these determinations are governed by the "the choice-of-law rules of the forum state—here, the District of Columbia." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014). Under D.C. rules, "the first step in a choice-of-law analysis is determining whether a true conflict exists between the laws of the [competing] jurisdictions—that is, whether more than one jurisdiction has a potential interest in having its law applied, and if so, whether the law of the competing jurisdictions is different." *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 27 (D.D.C. 2019) (alteration in original) (internal quotation marks omitted) (quoting *In re APA*, 766 F.3d at 51–52). When no conflict exists, D.C. law applies by default. *See, e.g.*, *Sharpe v. Am. Acad. of Actuaries*, 285 F. Supp. 3d 285, 288 (D.D.C. 2018). If there is a conflict, however, courts apply a "modified governmental interest analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Krukas*, 376 F. Supp. 3d at 27 (quoting *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006)). As part of that analysis, courts are to consider (1) where the injury occurred, (2) where the conduct causing the injury occurred, (3) where the parties reside or are incorporated, and (4) where the parties' relationship is centered. *See Washkoviak*, 900 A.2d at 180. Where those factors do not "clearly favor either jurisdiction," courts apply "the law of the forum state (D.C.) as a tie-breaker." *In re APA*, 766 F.3d at 51 (citing *Washkoviak*, 900 A.2d at 182); *see also id.* at 55.

1. Tortious Interference

Applying these principles to BestBus's tortious interference claims, the Court first concludes that there is a true conflict between D.C. and New Jersey law. Although the elements are similar in each jurisdiction, *compare Whitt v. Am. Prop. Constr. Co.*, 157 A.3d 196, 202 (D.C. 2017), *with Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993), there is one critical difference. In New Jersey, it is the plaintiff's burden to prove that the defendant's interference was not only intentional, but also wrongful and without justification. *See, e.g.*, *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 56 A.2d 31, 39 (N.J. 1989). In D.C., by contrast, "[i]nstead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008).

In light of that difference, the Court must decide which jurisdiction has the most significant relationship to the dispute, based on the four factors mentioned earlier. But here, those factors do not weigh strongly in favor of either jurisdiction. The first factor—where the injury occurred—favors D.C., where BestBus is based. The second—where the conduct causing the injury occurred—favors New Jersey, where Academy Bus is based. The third factor, meanwhile, is of no assistance at all because BestBus is incorporated in D.C. and Academy Bus is organized under the laws of New Jersey. And as for the fourth factor, it is not entirely clear where the parties' relationship was centered. On the one hand, they chose New Jersey law in the TSA. That contract language obviously does not govern BestBus's tort claims, but one could argue that it "serve[s] to illustrate the parties' expectations." *Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 164 F. Supp. 3d 104, 110 (D.D.C. 2016). Yet on the other hand, the bus routes within the scope of the TSA included two stops in D.C., and none in New Jersey. Indeed,

because of the nature of the business at issue, it might be fair to say that the parties' relationship spanned the entire mid-Atlantic region.

More generally, it is not hard to see how both D.C. and New Jersey have an interest in applying their law to this dispute. D.C. has an interest in protecting its corporations from out-of-state tortfeasors doing business in D.C., while New Jersey has an interest in regulating New Jersey corporations. As the applicable choice-of-law considerations do not "clearly favor either jurisdiction," the tie-breaker goes to D.C., the law of the forum state. *In re APA*, 766 F.3d at 51 (citing *Washkoviak*, 900 A.2d at 182).

With D.C. law governing, BestBus's two tortious interference claims must each allege four elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010) (quoting *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995)). These elements focus the Court on Academy Bus's alleged actions in interference with BestBus's relationships with third parties, whereas a contract claim would focus on BestBus's relationship with Academy Bus itself. Here, the third parties at the center of BestBus's tortious interference claims are its customers. The first claim is about BestBus's "relationship with existing and future passengers" on its D.C. to New York routes, Compl. ¶ 84, while the second centers on "the expectation of a business relation with future passengers" on the route that BestBus hoped to launch between New York and Boston, *id.* ¶ 87.

The problem with both of these claims is the same: tortious interference's first element—the existence of a valid business relationship of expectancy—"require[s] rather specific business

opportunities," *Jankovic*, 593 F.3d at 29, like a prospective book deal with publishing companies, *see Browning v. Clinton*, 292 F.3d 235, 242–43 (D.C. Cir. 2002), or "three [particular] potential sources of prospective employment," *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 45 (D.D.C. 2009). Thus, it is insufficient to allege interference with the "generic opportunities of any successful enterprise." *Jankovic*, 593 F.3d at 29. Indeed, "tortious interference claims are routinely dismissed where the plaintiff fails to name specific . . . relationships that the defendant allegedly interfered with." *Nyambal v. Alliedbarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016), *recons. granted on other grounds*, 344 F. Supp. 3d 183 (D.D.C. 2018). BestBus's claims in this case fall in that category. Instead of naming a relationship with a specific third party or class of third parties, the claims merely allege lost business. Tortious interference requires more.

BestBus argues that this imposes an impossible pleading requirement, but it does not identify a single case that endorses a tortious interference claim grounded on only the generic loss of customers. And in attempting to distinguish the case law dismissing tortious interference claims on this basis, BestBus only cites allegations involving Academy Bus's specific conduct and the effects of that conduct. Although those allegations may be relevant for the latter three elements, they do not speak to the first one, because they do not implicate a relationship with any specific third parties. BestBus's emphasis on those allegations shows how its theory effectively conflates the first and fourth elements: the "business relationship" interfered with was its relationship with its customers; the "resultant damage" was the loss of those customers.

Plus, without addressing the other three elements, the Court cannot help but notice that BestBus's complaint alludes to a prospective business relationship that likely would satisfy the first element of a tortious interference claim—which may help illustrate the inadequacies of

17

BestBus's claims as currently pled. Recall that the complaint alleges that Academy Bus prevented BestBus from reaching a bus supply agreement with Panorama Bus Tours. The complaint, however, does not cite that relationship with Panorama in support of either tortious interference claim. Because both claims instead focus entirely on the loss of customers, they must be dismissed.

2. Conversion

Finally, BestBus asserts a conversion claim related to the proceeds of the $40,000 loan that Academy Bus allegedly inherited from New World Tours and then refused to repay. The loan principal has been recovered, but BestBus alleges that it is entitled to interest that accrued during the years that the loan went unpaid. Unlike the tortious interference claims, this claim does not implicate a conflict between D.C. and New Jersey law, as they "would produce the identical result on the facts presented." *Krukas*, 376 F. Supp. 3d at 28 (quoting *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008)). Indeed, the elements of a conversion claim are essentially the same in each jurisdiction. In D.C., conversion requires "[1] an unlawful exercise, [2] of ownership, dominion, and control, [3] over the personalty of another, [4] in denial or repudiation of his right to such property." *Poola v. Howard Univ.*, 147 A.3d 267, 284 n.17 (D.C. 2016) (alterations in original) (quoting *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C. 1976)). In New Jersey, it requires "[1] the wrongful exercise [2] of dominion and control [3] over the property of another [4] in a manner inconsistent with the other person's rights in that property." *Peloro v. United States*, 488 F.3d 163, 173–74 (3d Cir. 2007) (quoting *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 771 (3d Cir. 1990)); *see also Mueller v. Tech. Devices Corp.*, 84 A.2d 620, 623 (N.J. 1951).

18

Both jurisdictions permit conversion claims involving money, but only in limited circumstances. Indeed, neither D.C. nor New Jersey recognize a conversion claim regarding a mere debt. *See Bondi v. Citigroup, Inc.*, 32 A.3d 1158, 1190 (N.J. Super. Ct. App. Div. 2011); *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008). Rather, they each require that a plaintiff allege "the right to a specific identifiable fund of money." *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 258 (D.D.C. 2015) (quoting *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013)); *see also Bondi*, 32 A.3d at 1190. This is because conversion "extend[s] only to intangible rights identified by a tangible document that is converted." *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008); *see also Bondi*, 32 A.3d at 1190. "[T]hus, a plaintiff may bring a suit for conversion of a promissory note, a check, a bank book, or an insurance policy . . . but not for conversion of a debt, the good will of a business[,] or an idea." *Ficken*, 578 F. Supp. 2d at 143 (omission in original) (quoting *Primedical, Inc. v. Allied Inv. Corp.*, No. 90-1802, 1994 WL 149139, at *7 (D.D.C. Mar. 31, 1994)). "A cause of action for conversion," in other words, "may not be maintained to enforce a mere obligation to pay money." *Campbell*, 130 F. Supp. 3d at 258 (quoting *Curaflex Health Servs., Inc. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995)).

Here, BestBus says that the original $40,000 loan "is a specific and identifiable quantity of money" that originated in BestBus's possession, and that the requested interest is a proper component of the damages for Academy Bus's refusal to return the loan. Pl.'s Opp'n at 35. This reasoning reflects a misunderstanding of the law, though. It does not matter that the $40,000 is an identifiable *amount* of money. Otherwise virtually any debt could be subject to a conversion claim. As noted above, conversion instead requires an entitlement to a particular *fund* of money. *See, e.g.*, *Campbell*, 130 F. Supp. 3d at 258. BestBus has not alleged such an entitlement in this

case. Rather, on the complaint's telling, BestBus was simply a creditor to whom Academy Bus failed to repay a debt. Or put differently, BestBus only claims to be owed an amount from whatever "fungible cash" Academy Bus has in its coffers. *McNamara*, 950 F. Supp. 2d at 195. Because conversion does not extend to those circumstances, BestBus is not entitled to any interest in the form of damages. The Court thus dismisses BestBus's conversion claim.

## IV. CONCLUSION

For the foregoing reasons, Academy Bus's motion to dismiss is **GRANTED**. For present purposes, the complaint, rather than the action, is dismissed without prejudice, and BestBus may seek leave to amend the complaint within thirty days. If no such motion is filed, the action shall be deemed dismissed as of that date. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: August 12, 2019　　　　　　　　　　　　　　　　　RUDOLPH CONTRERAS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge