# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DC2NY, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-2127 (RC) |
| | : | | |
| v. | : | Re Document No.: | 11, 14 |
| | : | | |
| ACADEMY BUS, LLC, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART
### PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT

DC2NY, Inc., which does business under the trade name BestBus, filed this lawsuit against Academy Bus, LLC ("Academy Bus" or "Academy"), asserting a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, as well as contract claims and claims for tortious interference with business relations. Academy moved to dismiss the Complaint, and the Court granted the motion because it found the Complaint to be deficient in a number of ways. *DC2NY, Inc. v. Academy Bus, LLC*, No. 18-cv-2127 ("*DC2NY Mot. Dismiss Op.*"), 2019 WL 3779571 (D.D.C. Aug. 12, 2019), ECF No. 10. BestBus now moves to amend its complaint, and Academy Bus opposes any amendment. The Court finds that amendment of the tortious interference claims would be futile, but that the same cannot be said for the entirety of the contract claims. BestBus's motion to amend is therefore granted in part and denied in part.

# I. BACKGROUND[1]

The Court provided a detailed factual background in its memorandum opinion addressing Academy Bus's motion to dismiss. *DC2NY* Mot. Dismiss Op. at *1–4. The Court reiterates many of those facts here, but also emphasizes those additional facts alleged for the first time in the Amended Complaint.

BestBus is a D.C. corporation that provides express bus services to a number of locations in the mid-Atlantic area between D.C. and New York City, but it does not own its own buses or employ its own drivers. See Am. Compl. ¶¶ 1, 15, ECF No. 13-1.[2] In 2011, Academy Bus, a New Jersey LLC which owns buses and employs its own drivers expressed interest in acquiring BestBus, and the two companies were in negotiations for about a year. *Id.* ¶¶ 9, 16–17. During those discussions, BestBus provided Academy Bus with certain "confidential proprietary financial information" and the parties entered into a "Confidential and Non-Disclosure Agreement" ("NDA"). *Id.* ¶ 18. When the parties were ultimately unable to reach a sale agreement, BestBus opted to pursue an alternative plan. *Id.* ¶ 19.

---

[1] At the motion to dismiss stage, the Court accepts the plaintiff's factual allegations as true. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). When considering a motion to amend a complaint, the Court evaluates the proposed amended complaint by applying essentially the same standard it would on a motion to dismiss. *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citing *Foman v. Davis*, 371 U.S. 178, 181–82 (1962)). Accordingly, for now, the Court accepts as true the plaintiff's factual allegations in the amended complaint. These overlap almost entirely with the factual allegations in its original complaint.

[2] When it filed its Reply, Pl.'s Reply in Supp. of Mot. Amend ("Reply"), ECF No. 13, BestBus attached a revised version of its proposed Amended Complaint. *See* Reply at 7. This version omitted any mention of certain 2013 and 2014 rebate payments that had inadvertently been referenced in the first version of the proposed Amended Complaint but which BestBus conceded it was time-barred from suing over. *See id.*; *compare* Am. Compl. ¶ 57, ECF No. 13-1 (second version), *with* Am. Compl. ¶ 57, ECF No. 11 (original version). For purposes of this Memorandum Opinion, the Court refers to the second version of the Amended Complaint because, while Academy Bus opposes the Motion for Leave to Amend, it appears to agree that if leave to amend is granted, any reference to the 2013 and 2014 rebates should be left out.

In June 2013, BestBus negotiated an exclusivity arrangement with Academy Bus that was memorialized in a Transportation Service Agreement ("TSA"). *Id.* ¶¶ 2, 20; Def.'s Mot. to Dismiss, Ex. 1 ("TSA") at 1–6, ECF No. 6-2. As a formal matter, Academy Bus, LLC was not a party to the TSA. *See* TSA at 1–6. The contracting parties were instead BestBus (using its legal name, DC2NY, Inc.) and Academy Express LLC, which the Agreement referred to simply as "Academy." *See id.*[3]

The TSA stated that BestBus "desire[d] to utilize Academy as [its] sole and exclusive transportation provider for motor transportation services between the points, places and locations described in Schedule A" of the Agreement, and that "Academy wishe[d] to provide such services exclusively to" BestBus. TSA at 1; Am. Compl. ¶ 22. The TSA further provided that "Academy . . . shall not operate any other 'line run' motor coach business in competition with any existing or future [BestBus] line run during the term of th[e] Agreement," which was five years. Am. Compl. ¶¶ 21, 24; *see also* TSA at 1. It required "Academy . . . to provide professional, experienced and qualified licensed drivers consistent with federal motor carrier regulations" and to "direct its driver employees to adhere to [a] level of professionalism, courtesy and respect in dealings with the public." TSA at 2. Either party could terminate the TSA "for any reason upon 90 days written Notice to the other Party." *Id.* at 5. Any disputes, the Agreement stated, would be governed by New Jersey law. *Id.* The TSA also stated that "Academy [would] pay [BestBus]" an annual "service rebate," to be calculated based on "the total annual revenue . . . paid to Academy by [BestBus] in connection with" the Agreement. *Id.*

---

[3] The original complaint named Academy Bus, LLC as a defendant. *See* Compl. at 1, ECF No. 1. The Court dismissed the contract claims because the named defendant was not a party to the contract. *DC2NY* Mot. Dismiss Op. at *5–6. The proposed amended complaint names Academy Express, LLC as defendant. Am. Compl. at 1. According to Academy Bus, Academy Express LLC has not been served. Def.'s Opp'n to Mot. Amend. at 1 n.1, ECF No. 12

at 7–8; see also *id.* at 2; Am. Compl. ¶ 26.  According to BestBus, Academy Bus did not make the vast majority of these rebate payments.  Am. Compl. ¶¶ 56–58.

In 2014, as part of an alleged plan to drive BestBus out of business, Academy Bus purchased Go Bus, a New York company that "provided buses to Vamoose Bus, a direct competitor of BestBus in the D.C.-New York market."  Am. Compl. ¶¶ 31–32.  Academy Bus "used Go Bus's existing relationship with Vamoose to begin supplying buses to Vamoose, on the same D.C.-New York route for which it was supplying buses to BestBus."  *Id.* ¶ 32.

Academy Bus provided Vamoose with "newer models and better buses than the ones [it] supplied to BestBus for the same routes."  *Id.*  Limited to the older buses, "BestBus suffered . . . numerous bus breakdowns and passenger services problems"—far more "than it would have experienced had it received [the] newer bus models."  *Id.* ¶ 34.  These problems were exacerbated by the fact that the drivers whom Academy Bus assigned to BestBus routes "regularly failed to exhibit . . . professionalism, decorum, courtesy, and respect."  *Id.* ¶ 39.  "On many occasions, the drivers did not know the routes to which they were assigned."  *Id.*  A number of them "were surly and uncommunicative with passengers."  *Id.*  And "[s]ome . . . did not clean their buses between runs" or "help passengers load their luggage."  *Id.*

New factual allegations added in the Amended Complaint provide further details about specific complaints made by specific customers. For example, according to the Amended Complaint:

> Individuals such as Jennifer P., Tyler D., and Valerie S. – customers who regularly use buses to travel the D.C.-New York and other BestBus routes – stated in email complaints to BestBus and on social media outlets that, as a direct result of these deficiencies, they would be switching to other providers and strongly discouraged anyone from using BestBus. . . .

*Id.* ¶ 34.  These problems with the buses and drivers "diminish[ed] BestBus's public reputation."  *Id.*  The company had to "regularly reimburse[] passengers who had . . . complaints," which led

to increased business losses. *Id.* BestBus complained to Academy about these issues multiple times, and Academy repeatedly indicated that it would make improvements. *See id.* ¶¶ 38, 40. Such promises ultimately proved empty, though. *See id.*

Around the same time, BestBus was trying to expand into the New York to Boston market, and communicated to Academy "that it needed and expected Academy's continued support for the Boston venture, given Academy's obligations under the TSA 'to promote and grow the BestBus business.'" *Id.* ¶ 43. Academy officials then "deliberately misled BestBus into believing that [Academy] was doing everything it could to help BestBus obtain a New York-Boston Route" when in fact Academy "was secretly engaged in acquiring the New York-Boston line run for itself" via the acquisition of Go Bus, which had its own New York-Boston route. *Id.* ¶¶ 44–45. BestBus did not learn about Academy's purchase of Go Bus until 2017. *Id.* ¶ 46.

Eventually, BestBus terminated the TSA, consistent with the Agreement's ninety-day notice provision. *See id.* ¶¶ 50–51. During the ensuing ninety-day period, Go Bus announced that it would begin servicing its own D.C. to New York routes, *see id.* ¶ 52, and Academy allegedly "put Go Bus flyers on the seats of [the] buses that it provided for BestBus, advertising its own [forthcoming] service at a lower rate than the rate being offered by BestBus." *Id.* ¶ 53.

This lawsuit followed. In its original complaint, BestBus asserted six claims: one civil RICO violation, two contract claims (breach of contract and breach of the duty of good faith and fair dealing) and three tort claims (tortious interference with business relations, tortious interference with prospective business relations, and conversion). *DC2NY* Mot. Dismiss Op. at *3. Academy moved to dismiss for failure to state a claim. *Id.* The RICO claim was dismissed because the Complaint failed to allege a *pattern* of racketeering activity as is required to state a RICO claim. *Id.* at *5; *see Zernik v. U.S. Dep't of Justice*, 630 F. Supp. 2d 24, 27 (D.D.C. 2009).

The conversion claim was dismissed because the claim was over a debt of $40,000—a particular *amount* of money, but not a particular *fund* of money of the sort required for a conversion claim. *DC2NY* Mot. Dismiss Op. at *9; *see Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 258 (D.D.C. 2015). The RICO and conversion claims have been dropped from the amended complaint.

The Court's decision on the motion to dismiss addressed the two contract claims together. The parties agreed that New Jersey law governed these claims. *DC2NY* Mot. Dismiss at *5. Both claims were dismissed for the fairly simple reason that Academy Bus, the defendant in the lawsuit, was not a party to the contract—Academy Express, LLC was. *Id.* at *5–6. BestBus argued that Academy Bus and Academy Express were alter egos and that the Court could consequently pierce the corporate veil and hold Academy Bus liable for Academy Express's breaches, but the complaint contained no factual allegations to support such a finding and BestBus had not raised the argument prior to its brief in opposition to dismissal. *Id.* at *6. The claims were therefore dismissed because BestBus could not possibly prevail against the defendant it had named. *Id.*

The tortious interference claims—for tortious interference with business relations and tortious interference with *prospective* business relations—were also addressed together. At the outset, the Court had to determine what law to apply. *Id.* at *7. The Court determined that the law of the District of Columbia governed. *Id.* at *8.[4] Under D.C. law, BestBus's two tortious

---

[4] The Court's analysis, which applied the choice-of-law rules of the District of Columbia involved balancing a variety of factors established by the D.C. courts. *See DC2NY* Mot. Dismiss Op. at *7–8 (citing *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014); *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006)). Finding that "the applicable choice-of-law considerations [did] not 'clearly favor either jurisdiction,' the tie breaker [went] to D.C., the law of the forum state." *Id.* at *8 (quoting *In re APA*, 766 F.3d at 51 (citing *Washkoviak*, 900 A.2d at 182)).

interference claims each needed to allege four elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010) (quoting *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995)). Both claims require "interference with BestBus's relationship with third parties." *DC2NY* Mot. Dismiss Op. at *8. As pled by BestBus, the relevant third parties would be its customers, specifically those customers who traveled on its D.C.-New York routes and those customers that BestBus expected would travel on its New York-Boston route. *Id.*

These allegations failed to state a claim, as the Court explained:

> [T]ortious interference's first element—the existence of a valid business relationship or expectancy—"require[s] rather specific business opportunities," *Jankovic*, 593 F.3d at 29 . . . . Thus, it is insufficient to allege interference with the "generic opportunities of any successful enterprise." *Jankovic*, 593 F.3d at 29. Indeed, "tortious interference claims are routinely dismissed where the plaintiff fails to name specific . . . relationships that the defendant allegedly interfered with." *Nyambal v. Alliedbarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016), *recons. granted on other grounds*, 344 F. Supp. 3d 183 (D.D.C. 2018). BestBus's claims in this case fall in that category. Instead of naming a relationship with a specific third party or class of third parties, the claims merely allege lost business. Tortious interference requires more.

*Id.* "Because both claims . . . focus[ed] entirely on the loss of customers," the Court dismissed them. *Id.* at *9. Having found each of BestBus's claims fatally flawed in some way or another, the Court granted Academy Bus's motion to dismiss, and allowed BestBus thirty days to seek leave to amend the complaint. Order Granting Def.'s Mot. Dismiss, ECF No. 9.

BestBus filed the instant Motion for Leave to File an Amended Complaint within the prescribed timeframe and attached a proposed Amended Complaint. *See* Pl.'s Mot. for Leave to File Am. Compl. ("Mot. Amend."), ECF No. 11; Am. Compl. The proposed Amended Complaint made certain changes to the substance of its factual allegations that will be discussed

below, but it also dropped the RICO and conversion claims and substituted Academy Express LLC as the defendant. *See* Am. Compl. Academy opposed the motion, noting that Academy Express was not a party to the action but that it was Academy Express LLC's sole member. Def.'s Opp'n to Mot. Amend. ("Opp'n") at 1 & n.1, ECF No. 12. BestBus filed a Reply. Pl.'s Reply in Supp. of Mot. Amend ("Reply"), ECF No. 13. And Academy filed a Motion for Leave to File Sur-Reply, which the Court will grant.[5] *See* Def.'s Sur-Reply in Further Opp'n to Mot. Amend. ("Sur-Reply"), ECF No. 14 at 5–16. The motion is now ripe for decision.

---

[5] Although sur-replies are generally disfavored, *see Kifafi v. Hilton Hotels Retirement Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), the determination as to whether or not to allow one is entrusted to the discretion of the district court, *Akers v. Beal Bank*, 760 F. Supp. 2d 1, 2 (D.D.C. 2011). The Court's exercise of discretion is guided by "whether the movant's reply in fact raises arguments or issues for the first time; whether the nonmovant's proposed surreply would be helpful to the resolution of the pending motion; and whether the movant would be unduly prejudiced were leave to be granted." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tobumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 93–94 (D.D.C. 2017) (quoting *Glass v. Lahood*, 786 F. Supp. 2d 189, 231 (D.D.C. 2011), *aff'd*, No. 11-5144, 2011 WL 6759550, at *1 (D.C. Cir. Dec. 8, 2011)).

In this instance, the Court is willing to allow the sur-reply. BestBus is correct to note that many of Academy Bus's arguments against allowing amendment of the complaint overlap with its arguments in favor of dismissing the original complaint. *See* Pl.'s Opp'n to Def.'s Mot. for Leave to File Sur-Reply ("Sur-Reply Opp'n") at 2, ECF No 15. However, BestBus's initial Motion to Amend did not contain any argumentation, meaning that its Reply in further support of that motion was the first time it was arguing how and why the changes it made in its amended complaint are sufficient to avoid the deficiencies the Court identified on the first round. *See* Mot. Amend; Reply. The Court finds it helpful to know how Academy Bus would respond to these arguments. This is especially so because, with regard to the tortious interference claims, Academy Bus misunderstood what BestBus was alleging in its amended complaint. *See* Reply at 3 n.1 (clarifying that "Plaintiff does not intend, as Defendant seems to believe, *see* Opposition at 17–21, to assert separate tortious interference claims with respect to [named] individuals."). The Court views the misunderstanding as reasonable in light of Plaintiff's counsel's brief and under-explanatory email response to Defendant's counsel's attempt to clarify the allegations before filing its opposition brief. Opp'n Ex. A, ECF No. 12-1. Leave to file the sur-reply is therefore granted.

The Court is mindful, though, of the fact that Academy Bus has twice now argued for dismissal of the case on more or less the same grounds, and that it will get a third opportunity when the Amended Complaint is filed. In granting the motion for leave to amend, the Court has concluded that parts of the amended claims could withstand a motion to dismiss. The Court

## II. LEGAL FRAMEWORK

Federal Rule of Civil Procedure 15(a) permits a plaintiff to amend a complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading. *See* Fed. R. Civ. P. 15(a)(1). Otherwise, a plaintiff may amend a pleading only with the opposing party's written consent—which has been denied in this case—or by the Court's leave. Fed. R. Civ. P. 15(a)(2). Rule 15 instructs courts to "freely give leave when justice so requires." *Id.*; *see also Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006) (explaining that Rule 15 "is to be construed liberally"). Importantly, "[t]he decision to grant or deny leave to amend . . . is vested in the sound discretion of the trial court." *Commodore–Mensah v. Delta Air Lines, Inc.*, 842 F. Supp. 2d 50, 52 (D.D.C. 2012) (citing *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)). Generous standard notwithstanding, courts may deny leave to amend for such reasons as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Amendments that do not radically alter the scope and nature of the action . . . are especially favored." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 8 (D.D.C. 2013) (quoting *Estate of Gaither ex rel. Gaither v. District of Columbia*, 272 F.R.D. 248, 252 (D.D.C. 2011)).

"Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citing *Foman*, 371 U.S. at 181–82). Accordingly, in determining the futility of

---

would therefore not be favorably disposed toward any motion to dismiss the amended complaint filed by Academy Express after it is served that simply repeats the same arguments yet again.

amendment, the Court applies the same standard it applies in resolving a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.* As noted in the Court's previous opinion, to survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, would state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At this stage, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.* at 555. These standards derived from the Federal Rules of Civil Procedure govern evaluations of the sufficiency of pleadings even in a diversity case where the governing substantive law is the law of a state or of the District of Columbia. *See Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1333–34 (D.C. Cir. 2015).

### III. ANALYSIS

#### A. Local Civil Rule 7(m)

As a preliminary matter, Academy argues that BestBus's motion should be denied because BestBus failed to comply with the requirements of Local Civil Rule 7(m), which provides that:

> Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement. . . . A party shall include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed.

LCvR 7 (m). The parties dispute the extent to which the required consultation occurred. *Compare* Opp'n at 8 ("The first requirement . . . was not <u>meaningfully</u> satisfied."), *with* Reply at 7 ("[Defendant's counsel] threatened [Plaintiff's counsel] with Rule 11 sanctions . . . [Plaintiff's

counsel] did not think further negotiation . . . would be fruitful.").  BestBus concedes it failed to include the required Rule 7(m) statement.  Reply at 7 n.4.  The Court reminds the parties to diligently confer and be mindful of the burden placed on the Court but declines to resolve Petitioner's motion on Rule 7(m) grounds.  *Cf. Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007) ("Perhaps if [the required] conversation occurred . . . the issues now before the Court could have been narrowed in scope or eliminated altogether.").

## B.  Diversity Jurisdiction

Academy argues for dismissal based on BestBus's failure to plead sufficient fact supporting diversity jurisdiction—which can be the only basis for the Court's jurisdiction over the Amended Complaint, now that BestBus has abandoned its RICO claim.  Opp'n at 9 n.7.  Diversity jurisdiction requires that no opposing parties be citizens of the same state, and that more than $75,000 be in dispute.  28 U.S.C. § 1332.  The proposed amended complaint alleges that a sufficient amount is at stake.  *See* Am. Compl. ¶ 11.  The parties' citizenship, therefore, is the important question.

BestBus, or DC2NY, Inc., is a corporation, and Academy Express, LLC, the proposed new defendant, appears to be a limited liability company or "LLC."  A corporation is "a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business."  28 U.S.C. § 1332(c)(1); *see also id.* § 1332(e) (noting that the District of Columbia is considered a "State" for purposes of diversity jurisdiction).  An LLC, like Academy Express, takes the citizenship of each of its members.  *See, e.g.*, *Lopes v. JetsetDC, LLC*, 994 F. Supp. 2d 135, 143 (D.D.C. 2014) (citing *C.T. Carden & Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990)).

"The party seeking the exercise of diversity jurisdiction bears the burden of pleading the citizenship of every party to the action," *Loughlin v. United States*, 393 F.3d 155, 171 (D.C. Cir. 2004), and "[w]hen challenged on allegations of jurisdictional facts, [the party asserting jurisdiction] must support their allegations by competent proof," *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). However, the burden of presenting such competent proof is not necessarily triggered by an adversary's "simply argu[ing] Plaintiffs have not met their burden" without actually "factually contravening Plaintiffs' jurisdictional allegations or raising an issue of fact." *See In re Lorazepam & Clorazepate Antitrust Litig.*, 900 F. Supp. 2d 8, 17 (D.D.C. 2012) (declining to decide, and doubting "whether simply uttering 'challenge' constitutes a challenge sufficient under *McNutt* to trigger Plaintiffs' burden").

The Amended Complaint leaves out some important facts concerning the citizenship of the parties. It says that DC2NY, Inc. is organized under the laws of the District of Columbia and that Academy Express LLC "is a corporation organized under the laws of New Jersey" and that it "does substantial business in the District of Columbia." Am. Compl. ¶¶ 8–10. The Amended Complaint does not state the principal place of business for either entity. Further, as Academy notes, Academy Express LLC appears to be an LLC, not a corporation, which means its state of organization is not relevant to its citizenship. Opp'n at 9 n.7. The citizenship of its members would be relevant, and the Amended Complaint contains no information about these. At the motion to dismiss stage, when the defendant was Academy Bus, LLC, BestBus had submitted New Jersey state records indicating that all members of that LLC were New Jersey residents. *See DC2NY* Mot. Dismiss Op. at *5 n.2 (citing Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Mot. Dismiss Opp'n"), Exs. 1 to 4, ECF Nos. 7-1 to -4). One of these showed that when Academy

Express, LLC was formed in November of 2000, its sole member was Academy Bus, LLC, Mot. Dismiss Opp'n Ex. 3, ECF No. 7-3, but BestBus has not documented or even alleged any more recent facts about Academy Express LLC, and it has not attached any new state records to its Amended Complaint or to its briefing on the Motion to Amend.

The Court will not deny the Motion for Leave to Amend for want of jurisdiction because it is far from clear that amendment would be "futile" for this reason. Academy points out the factual deficiencies with the amended pleading, *see* Opp'n at 9 n.7; Sur-Reply at 6 n.3, but it does not actually say at any point (a) that the parties are not diverse, (b) that Academy Express LLC is a citizen of any state other than New Jersey, (c) that DC2NY, Inc. is a citizen of anywhere other than the District of Columbia, or (d) that Academy Express LLC has had any change in membership since 2000. The Court imagines that if jurisdiction were, in fact, improper Academy most likely would have made at least one of these arguments directly, rather than only insinuating jurisdictional defects. And Academy likely conceded the last of these points because it stated in its Opposition Brief that "Academy Bus . . . is the sole member of Academy Express." Opp'n at 1 n.1. Because Academy Bus has not directly alleged that jurisdiction is improper, and because we are dealing with only a *proposed* amended complaint, to which facts may be added before it becomes operative, the Court will not hold BestBus to the most stringent pleading standard at this point.

In declining to deny amendment based on jurisdictional concerns, the Court does not hold that subject-matter jurisdiction is necessarily proper. The Amended Complaint is missing some key facts, and BestBus will still need to allege them in order to proceed. In granting leave to amend, then, the Court will also grant leave for BestBus to add the necessary jurisdictional facts before filing an amended complaint. Leave to add facts to the complaint is granted *only* for the

limited purpose of clarifying this Court's jurisdiction (i.e. not to bolster the substance of any surviving claim). If BestBus fails to demonstrate that jurisdiction is proper, or if it cannot do so, the Court has little doubt that Academy Bus or Academy Express will swiftly move to dismiss for lack of subject matter jurisdiction once the amended complaint becomes operative. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("Objections to subject matter jurisdiction . . . may be raised at any time."). And at that point, with the question of subject-matter jurisdiction squarely presented, the Court would be obligated to more closely scrutinize BestBus's factual allegations. *Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) ("'[T]he plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' [for lack of subject-matter jurisdiction] than in resolving a 12(b)(6) motion for failure to state a claim.") (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350).

## C. The Tortious Interference Claims

Having ruled out the possibility of denying leave to amend across the board—for lack of compliance with the local rules or for want of subject-matter jurisdiction—the Court now turns to the specifics of the proposed amended claims, beginning with the claims for tortious interference with business relations (Amended Count II) and tortious interference with prospective business relations (Amended Count III). The elements of a tortious interference claim under D.C. law are, again, "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Jankovic*, 593 F.3d at 29 (quoting *Bennett Enters.*, 45 F.3d at 499).

The problem with the tortious interference and prospective tortious interference claims in BestBus's first complaint was that "[i]nstead of naming a relationship with a specific third party or class of third parties, the claims merely allege[d] lost business." *DC2NY* Mot. Dismiss Op. at *8. BestBus had argued that Academy Bus's interference had caused "harm to [BestBus's] relationship with existing and future passengers" and "to its prospective business relationship with future passengers on [a New York-Boston] route." *Id.*; Compl. ¶¶ 84, 87. The Court held that such a theory "effectively conflate[d] the first and fourth elements" of tortious interference—the existence of a valid business relationship or expectancy and resultant damage—by arguing that "the 'business relationship' interfered with was its relationship with its customers" and that "the 'resulting damage' was the loss of those customers." *DC2NY* Mot. Dismiss Op. at *9. The Court observed that "tortious interference claims are routinely dismissed where the plaintiff fails to name specific . . . relationships that the defendant allegedly interfered with." *Id.* at *8 (quoting *Nyambal*, 153 F. Supp. 3d at 316).

BestBus explains, in its Reply, that its proposed amended complaint aims to "satisf[y] the Court's concern by identifying *with greater specificity* the class of customers encompassed by both of [BestBus's] tortious interference claims." Reply at 2. BestBus directs the Court's attention in particular to paragraphs 70 and 78 of the Amended Complaint:

> 70. BestBus had a business relationship with its passengers, for whom it agreed to provide premium bus service in exchange for set fees. The class of individuals with whom BestBus had a business relationship included all persons who actually purchased tickets from BestBus for the routes it serviced, i.e. regular and occasional travelers between the D.C. area and New York, Wilmington, and Rehoboth and Dewey Beaches. This class included, but was not limited to, the following persons: Jennifer P., Tyler D., Valerie S., Kelsey W., Chase H., Anirudh H., and Hong Y.

> 78. BestBus had the expectation of a business relationship with a definable class of passengers: (1) those passengers who had used BestBus in the past and who would have continued to use BestBus in the future, had their experience been favorable; and (2) those passengers who would have used BestBus but for negative reviews by previous passengers on social media platforms such as Yelp or word of mouth.

> This class included, but was not limited to: Tyler D., Jennifer P., Valerie S., and
> A.K.

Am. Comp. ¶¶ 70, 78.  BestBus maintains that it is not making separate tortious interference

claims with regard to these named individuals.  *See* Reply at 3 n.1.  Rather, the naming of these

individuals "is intended to demonstrate the non-speculative nature of the class of persons with

whom BestBus had, or expected to have, a business relationship."  *Id.*  That is to say their

inclusion is only meant to bolster the class-based claim alleged in the original complaint.  *See id.*

The inclusion of these details gets BestBus somewhat closer to stating a claim, but it is

not enough to satisfy the first element of tortious interference.  The pleading requirements

remain unchanged, and BestBus still needs to allege more than "interference with the 'generic

opportunities of any successful enterprise.'"  *DC2NY* Mot. Dismiss. Op. at *8 (quoting *Jankovic*,

593 F.3d at 29).  A loss of customers, without more specificity, does not generally suffice.  *See*

*id.*  For example, in *Guttenberg v. Emery*, 41 F. Supp. 3d 61 (D.D.C. 2014), certain doctors

alleged that "disparaging comments" made to the medical community had "caus[ed] [other]

doctors to terminate their referrals to Plaintiffs."  *Id.* at 73.  These allegations were not a

sufficient basis for a tortious interference claim under D.C. law because they amounted to only

"general allegations of harm to their business," and did not include details such as "examples of

referrals which they would have received but for defendants' conduct."  *Id.*  BestBus's proposed

amended claims fall short in the same way.

Merely putting partial names to a few members of the alleged class of third parties,

without including more specific identifying information or "facts related to future contracts

compromised by the alleged interferer" is an insufficient basis for a tortious interference claim.

*Nyambal*, 153 F. Supp. 3d at 316 (observing that "tortious interference claims are routinely

dismissed where the plaintiff fails to" allege such facts or "to name specific contractual

relationships"). To separate interference with the proposed class of customers from generic harm to its business, BestBus would have had to plead more specific facts about existing and prospective business relations. BestBus has not identified a sufficiently specific class because the business relationship described is simply the relationship BestBus has with all or nearly all of its customers. Every single BestBus customer "actually purchased tickets from BestBus" and was either a "regular [or] occasional traveler[]" between areas serviced by BestBus. Am. Comp. ¶ 70. There is no specificity in a class described in this way. The prospective class described in paragraph 78 is not quite as universal, but it remains very nonspecific as it covers nearly all past customers who would use BestBus again. *See id.* ¶ 78. Furthermore, tortious interference with prospective business relations requires "business expectancies not grounded in present contractual relationships." *Sabre Intern. Sec. v. Torres Advanced Enter. Sols., Inc.*, 820 F. Supp. 2d 62, 77 (D.D.C. 2011) (citing *Democratic State Comm. of the District of Columbia v. Bebchick*, 706 A.2d 569, 572 (D.C. 1998)). The prospective class is further deficient in this regard because, as Academy notes, Opp'n at 18–19, three of the four named members (Tyler D., Jennifer P., and Valerie S.) are also identified in Amended Count II as members of the class of persons with whom BestBus already had a business relationship. *See* Am. Compl. ¶¶ 70, 78. The fourth member of the prospective class, A.K., is mentioned nowhere else in the complaint, so the facts alleged regarding this customer are entirely inadequate. *See* Opp'n at 19.

BestBus argues that the kind of customer-focused tortious interference theory it pursues was validated by the D.C. Court of Appeals in *Whitt v. American Property Construction, P.C.*, 157 A.3d 196 (D.C. 2017). In that case, the owner of a hair salon was able to bring a tortious interference claim against a construction firm alleging that the firm caused the salon to lose customers and ultimately to shut down because the firm's work on a construction project on an

adjoining property made it exceedingly difficult if not impossible for salon customers to access the salon.  *See id.*  at 200.  This Court cited *Whitt* in its first opinion in this case, though only by way of identifying the elements of a tortious interference claim under D.C. law.  *DC2NY* Mot. Dismiss Op. at *7 (citing *Whitt*, 157 A.3d at 202).

The Court is unpersuaded that *Whitt* stands for the proposition that the kind of theory BestBus puts forward would suffice to state a claim for tortious interference under D.C. law. Most importantly, as BestBus acknowledges, the decision in *Whitt* did not actually address the first element of a tortious interference claim.  *See* Reply at 5 (acknowledging this).  As of early 2020, the D.C. Court of Appeals has considered *Whitt* twice, first in the cited 2017 decision and again, recently in an unpublished *per curiam* Memorandum of Judgment, *Wash. Gas Light Co. v. Whitt*, No. 18-CV-330+ (D.C. Feb. 26, 2020) (per curiam).  There is no indication that on either occasion the D.C. Court of Appeals gave any thought to how specific a business relationship or expectancy was required for the first element of the claim.  Accordingly, even though the D.C. courts are the authorities on questions of D.C. law, this Court is not inclined to give greater weight to implicit holdings from *Whitt* than it gives to clear statements by courts in this district that did consider the issue.  *Cf. District of Columbia Dep't. of Mental Health v. District of Columbia Dep't. of Employment Servs.*, 15 A.3d 692, 697 (D.C. 2011) ("[W]e will not assume that [an] issue has been considered *sub silentio* when there is no discernable evidence that it has." (internal quotation omitted, second alteration in original)).

Additionally, two other courts in this district have cited *Whitt* for the elements of a tortious interference claim under D.C. law and then proceeded to dismiss a plaintiff's tortious interference claim for failure to identify sufficiently specific prospective business relationships. *Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 124–25

(D.D.C. 2019); *Samuel v. Wells Fargo & Co.*, No. 17-cv-2539, 2018 WL 4705807, at *3 (D.D.C. Oct. 1, 2018) ("Plaintiff merely claimed that Defendants' actions left him without the time and resources to pursue other clients.").  In one of these cases, the "allegations of inference with relationships" bore some similarity to the ones BestBus has alleged, as they were based on "existing and valid business relationships" that the Plaintiff claimed to have based on "customers who had given glowing ratings and reviews about [Plaintiff] on [Defendant's] websites." *Precision Contracting Sols.*, 415 F. Supp. 3d. at 125.  In neither case, apparently, did the district court see any notable tension between any implicit holding in *Whitt* and the application of standard caselaw requiring more specific business relations than standard relationships with customers.  Nor, for that matter, did this Court recognize any inconsistencies in its earlier opinion, which likewise cited *Whitt* for the elements of the claim but did not reflect that it had lowered the pleadings required for any of these elements.  *DC2NY* Mot. Dismiss Op. at *8–9.

The Court therefore relies on the same precedents and reaches the same conclusion it reached when reviewing BestBus's first complaint.  "[T]he existence of a valid business expectancy . . . 'require[s] rather specific business opportunities,' *Jankovic*, 593 F.3d at 29, like a prospective book deal with publishing companies, *see Browning v. Clinton*, 292 F.3d 235, 242–43 (D.C. Cir. 2002), or 'three [particular] potential sources of prospective employment,' *Kimmel v. Gallaudet Univ.*, 639. F. Supp. 2d 34, 45 (D.D.C. 2009)."  *DC2NY* Mot. Dismiss Op. at *8.  A claim that focuses on lost business does not qualify.  *Id.*  It is theoretically possible that a plaintiff could plead sufficient details about particular customers to transform a claim focused on lost business into a viable claim for tortious interference, but that would require more than the partial names and minimal factual elaboration that BestBus has presented in its proposed Amended Complaint.  Because these proposed amended claims would not survive a motion to

dismiss, they are futile and may not be included in the amended complaint that BestBus ultimately files.

## D. The Contract Claims

This leaves only the contract law claims for breach of contract (Amended Count I) and for breach of the covenant of good faith and fair dealing (Amended Count IV) as potentially viable. Academy concedes that at least one aspect of these contract claims is not futile, specifically the claim that Academy failed to pay service rebates in 2016 and 2017. Opp'n at 17 (citing Am. Compl. ¶ 57). This means that both contract claims can go forward—at least to some extent.[6] The question therefore becomes whether or to what extent Academy is correct in its contention that the contract claims are otherwise futile because they would not survive a motion to dismiss. Because BestBus identified the wrong defendant in its first complaint, this review of these proposed claims is the first time the Court has measured them against the familiar legal standards for failure to state a claim. The Court must therefore evaluate, for each proposed violation of the TSA, whether the proposed amended complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

The parties agree that New Jersey law governs the contract claims. *DC2NY* Mot. Dismiss Op. at *5. The Court is therefore mindful of some of some of the tenets of contract construction under that state's laws. In New Jersey, as elsewhere, "fundamental canons of contract construction require that [courts] examine the plan language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *Highland Lakes*

---

[6] The Court addresses the claim for breach of the covenant of good faith and fair dealing in section III.D.5.

*Country Club & Cmty. Ass'n v. Franzino*, 892 A.2d 646, 656 (N.J. 2006) (quotation omitted).  If the contract is ambiguous, the ambiguous term is strictly construed against the party who drafted it.  *GMAC Mortgage, LLC v. Willoughby*, 165 A.3d 787, 794 (N.J. 2017).  But courts must also be "sensible" and should not "read into a private agreement that which is not there, and that which people dealing fairly with one another could not have intended."  *Werner Indus., Inc. v. First State Ins. Co.*, 548 A.2d 188, 192 (N.J. 1988) (quotations omitted).

### 1. New York-to-Boston Line

BestBus first alleges that Academy "violated paragraph 2 of the TSA by acquiring and operating a New York-Boston Line Run Service" operated by Go Bus.  Reply at 10 (citing Am. Compl. ¶ 24); *see also* Am. Compl. ¶¶ 45, 47 (describing Academy's acquisition of competitor Go Bus and its New York-Boston line).  Paragraph 2 of the TSA states, in relevant part, that "Academy shall serve as DC2NY's exclusive motor coach transportation provider, and Academy shall provide such services exclusively for DC2NY and shall not operate any other 'line run' motor coach business in competition with any existing or future DC2NY [line] run during the term of this Agreement."  TSA ¶ 2 (misspelling corrected).

Academy first argues that because BestBus "never actually started a New York-to-Boston route . . . there was no 'existing' or 'future' BestBus line run during the term of th[e] Agreement" that Academy's Go Bus line competed with.  Opp'n at 10–11.  Certainly there was no "existing" BestBus line, but Academy's argument overlooks the TSA's reference to any "future DC2NY line run."  TSA ¶ 2.  Under New Jersey law, "[c]ontract provisions are to be interpreted so as to give each provision meaning, rather than rendering some provisions superfluous."  *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 229 (3d Cir. 2018) (quoting *Carter v. Exxon Co. USA*, 177 F.3d 197, 206 (3d Cir. 1999) (citing, *inter alia*, *Ehnes v. Hronis*, 23 A.2d

592, 593 (N.J. 1942))). If paragraph 2 required BestBus to have a new line up and running before it barred Academy from competing with it, the word "future" would be superfluous. Any such already-operational line, even if it was not operational when the TSA was signed, would be an "existing . . . DC2NY line run during the term of th[e] Agreement" at the time Academy started competing with it. TSA ¶ 2. The language of paragraph 2 is inartfully drafted, and the reference to "future" lines raises a number of questions including how Academy could know where BestBus would operate in the future, and whether BestBus could force Academy into a breach by opening a new line alongside an existing Academy route. The Court need not evaluate at this time what the best reading of the TSA would be, but it is obligated to read the reference to "future" lines as meaning something.

The TSA was concluded in June 2013. *See* TSA at 6. Less than a year later, BestBus announced it was interested in a New York-to-Boston line, and BestBus executives were meeting with Academy representatives in Boston to discuss the endeavor. Am. Compl. ¶¶ 42–43. By the end of 2014, Academy was operating the New York-to-Boston Go Bus route. *Id.* ¶¶ 5, 45, 47. Considering the Court's obligation to draw inferences in BestBus's favor at this stage, it is enough to say that, because a "future" line should refer to something more than an "existing" line, the TSA's reference to "future" BestBus lines might plausibly be interpreted to cover at least a line like New York-to-Boston, which Academy knew BestBus was taking significant steps toward opening. The contract's meaning is uncertain enough that the Court cannot rule out the possibility that BestBus and Academy Bus mutually understood it to require Academy Bus not to open a competing New York-to-Boston line. Consequently, the proposed amended complaint states a claim for breach of paragraph 2 based on Academy Bus's alleged conduct. The amendment of this claim is therefore not futile in this regard.

Regarding this same alleged breach of paragraph 2, Academy argues that amendment would be futile because BestBus's amended complaint does not contain a plausible claim for damages flowing from the breach, as is required for a breach-of-contract claim under New Jersey law. *See Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 160 (3d Cir. 2018). Academy argues that its acquisition of Go Bus and its New York-to-Boston route "did not deter BestBus from entering that market" because BestBus did not know about the acquisition until 2017, "after the TSA was terminated."[7] Opp'n at 11. Academy also argues that because Go Bus was already operating a New York-to-Boston route, Academy did not introduce any new competition into the relevant market when it acquired Go Bus. *Id.*

BestBus will have to account for each of these arguments in order to prove its damages, but damages caused by this particular breach have been pled well enough for the motion to dismiss stage. BestBus alleges that Academy's breaches caused, among other forms of damage, "lost profits that BestBus would have earned from customers in the market for express bus services between New York and Boston, between 2015 and 2017." Am. Compl. ¶ 68. It is plausible enough, at this stage, to infer that if Academy had been living up to its obligations under TSA paragraph 2 rather than operating its own New York-to-Boston line run through Go Bus, BestBus may have managed to get its own line up and running in this time period. The proposed amended complaint makes clear that while it was trying to set up a New York-to-Boston line, BestBus was relying on Academy's assistance and advice, and that "Academy officials represented that they would help BestBus." Am. Compl. ¶ 43. Viewed in the light most

---

[7] BestBus learned about Academy Bus's acquisition of Go Bus in 2017 and the TSA was terminated on January 5, 2017. Am. Compl. ¶¶ 46, 51. It therefore is conceivable, though unlikely, that BestBus learned about the acquisition in the first few days of the year while the TSA was in operation. *See* Opp'n at 11–12. BestBus has not addressed this question.

favorable to BestBus, it is plausible to think that if Academy had not been secretly arranging for its own line on the same route, Academy might have provided more or better help to BestBus and that BestBus might have successfully operated a New York-to-Boston line. The Court cautions that, because the claim is for breach of contract and not for fraud or a similar tort, BestBus will need to prove damages stemming from the breach of paragraph 2, and not damages stemming from false statements made by Academy representatives. This may be challenging, though BestBus represents that it will present a damages expert, Reply at 11. For now, BestBus has said enough to demonstrate that this alleged breach could survive a motion to dismiss, and thus that amendment would not be futile.

### 2. Provision of Buses to Vamoose

BestBus's second alleged breach charges that Academy Bus's provision of buses to Vamoose violated both paragraph 2 and the TSA preamble. The preamble states: "DC2NY desires to utilize Academy as DC2NY's sole and exclusive transportation provider for motor transportation services between the points, places and locations described in Schedule A . . . and Academy wishes to provide [motor coach transportation] services exclusively to DC2NY." TSA at 1 & ¶ 2; *see also id.* ¶ 1 (incorporating the preamble into the agreement). Academy responds that although Vamoose ran a line from Lorton, Virginia to New York City, it did not and is not alleged to have run buses to or from any of the specific "points, places and locations" within the District of Columbia or New York City that are listed on Schedule A—or, indeed, from anywhere in the District. *See* Opp'n at 11–12 (citing Mot. Dismiss Opp'n at 18–19, ECF No. 7).

Again, the Court sees sufficient ambiguity in the TSA to allow the claim to move forward. The geographical terms—"points, places and locations"—are undefined and ambiguous and the TSA does nothing to clarify how far away a different bus line would have to

operate in order to be at a different point, place, or location. The Court would therefore be unlikely to dispose of this claim at the motion to dismiss stage based on a conclusion that, for example, Vamoose's Lorton, Virginia location is sufficiently far from BestBus's Springfield Metro location as to be a meaningfully different "location" within the meaning of the TSA. Further, any bus route from the D.C. metro area to the New York metro area is, to some extent "in competition with" all other such routes, TSA ¶ 2, so it seems reasonable to infer that paragraph 2 of the TSA could have been violated even by actions on a route operating from a different location. The proposed amendment is therefore not futile with regard to this alleged breach.

### 3. Bus Quality

Academy next argues that amendment is futile with regard to a number of alleged breaches focused on the quality of the buses it supplied to BestBus. First is the claim that Academy violated the TSA "[b]y providing superior buses to Vamoose." Am. Compl. ¶ 62. The Court has just held that BestBus has a viable claim that Academy was contractually obligated not to provide Vamoose with *any* buses on competing routes, but BestBus has not pointed to any provision of the TSA that obligated Academy to provide BestBus with buses of any particular *relative* level of quality. Paragraph 3 requires "motor coaches that fully comply with the specifications attached . . . as Schedule C," but Schedule C is entirely blank. *See* TSA ¶ 3, & 10. Paragraph 7 says that Academy's equipment must be "in compliance with all applicable [Federal Motor Carrier Safety Administration] laws and regulations," TSA ¶ 7, but this only sets a floor for quality and compliance, it does not suggest that BestBus was entitled to Academy Bus's best or newest vehicles. If supplying buses to Vamoose was a violation—and at this stage the claim has been plausibly alleged—then that alone was a breach of the TSA. BestBus has not pointed to

anything in the TSA indicating that supplying superior buses to Vamoose would be an additional breach. It would therefore be futile to allow amendment regarding whether the TSA was violated when Vamoose allegedly received superior buses.

The remaining allegations concerning vehicle quality concern the absolute—as opposed to relative—quality of the vehicles BestBus received. As described, it seems as though TSA Schedule C was intended to establish minimum levels of quality for the vehicles BestBus received, but the Schedule was apparently left blank and BestBus has not argued otherwise. The only other parts of the TSA that touch on bus quality are paragraphs 7 and 11, which incorporate applicable federal regulations. TSA ¶ 7 ("Academy . . . covenants that it is, and will remain, in compliance with all applicable FMCA laws and regulations concerning its equipment[.]"); *id.* ¶ 11(D) (also requiring "compliance with federal motor carrier rules and regulations"). The proposed amended complaint directs the Court to 49 C.F.R. § 374.313(a)–(c), Am. Compl. ¶ 63, which requires three things: (a) a temperature control system that provides for "a reasonable temperature on each bus"; (b) "a clean, regularly maintained restroom, free of offensive odor," although "[a] bus may be operated without a restroom if it makes reasonable rest stops"; and (c) a bus that is "kept clean, with all required items in good working order." 49 C.F.R. § 374.313(a)–(c).

BestBus alleges that it was provided "older buses that suffered breakdowns and were otherwise defective," and "buses that had inoperative electrical outlets, defective toilets and broken restroom doors, bathroom odors, heating and air conditioning problems, and bus breakdowns." Am. Compl. ¶¶ 62, 64. The proposed amended complaint also mentions "inadequate or non-functional WiFi." *Id.* ¶ 34; *see also id.* ¶ 36 ("defective WiFi service"). Academy first argues that it was not obligated to provide its newest buses to BestBus. Opp'n at

14.  To the extent that BestBus intended for its receipt of "older buses" to be read as a standalone argument for breach, Academy is correct and this argument would be futile—nothing in the regulation plausibly requires this.  The other alleged deficiencies could potentially fit within the regulation's requirements, including defective outlets and WiFi because these are at least arguably "required items" that must be "in good working order."  49 C.F.R. § 374.313(c).

Academy argues that all of BestBus's allegations concerning the inadequacy of buses fail to meet the required pleading standard because the proposed amended complaint lacks "specific facts or examples of the problems."  Opp'n at 15.  Academy argues that this means BestBus is levelling only "'naked assertions' devoid of 'further factual enhancement'" like routes, dates, duration of the problem, and information about how it was reported to Academy Bus.  *See* Sur-Reply at 9–10 (quoting *Iqbal*, 556 U.S. at 678).[8]  This overstates what *Iqbal* requires and understates the factual detail included in the proposed amended complaint.  BestBus's pleading regarding deficiencies in the buses it received from Academy meet the standard set out in *Twombly* and *Iqbal* because the proposed amended complaint contains more than bare legal conclusions.  These cases require that courts "assume [the] veracity" of "well-pleaded factual allegations . . . and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. Pro. 8(a)(2)).  Courts should only reject "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 678.  BestBus has alleged that "[b]etween 2014 and 2017, [it] regularly forwarded customer complaints about older buses . . . to Academy," and has provided the dates and partial contents of

_____

[8] Academy Bus also argues that the allegations are unreliably based on complaints from passengers who stood to be reimbursed if they lodged complaints.  Opp'n at 15.  This argument relies on the Court drawing an inference that the passengers likely lied, but all inferences must be drawn in BestBus's favor at this stage of litigation.  *Twombly*, 550 U.S. at 555.  The Court therefore cannot dismiss based on this theory.

some of these communications regarding the WiFi service. Am. Compl. ¶¶ 37–38. This kind of factual support "permit[s] the Court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. It also provides an example of the sort of evidence BestBus will rely on in proving its case more broadly. *See Twombly*, 550 U.S. at 545 ("Asking for plausible grounds [for relief] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [misconduct].").

In allowing BestBus to amend its claim for breach based on inadequate WiFi, outlets, restrooms, and similar deficiencies, the Court has not concluded as a matter of law that any particular deficiency would constitute a breach if it could be established. Going forward BestBus will still have to prove not only the fact of the breach but also Academy's duty under the TSA not to provide a vehicle with each and every deficiency it claims constituted a violation. Proof may be relatively straightforward for the temperature controls and restroom quality guaranteed by 49 C.F.R. § 374.313(a) and (b), but it will take more work to establish what "required items" Academy was required to furnish "in good working condition" under subsection (c). Facts concerning the circumstances of the contract and the parties' mutual understanding of its requirements will play a role in determining what the TSA required, so it would be premature to attempt a determination at this stage of which particular deficiencies were violations of that agreement. Drawing all inferences in BestBus's favor, though, the Court is persuaded that "industry standards for interstate bus service" may have required, for example, WiFi and functioning outlets. *See* Reply at 14. Subsection (c) might best be interpreted in line with such standards. *See id.* At the very least, the Court is willing to let BestBus advance this argument more fully. Because it is plausible that at least some of the alleged deficiencies can be shown to

violate the TSA, the amendment of the complaint with regard to this alleged breach would not be futile.

### 4. Driver Professionalism

The final alleged breach that Academy challenges is BestBus's contention that "[b]y assigning drivers to BestBus routes who were incompetent, rude, and unprofessional, and who engaged in texting while driving, Academy violated federal regulations and Paragraphs 7 and 8 of the TSA." Am. Compl. ¶ 65. Paragraph 7 says that "Academy . . . covenants to provide professional, experienced and qualified licensed drivers consistent with federal motor carrier regulations under this Agreement." TSA ¶ 7. The proposed amended complaint points to 49 C.F.R. § 392.80, which prohibits drivers from texting while driving. Am. Compl. ¶ 63. Paragraph 8 establishes a hierarchy for reporting and discipline. TSA ¶ 8. It reads:

> 8. Academy believes that it has a sound understanding of the level of professionalism, decorum, courtesy and respect its drivers should adhere to when dealing with members of the public, and Academy shall direct its driver employees to adhere to that level of professionalism, courtesy and respect in dealings with the public. If DC2NY receives complaints concerning the performance of any driver, the same shall be communicated to Academy for review and further action. Academy, in its sole judgment and discretion, shall determine whether any of its driver employees assigned to DC2NY should be removed, re-assigned, or disciplined. If the action taken by Academy does not ameliorate the concerns raised with respect to a driver[, the] Parties shall confer to determine what if any additional action may be warranted and taken.

*Id.* Academy makes a number of arguments, including that a violation cannot be established because a driver falling short of desired standards did not constitute a violation, and that the proposed amended complaint never alleges that Academy failed to take action against any particular driver. Opp'n at 15–16. In short, Academy argues that "[t]he claim is too vague, and too contrary to TSA [paragraph] 8, to be actionable." Sur-Reply at 16.

On this alleged breach, Academy has the better of the argument because BestBus fails to explain how exactly the facts it lays out amount to a violation of the TSA. The proposed

amended complaint lists a variety of incidents but does not explain—as it does for the deficient buses issue—how these incidents were communicated to BestBus or how BestBus communicated them to Academy, if at all.  *Compare* Am. Compl. ¶ 36 ("BestBus regularly forwarded customer complaints about older buses . . . to Academy."), *with id.* ¶ 39 (listing incidents with no discussion of reporting).  BestBus alleges that it "complained to Academy about the incompetence and unprofessional behavior of drivers," *id.* ¶ 40, but Academy is correct that the TSA gave it "sole judgment and discretion" to determine appropriate disciplinary actions, TSA ¶ 8, and nothing in the TSA sets a minimum standard for driver quality.  Through the TSA, Academy only promised to "direct its driver employees to adhere to [a certain] level of professionalism, courtesy and respect."  TSA ¶ 8.  The proposed amended complaint describes how Academy was frustratingly unresponsive to a series of complaints about drivers and claims that Academy representatives lied about their intended responses.  *See* Am. Compl. ¶ 40.  But it fails to explain what provision of the TSA this is supposed to have violated.

Additionally, even if BestBus had established that it could prove with sufficient detail the content and volume of violations it reported to Academy, and that Academy's responses were unsatisfactory, this would still not necessarily amount to a violation of the TSA.  The TSA explicitly contemplates that "the action taken by Academy" might "not ameliorate the concerns raised with respect to a driver."  TSA ¶ 8.  To have violated the TSA's driver-discipline requirements, then, Academy would need to have done something more than fail to ameliorate BestBus's concerns.  It is not obvious from the face of the agreement what that would be, and BestBus has not explained sufficiently in its pleadings for this group of alleged breaches to survive a motion to dismiss.  Amendment of the complaint is therefore futile in this regard.

The allegation that drivers were texting while driving comes closer to stating a violation of the TSA because this texting violates the regulations that Academy agreed to comply with in paragraph 7. Texting drivers could amount to a violation of paragraph 7 regardless of the reporting and disciplinary procedures laid out in paragraph 8. The problem with the texting allegations is that the proposed amended complaint provides no detail about when or how these violations occurred. *See id.* ¶ 39. BestBus says only that "[o]n multiple occasions [between 2013 and 2017], customers complained that drivers were texting on their cell phones while they were driving." *Id.* This is too conclusory. The pleading requirements in Rule 8 are meant to ensure that pleadings will give defendants "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Among other things, Rule 8 is intended "to permit the adverse party the opportunity to file a responsive answer, [and] prepare an adequate defense." *Economic Research Servs., Inc. v. Resolution Economics, LLC*, 208 F. Supp. 3d 219, 226 (D.D.C. 2016) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

The allegation that Academy drivers texted while driving "on multiple occasions" over the course of four years is too vague to put Academy on sufficient notice. There is no allegation that Academy itself failed to train drivers properly or to notify them about the regulation against texting, just a conclusory statement that on multiple occasions violations occurred. BestBus has given no indication of how it would prove this claim, and Academy could not know where to begin investigating whether it is true. The allegation therefore does not fulfill "a plaintiff's obligation to provide the grounds of his entitlement to relief" with "more than labels and conclusions." *Twombly*, 550 U.S. at 555 (quotations omitted); *see also Heard v. Dep't of State*, No. 08-cv-2123, 2009 WL 10694340, at *3 (D.D.C. Sept. 29, 2009) ("[A]bsent any indication of

'where, when, and how' the defendants allegedly violated the statutory provisions cited . . .

[they] are without the 'fair notice' they are entitled to receive."). The proposed amendment is

therefore futile in this regard also.

### 5. Implied Covenant of Good Faith and Fair Dealing

Amended Count IV alleges a breach of the duty of good faith and fair dealing. Am.

Compl. ¶¶ 85–88; *see also Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997)

("[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing.").

This duty, or covenant, requires "that 'neither party shall do anything which will have the effect

of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Sons*

*of Thunder*, 690 A.2d at 587 (quoting *Palisades Properties, Inc. v. Brunetti*, 207 A.2 522, 531

(N.J. 1965)). This Count challenges all of the conduct by Academy that has been previously

discussed. After incorporating the preceding allegations by reference, BestBus asserts that

"Academy's deceptive, intentional, and continuous actions and omissions . . . deprived BestBus

of its reasonable expectations under the TSA, and its rights to receive the fruits of the TSA."

Am. Compl. ¶¶ 85, 87. Three times in its opposition, Academy Bus cites New Jersey precedents

stating that the duty of good faith and fair dealing cannot be cited by a party seeking to expand

its rights under a contract beyond those which it was able to negotiate for. *See*, *e.g.*, Opp'n at 12

(citing *Glenfed Fin. Corp. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994),

*cert denied*, 139 N.J. 442 (N.J. 1995)); *see also* Opp'n at 13 n.11, 16–17. BestBus makes no

mention of the duty of good faith and fair dealing in its Reply, *see* Reply, and arguments in

dispositive motions that go unaddressed by the nonmoving party are generally treated as

conceded, *see Davis v. Transp. Sec. Admin.*, 264 F. Supp. 3d 6, 10 (D.D.C. 2017).[9]  In this instance, however, the Court cannot treat Amended Count IV as conceded, for two reasons.  First, although Academy repeats its claim about the scope of the implied covenant three times, it never elaborates with any clarity what it is asking the Court to make of this—to disallow Amended Count IV entirely or just to limit it to the terms of the contract.  Second, and more importantly, the relevant New Jersey law allows for more than what Academy suggests.

Academy Bus is correct that "the duty of good faith and fair dealing 'does not alter the terms of a written agreement.'"  *Arias v. Elite Mortg. Group, Inc.*, 108 A.3d 21, 25–26 (N.J. Super. Ct. App. Div. 2015) (citing *Glenfed Fin. Corp.*, 647 A.2d at 858).  However, Academy overlooks other caselaw clarifying that "[a]lthough the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term."  *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259–60 (N.J. 2002) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001)).  "Unlike in many other states, in New Jersey a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate."  *Wilson*, 733 A.2d at 1126 (citation and quotation omitted).  As a result, under New Jersey law "the discretion afforded to [a party under a contract] is not unbridled discretion" and "performance under the contract is tempered by the implied covenant of good faith and fair

---

[9] The frequently quoted rule in this Circuit is "that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Davis*, 264 F. Supp. 3d at 10; *Hopkins v. Women's Div. Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003).  In the case of motion for leave to amend, the defendant's opposition on grounds of futility of amendment functions as a motion to dismiss, so the same rule could be applied here.

dealing and the reasonable expectations of the parties." *Id.* at 1130. Acting within the terms of an agreement, but with improper motives, may constitute a violation. *See id.* ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.").

Because Academy did not clearly argue that Amended Count IV should be disallowed in its entirety, and because the law of New Jersey would not support such a holding in any event, the Court will not treat the count as conceded. Other than its flawed legal argument, Academy does not make any argument that Amended Count IV could not survive a motion to dismiss, and "pleading in the alternative is permissible in New Jersey, so long as the alternative claims meet the pleading standards." *In re AZEK Bldg. Prods., Inc., Mktg. & Sales Practices Litig.*, 82 F. Supp. 3d 608, 620 (D.N.J. 2015); *see Talon Indus., LLC v. Rolled Metal Prods., Inc.*, No. 15-cv-4103, 2016 WL 11325768, at *2 (D.N.J. Apr. 12, 2016) ("Courts in this district have permitted claims [under New Jersey law] for both breach of contract and breach of the implied covenant of good faith and fair dealing to proceed."). Amended Count IV challenges a range of conduct broader than what Amended Count II challenges. Some the alleged breaches in Amended Count II have been found to be incapable of surviving a motion to dismiss, because they challenged conduct that does not violate the TSA. This TSA-compliant conduct could still be the basis for a breach of the covenant of good faith and fair dealing, if BestBus can demonstrate that Academy exercised its rights under the contract with improper motive to harm BestBus. *See Wilson*, 773 A.2d at 1132 (permitting discovery into motive surrounding alleged breaches of a covenant of good faith and fair dealing). As a result, Amended Count IV, the claim for the breach of the duty of good faith and fair dealing therefore remains viable in its entirety.

## IV. CONCLUSION

For the foregoing reasons, BestBus's Motion for Leave to File an Amended Complaint (ECF No. 11) is **GRANTED IN PART AND DENIED IN PART**.  Academy Bus's Motion for Leave to File a Sur-Reply in Further Opposition (ECF No. 14) is **GRANTED** and the Sur-Reply (ECF No. 14 at 5–16) is deemed filed.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 31, 2020                                       RUDOLPH CONTRERAS
                                                                         United States District Judge