# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ASAF OHANA | : | | |
| RICHARD GREEN, | : | | |
| | : | | |
| *Plaintiffs*, | : | Civil Action No.: | 18-2127 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 46, 47, 48, 50, 53 |
| | : | | 54 |
| ACADEMY EXPRESS, LLC, | : | | |
| | : | | |
| *Defendant*. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY; HOLDING IN ABEYANCE MOTIONS TO FILE UNDER SEAL

## I. INTRODUCTION

In 2013, Plaintiffs Asaf Ohana and Richard Green, on behalf of their company BestBus, signed a Transportation Services Agreement ("TSA") with Defendant Academy Express. Academy had a fleet of buses and drivers that it used for charter services, and BestBus had a growing brand operating intercity "line runs" between the DC and NYC regions in need of equipment and drivers. At first, Plaintiffs had high hopes for expanding their business through this partnership, but it was not long before the relationship began to break down. Over the coming years, a series of disagreements over quality of service and exclusivity lead Green and Ohana to lose all faith in Academy and eventually terminate the agreement, effective January 5, 2017. This lawsuit followed in September 2018. After multiple rounds of amendments and extensive discovery, Defendant has moved for summary judgment on all claims. For the reasons explained below, the Court will grant that motion in part and deny it in part.

## II.  FACTUAL BACKGROUND

Previously known as "DC2NY, Inc.," BestBus[1] is a D.C. corporation that provided express bus services between D.C. and New York City and other points in the mid-Atlantic region.  Def.'s Statement Material, Undisputed Facts Supp. Mot. Summ. J. ("SMF") ¶¶ 1, 14, ECF No. 46-3.  Plaintiff Asaf Ohana founded BestBus in 2007 and served as its President at all relevant times.  *Id.* ¶ 2.  Plaintiff Richard Green was the primary investor of BestBus in 2007 and later became the Chief Executive Officer.  *Id.* ¶ 4.  BestBus did not own its own buses, however, and for the first few years of its existence it obtained buses and drivers from multiple operators, one of which was New World Tours.  *Id.* ¶ 15.  In mid-2011, New World Tours was acquired by the Defendant Academy Express, LLC.  *Id.* ¶ 16.

Academy expressed interest in acquiring BestBus around that time, and the two companies were engaged in negotiations until some point in 2013.  *Id.* ¶ 16; *see also* 3d. Am. Compl. ("Compl.") ¶ 1, ECF No. 38; Answer 3d Am. Compl. ¶ 1, ECF No. 40.  Academy provided buses to BestBus during that period pursuant to an oral agreement to continue the agreement BestBus had with New World, which BestBus contends included "amenities like outlets, air conditioning, reclining seats, and Wi-Fi."  Pls.' Resp. Def.'s Statement Material Undisputed Facts ("SMF Resp.") ¶ 114, ECF No. 48-2.  When the parties did not reach an agreement on acquisition, they instead signed the TSA in June 2013.  SMF ¶ 1; *see also* Ex. 1 of Def.'s Mot. Summ. J. ("TSA"), ECF No. 46-5.

---

[1] Ohana and Green have been substituted for DC2NY, d/b/a "Best Bus" as the real parties in interest.  *See* Min. Order of April 23, 2021.

### A. Exclusivity, Competition, and Academy's Acquisition of Go Bus

The TSA included various exclusivity provisions whose meanings are now sharply disputed. The TSA stated that BestBus "desire[d] to utilize Academy as [its] sole and exclusive transportation provider for motor transportation services between the points, places and locations described in Schedule A" and that "Academy wishe[d] to provide such services exclusively to" BestBus. TSA at 1. During negotiations, the Preamble of the TSA was modified "to allow for the addition of new routes through amendments to the TSA's route list in TSA Schedule A" because of the concern that the TSA not "be limited to BestBus's existing routes because BestBus was 'going to grow.'" SMF ¶ 32. The TSA further provided that "Academy . . . shall not operate any other 'line run' motor coach business in competition with any existing or future [BestBus] li[n]e run during the term of th[e] Agreement." TSA at 1, ¶ 2.

BestBus had an interest in expanding its service to include a New York City to Boston route as early as 2011. SMF ¶ 57. It communicated that interest to Academy, which initially offered its support and collaboration by identifying potential stops. *Id.* ¶ 59. BestBus invested significant money in rebranding from "DC2NY" to "BestBus" in anticipation of expanding its routes, although the parties disagree on whether the anticipated Boston route was actually BestBus's primary motivation for the rebranding. *Compare* SMF Resp. ¶ 58 *with* Def.'s Reply to Pls.' Resp. to Statement Material, Undisputed Facts ("SMF Reply") ¶ 58, ECF No. 50-2. That rebranding was complete by May 2014. *Id.* ¶ 58 n.7. BestBus contacted Academy repeatedly over the next few months "identifying stop locations in Boston that they considered desirable, asking for Academy's input and help in securing a location," and BestBus claims that all that was left was for Academy to apply for a stop—an application that needed to be made by the motor carrier in Boston. SMF Resp. ¶¶ 58, 60. Academy insists that it did provide the requested

support, but that BestBus never selected a final location for its Boston stop or authorized Academy to submit an application on its behalf.  SMF Reply ¶ 60.

Around that time, though, Academy entered negotiations to acquire certain operations of Go Bus, including a New York City to Boston line run.  *Id.* ¶ 63.  That acquisition was finalized in July 2014, after which Academy began operating the New York to Boston line runs previously operated by GoBus.  *Id.* ¶¶ 64–65.  Academy notified BestBus that it had acquired GoBus in August 2014, but Plaintiffs dispute whether they immediately understood that Academy would be operating GoBus's Boston–NYC line run.  *Id.* ¶ 68; Pls.' SMF Resp. ¶ 68.  Later emails raised the possibility of BestBus collaborating with Academy on the New York–Boston Go Bus route, but BestBus maintains that Academy's intentions were always vague and that suggested that collaboration was possible.  SMF ¶ 69; SMF Resp. ¶ 69.  BestBus appears to have abandoned its plans to expand into Boston at that point, which Ohana attributes to his disillusionment with (and growing distrust of) Academy.  SMF Resp. ¶¶ 72–73.

As a result of the acquisition of Go Bus, Academy also began to provide buses to Vamoose for that company's DC–New York City route.  SMF ¶ 141.  The Vamoose and BestBus stops in New York City were only three blocks apart, and the stops in DC were four miles apart.  SMF Resp. ¶ 140.  Plaintiffs complained to Academy about this, but Academy initially maintained that it was only providing "charter" services, as opposed to "line run" services, to Vamoose.  SMF ¶ 145; SMF Resp. ¶ 145.  The parties dispute whether Vamoose was a "competitor" within the meaning of the TSA or whether Academy's provision of services to Vamoose caused BestBus any quantifiable damages.  *Compare* SMF ¶ ¶147, 156, 160 *with* SMF Resp. ¶¶ 147, 156, 160.

### B.  Service Quality Problems

The TSA also required Academy "to provide professional, experienced and qualified licensed drivers consistent with federal motor carrier regulations" and to "direct its driver employees to adhere to [a] level of professionalism, courtesy and respect in dealings with the public."  TSA at 2, ¶¶ 7–8.  In addition, the TSA referenced a Schedule C with specific motor coach requirements, but Schedule C on the signed agreement was blank.  SMF ¶ 52.  The parties have not been able to locate a Schedule C and do not recall whether there had ever been one.  *Id.*; SMF Resp. ¶ 52.

As a result, the agreed-upon level of service in terms of bus and driver quality is a major point of disagreement between the parties.  BestBus believed that it was paying a premium price to receive Academy's newest buses and highest level of service—and that Academy understood the same based on the parties' prior relationship.  *See* SMF ¶ 88; SMF Resp. ¶ 53 (quoting a 2011 email from Academy stating that "DC2NY service bills itself as a high end alternative . . . and we need to make sure that drivers and equipment meet the standard.").  Academy regularly gave BestBus deductions for buses that failed to meet BestBus's standards, although the parties dispute whether those deductions were granted out of obligation or a desire to maintain a positive working relationship.  *Compare* SMF Resp. ¶ 54 *with* SMF Reply ¶ 54.

Plaintiffs maintain that Academy did not perform adequate cleaning and maintenance of its buses, that safety concerns were frequently not addressed, and that on one occasion Academy's failure to adequately maintain its buses resulted in a fire on the highway while carrying passengers.  SMF Resp. ¶¶ 90; 92.  BestBus also contends that despite raising issues with the quality of WiFi from the beginning of the parties' relationship, the WiFi issues were not resolved until 2016, and even then primarily as a result of the efforts of BestBus's General Manager, Avi Cohen.  *Id.* ¶ 96; SMF Reply ¶ 96.  Academy disagrees, claiming that it made a

good faith effort "to improve the service with modem and router updates, but the service was still unsatisfactory to BestBus." SMF ¶ 122. Most service issues were brought to the attention of Academy's General Manager David Bolen, who previously owned New World Tours. *Id.* ¶ 9.

Another sticking point is the level of driver quality with respect to professionalism and customer service. The Court previously dismissed BestBus's separate claims for breach of TSA Paragraphs 7 and 8 based on driver professionalism, but BestBus now argues that Academy's drivers failed to meet the industry standards and federal regulations referenced in Paragraph 11(D) of the TSA. Pls.' Mem. P. & A. Opp'n Mot. Summ. J. ("Pls.' Opp'n") at 23, ECF No. 48-1. Plaintiffs argue that Academy did not implement agreed-upon trainings and that the only training provided to Academy drivers came from BestBus itself. SMF Resp. ¶¶ 105; 108; *see also* SMF ¶¶ 182–83 (providing examples of Academy's attempts to remedy driver problems); SMF Resp. ¶¶ 182–83 (disputing whether those remedial actions were taken or effective). BestBus attributes the "[v]oluminous customer complaints" of "a wide range of driver malfeasance" that have been included in the record to this lack of training. *Id.* ¶ 108.

Finally, BestBus points to the concrete example of Academy's failure to comply with timekeeping requirements for drivers under federal regulations as a separate breach of the TSA. Federal regulations "require drivers to maintain logs and records documenting drivers' hours of service" and provide relief drivers if a driver exceeded the maximum number of hours. SMF ¶ 168 (citing 49 C.F.R. § 395.8(a)1)). Plaintiffs contend that Academy tolerated routine violations of the services hours requirement and attempted to evade its obligations by falsifying paper logs and relying on loopholes. SMF Resp. ¶ 170. BestBus points to Academy's FMCSA reports from that period, which cited Academy for failing to keep drivers' logs current during every month that the TSA was in effect. SMF ¶ 173; SMF Resp. ¶ 173. Although that citation does

not itself mean a service-hours violation occurred, electronic log sheets that were first created in late 2016 detail at least a handful of concrete examples, though Academy points out that some of these violations were clerical or a matter of mere minutes.  SMF ¶ 173; SMF Reply ¶ 173.

### C.  Rebates and the Termination of the TSA

Eventually, BestBus terminated the TSA, consistent with the Agreement's ninety-day notice provision, with the effective end date of the agreement being January 5, 2017.  SMF ¶ 188.  The letter providing notice referenced increased costs and profitability as the main reason.  Ex. 64 of Def.'s Mot., ECF No. 46-7.  In the final days before the TSA had formally expired, Academy placed flyers advertising Go Bus's DC–NYC route on the seats of a bus assigned to BestBus.  *Id.* ¶ 185.  Around that time, an Academy employee wrote that he believed Academy's Chief Executive Officer and Managing Partner, Francis Tedesco, "has a little bit of personal interest in crushing BB."  *Id.* ¶ 186; *see* SMF ¶ 10 (identifying Tedesco's position).

The TSA included a provision that Academy would pay BestBus an annual "service rebate based on a percentage amount of the fees paid to Academy annually" under the TSA.  TSA at 2, ¶ 6.  The rebate for each calendar year was due 60 days after the close of the calendar year.  *Id.* at 7–8, Sched. A2.  Academy did not pay the rebates for 2016 or 2017, claiming that because the rebate provision did not survive the termination of the TSA and its obligation to pay fell after the termination of the TSA, it no longer had any obligation to do so.  SMF ¶ 196.

After the TSA was terminated, BestBus continued to operate its routes using a patchwork of different providers.  *Id.* ¶ 197.  BestBus experienced numerous service issues, including two bus fires, in that period.  *Id.* ¶¶ 197–99.  Eventually, Plaintiffs sold BestBus to another company, DC Trails, in April 2018.  *Id.* ¶ 201.

### D.  Procedural History

This lawsuit was filed on September 13, 2018.  *See* Compl., ECF No. 1.  The Court

granted Academy Bus, LLC's first motion to dismiss because, among other reasons, BestBus had

named the wrong defendant.  *DC2NY, Inc. v. Acad. Bus, LLC ("Academy I")*, No. CV 18-2127,

2019 WL 3779571, at *1 (D.D.C. Aug. 12, 2019).  BestBus received leave to amend in part

pursuant to two different opinions of this Court.  *See DC2NY, Inc. v. Acad. Bus, LLC ("Academy

II")*, No. 18-cv-2127, 2020 WL 1536219, at *17 (D.D.C. Mar. 31, 2020); *DC2NY, Inc. v. Acad.*

*Express, LLC ("Academy III")*, 485 F. Supp. 3d 113, 115 (D.D.C. 2020).

Following those opinions and a third consent motion to amend, the Third Amended

Complaint now asserts claims for breach of contract and breach of the duty of good faith and fair

dealing.  *See* 3d. Am. Compl. at 16–18.  Count I, for breach of contract, consists of the following

sub-parts that BestBus alleges were a breach of the TSA: 1) Provision of buses to Vamoose; 2)

Failure to comply, as required by the TSA, with the Federal Motor Carrier Safety Act

("FMCSA") regulation at 49 C.F.R. § 374.313(a)-(c) to maintain buses that were "kept clean,

with all required items in good working order;" 3) Failure to comply, as required by the TSA,

with the FMCSA regulations for maximum hours of driver service, and in turn of the TSA; 4)

Violation of the exclusivity provision of the TSA by acquiring and operating the NYC–Boston

Go Bus line run; and 5) failure to pay outstanding rebates.  *Id.* ¶¶ 63–68.  Academy has moved

for summary judgment, Def.'s Mem. P. & A. Supp. Mot. Summ J. ("Def.'s Mot."), ECF No. 47-

1, and Green and Ohana have opposed, Pls.' Opp'n.  Academy has also filed a Reply, Def.'s

Reply Mem. Supp. Mot. Summ. J. ("Reply"), ECF No. 50-1 and Green and Ohana have sought

leave to file a proposed surreply, Pls.' Surreply Supp. Opp'n Summ. J. ("Proposed Surreply"),

ECF No. 53-2.

### III.  LEGAL STANDARD

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard serves to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  If the moving party meets this burden, then the non-movant must point to specific facts in the record that reveal a genuine issue of material fact that is suitable for trial.  *Celotex*, 477 U.S. at 324.  A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The nonmovant must provide evidence that would permit a reasonable jury to find in their favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

When evaluating whether a genuine dispute of fact exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). However, a conclusory assertion offered without any evidentiary support does not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  And because the nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable or

not significantly probative" evidence will not preclude summary judgment.  *Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) (quoting *Anderson*, 477 U.S. at 249–50).

## IV.  ANALYSIS

### A.  Statute of Limitations

The Court begins with Academy's affirmative defense that at least some of the claims are barred by the statute of limitations if they accrued before September 13, 2015.  Under D.C. law, "[a]n action for breach of contract generally accrues at the time of the breach."  *Wright v. Howard Univ.*, 60 A.3d 749, 751 (D.C. 2013).  The same is true for a breach of the implied duty of good faith.  *See Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 321 (D.C. 2008) ("[T]he claim at issue here accrued, and the statute of limitations began to run, when the implied duty of good faith and fair dealing was breached.").  The parties agree that the District of Columbia's three-year limitations period applies to this case and that at least some of the alleged breaches occurred prior to September 13, 2015, but dispute whether the claims were nonetheless tolled by the lulling doctrine.  *See* MSJ 46 (citing D.C. Code § 12-301(7)); Pls.' Opp'n at 47.

The lulling doctrine prevents a defendant from asserting the statute of limitations "if it appears the defendant has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run."  *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (quoting *Hornblower v. George Washington University*, 31 App. D.C. 64 (1908) (alterations removed)).  Lulling "requires some affirmative action on the defendant's part," and "'mere silence, failure to disclose, or ignorance of facts establishing a claim' generally do not rise to the level of affirmative misconduct."  *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 157 (D.C. 1998); *see also Kamerow v. D.C. Rental Hous. Comm'n*, 891 A.2d 253, 258 (D.C. 2006) ("The 'lulling' or 'unique circumstances' doctrine was designed to create a

very narrow equitable exception to rigorous filing requirements." (quoting *Chase v. District of Columbia Alcoholic Beverage Control Bd.*, 669 A.2d 1264, 1269 (D.C. 1995))).

Although the "[e]xpiration of the statute of limitations is a question of law," whether lulling occurred will often involve disputed issues of material fact that preclude summary judgment. *Bailey*, 516 A.2d at 940. The Court must therefore examine, for each alleged breach, whether there is evidence in the record from which a jury could find that Academy took any affirmative steps that lulled Plaintiffs into inaction. The Court concludes that Plaintiffs' claims related to the 2014 acquisition of Go Bus (specifically, Academy's operation of the Boston–NYC Go Bus line run and the provision of buses for Vamoose's NYC–DC line in that same year) are partially barred by the statute of limitations, but that a reasonable jury could find evidence of lulling with respect to the alleged breaches of service quality prior to 2015.

1. Claims Related to the Acquisition of Go Bus

It is undisputed that Academy acquired certain operations of Go Bus in July 2014, and that Green and Ohana were notified of the acquisition within a few weeks. SMF ¶¶ 64, 68. Plaintiffs claim that despite being informed of the acquisition, they did not immediately understand that Academy would be operating the Go Bus line run between New York City and Boston and providing buses for the Vamoose line run between New York City and D.C. *See* Dep. Richard Green ("Green Dep.") at 146:4–19, Ex. 4 Def.'s Mot., ECF No. 46-6 ("Q: What does 'we take over the Go Bus operation on Monday, August 11' mean to you? A: That doesn't mean that they were necessarily going to operate a line, keep going on the line run . . . . they were buying a bus company . . . . I wasn't quite sure what service he was talking about . . . . I assumed that it was charter."). BestBus expressed concern about the Vamoose line run even before learning about the acquisition, however, writing to Academy's management in July 2014

that "it has come to our attention that you have had a recent meeting with one of our major competitors, Vamoose Bus" and expressing concern about "the ramifications of customer confusion and brand blurring if Academy were to take action and work with Vamoose in addition to BestBus."  Ex. 15 of Pls.' Opp'n.  But even assuming that Academy's initial communications were evasive, they were not affirmatively misleading.  "'[M]ere silence, failure to disclose, or ignorance of facts establishing a claim' generally do not rise to the level of affirmative misconduct."  *East*, 718 A.2d at 157.

And in any event, the details of Academy's operation of the Go Bus and Vamoose line runs became readily apparent within the coming months.  Plaintiffs knew by October 2014 that Academy was operating the New York City–Boston line run and proposed working jointly on the line run at that time.  Green Dep. 148:17–19 ("[A]t the latest, you knew about this in October of 2014, right?  A: Correct.").  Another email from November 2014 again expressed serious dissatisfaction with Academy's lack of communication, "[b]randing confusion," and a "[p]otential breach [of] our Transportation Services Agreement."  Ex. 16 of Pls.' Opp'n.  Other emails referenced and complained about Academy's provision of buses to Vamoose at multiple points in 2015.  *See* SMF ¶ 145; Ex. 22 of Pls.' Opp'n(stating in an August 2015 email from Green that "now that you have other line run customers and even your own, it appears to me that we are no longer getting the equipment we are paying for").

Academy initially characterized its provision of buses to Vamoose as a "charter" rather than a line run.  In an August 2014 email around the time of the acquisition, Scullin wrote that "part of our acquisition of GO is their charter business. Vamoose is currently a customer of GO and in accordance with our acquisition we will be providing charter services to GO."  Ex. 29 of Def.'s Mot., ECF No. 46-6; *see also* Dep. Asaf Ohana at 93:21–94:7, Ex. 3 Def.'s Mot. Summ. J.

("Ohana Dep."), ECF No. 46-5 ("When I went to [Tedesco] and I say, why do you provide buses to Vamoose?  . . . He said, we had a contract. That's a direct lie . . . . even if there was, you cannot justify wrong by doing another thing that is wrong.").  Nonetheless, it was also clear in the exact same email Scullin was responding to that BestBus understood Vamoose to be a line run and unambiguously "oppose[d Academy] providing buses to a line run that is in direct competition with us," however Academy had chosen to label it.  Ex. 29 of Def.'s Mot.  Despite any semantic disagreement about how to label Academy's services to Vamoose, BestBus was aware of the nature of those services and that Academy intended to continue providing them.

The purported lulling that Plaintiffs point to is Academy's promises that its provisions of buses to Vamoose would not harm BestBus and that BestBus might eventually be able to participate in the Boston Go Bus route.  Pls.' Opp'n at 48–49.  As Green put it, Academy management was "great at consoling and promising us that any of their business acquisitions weren't going to affect our level of service, our level of buses, that kind of thing."  Green Dep. at 169:4–8; Ohana Dep. at 98:18–22 ("[We] thought it was a potential for a breach of contract . . . [b]ut when they assured us that everything is fine, it's not going to affect you, we're just helping Vamoose, we thought, okay.").

Even though Academy's actions "left a bad feeling" with Plaintiffs, they did not perceive the situation to be serious enough to warrant legal action until Thanksgiving weekend of 2015.  *See* Green Dep. at 171:1–21("[I]t left a bad feeling, but obviously, not a feeling bad enough to pull the trigger on them right then . . . . Because there wasn't yet examples of stress on providing multiple buses until, as I recall, Thanksgiving weekend of 2015. . . ."); Ohana Dep. at 40: 13–20 ("November 2015, that's when we realized they're breaching the contract.  That's when we realized we need to sue them because they're causing us a lot of losses.").  In Ohana's words:

13

> [T]hey kept promising us it's going to be good.  The Vamoose stuff is not going to
> hurt you.  With GoBus we said, what are you doing?  Can we do the Boston?
> [Tedesco] told us, let's see how it goes and then we sit together and talk.  So -- so
> all along they promised us promises that led us to believe that it's going to be okay.
> That's why we stayed with them. We stayed with them all along because, okay, it's
> going to be good, they're a big company, they're taking time to figure things out.
> But November of 2015 it was like, you know what? They're doing it on purpose.

Ohana Dep. at 39:18–40:9.

The problem for Plaintiffs is that Academy's consolations do not rise to the standard of

affirmative misconduct needed under the lulling doctrine.  *See* Green Dep. 306:2–8 (describing

the "most egregious" instance of being misled as "when we were asking about the Go Bus line

run from Boston and [Tedesco] said something to the effect of let's just let it go for awhile, and

we'll see what happens.").  Under D.C. law, an affirmative misrepresentation involves both "an

acknowledgement of indebtedness and (virtually) a promise to pay."  *Bailey*, 516 A.2d at 938;

*see also id.* at 938–39 ("The general rule is that an insurance company is not deemed to have

waived a contractual limitations period . . . unless the company has conceded liability and some

discussion of a settlement offer has occurred.").

Here, Academy never acknowledged a breach of the TSA or even any wrongdoing, nor

did it promise to take any corrective action such as ending its involvement with Go Bus or

Vamoose.  Perhaps Academy was not entirely transparent, but a promise to "see what happens"

does not acknowledge wrongdoing or promise any concrete action to right any missteps.  *See*

*Grass v. Eiker*, 135 A.2d 153, 154 (D.C. 1957) ("At most [the evidence] represents a bare verbal

promise to pay the debt at a vague future time with an implied request for forbearance . . . .

Appellee never agreed to waive the statute nor did he ask appellant to refrain from bringing

suit.").  Likewise, Academy's vague reassurance that the provision of buses to Vamoose would

not harm BestBus did not acknowledge any wrongdoing or discuss any potential resolutions.  To

the contrary, Academy made clear from the beginning that it intended to provide buses to

Vamoose despite BestBus's specific objections.  As such, neither rises to the level of affirmative "lulling."

Even if "it was not until Thanksgiving 2015 that Mr. Ohana and Mr. Green realized that Academy's arrangement with Vamoose was seriously impacting BestBus," Pls.' Opp'n at 48, a lack of awareness about the seriousness of potential damages from a breach does not toll the statute of limitations.  "[I]t is settled in [the District of Columbia] that the absence of 'substantial or consequential damages' does not prevent the limitations period from beginning to run on a claim for breach of contract" because "a plaintiff who can establish a breach of contract is entitled to an award of nominal damages."  *Wright*, 60 A.3d at 753.  In the absence of any evidence from which a jury could find that Academy lulled BestBus into inaction regarding the violation of its rights due to the Go Bus and Vamoose line runs, the statute of limitations bars Plaintiffs' claims relating to the acquisition of Go Bus and the provision of buses to Vamoose to the extent they occurred prior to the limitations period.[2]

Nonetheless, Academy's actions with respect to Go Bus and Vamoose continued into the applicable limitations period as well.  Plaintiffs do not clearly argue that those ongoing actions were separate breaches of the TSA or that they should be able to recover for the portions of the alleged ongoing violation that occurred within the limitations period.  *Cf. Beard v. Edmondson & Gallagher*, 790 A.2d 541, 548 (D.C. 2002) ("When the plaintiff is or should be aware that he or she is being injured by a continuing tort, the statute of limitations begins to run.  The plaintiff then may recover only for injuries attributable to the part of the continuing tort that was committed within the limitations period immediately preceding the date on which suit is

---

[2] The Court need not reach Academy's alternative argument that even if equitable tolling is proper, Green and Ohana did not bring this action within a "reasonable" amount of time thereafter.  *See* Def.'s Mot. at 48.

brought."); *Doolin v. Env't Power Ltd.*, 360 A.2d 493, 498 (D.C. 1976) ("[T]he three-year statute

of limitations . . . would only bar those quarterly royalty payments that were due and not paid

more than three years before [plaintiffs] brought suit.").  Academy appears to concede that this

would be the case, however.  *See* Def.'s Mot. at 47 & n.37 ("[C]laims based on alleged breaches

after [September 13, 2015] could be pursued."); Reply at 8 ("Part of the Boston Claim is Time

Barred"); *id.* at 14 ("Part of the Boston Claim is Time Barred").  The Court will therefore

address Defendant's remaining arguments with respect to the period after September 13, 2015 on

the merits.

### 2.  Claims Relating to Service Quality

Green and Ohana's lulling argument fares better with respect to the service quality

claims, however.  "A plaintiff may invoke the [lulling] doctrine based on actions such as

assurances that the defendant will begin or resume performing its obligations under an

agreement."  *Bakeir v. Cap. City Mortg. Corp.*, 926 F. Supp. 2d 320, 336 (D.D.C. 2013) (citing

*Prof'l Answering Serv., Inc. v. Chesapeake & Potomac Tel. Co.*, 565 A.2d 55, 67 (D.C. 1989)).

The parties agree that "BestBus was unhappy with Academy's service quality from the start" of

the relationship.  SMF ¶ 91; SMF Resp. ¶ 91.  Still, Academy routinely apologized for these

alleged lapses and offered remedial action.  A reasonable jury could conclude from that evidence

that Green and Ohana were lulled into inaction with respect to the alleged breaches of service

quality.

*Professional Answering Service, Inc.* is directly on point.  There, the plaintiff company

had immediately objected to the provider's installation of an outdated type of switchboard, but

the provider represented that it "would maintain and service the equipment to provide adequate

service."  *Prof'l Answering Serv., Inc.*, 565 A.2d at 58.  The D.C. Court of Appeals held that if it

was proved at trial that the provider "made subsequent representations . . . that it would correct

the deficiencies in services," the provider would be estopped from asserting the statute of limitations. *Id.* at 66–67.

Here, the record contains numerous emails sent over the course of the relationship accepting responsibility for service errors and committing to various steps to improve service quality. For instance, in an email from February 2014, an Academy terminal manager apologized for a mechanical failure and asked BestBus to "advise [him] of the total refund for this trip so I can absorb this refund on my end and discount your bill for this entire trip." Ex. 38 of Pls.' Opp'n. In January 2015, Academy's Chief Operating Officer Tom Scullin sent an email to BestBus apologizing "for the service incidents . . . cited in your email," and stating that Academy would take a series of concrete steps to improve performance, including additional training and making a greater effort to keep "preferred" BestBus drivers on the schedule. Ex. 9A of Def.'s Mot. (email of January 23, 2015). In another early 2015 email, Scullin apologized for an incident in which a bus with signage for another company arrived for a BestBus run, calling it "an obvious oversight on our part." Ex. 9F of Def.'s Mot. (original email dated Feb. 27, 2015). In July 2015, Scullin emailed several Academy employees admonishing them about service failures for BestBus, saying "we do not appear to be putting out the product we have been hired to deliver." Ex. 38 of Pls.' Opp'n. And an email from an Academy employee in August 2016 apologized for "driver errors that occurred on Sunday" and promised to take remedial actions "to minimize the probability of performance lapses." Ex. 43 of Pls.' Opp'n.

In addition, Academy's apologies often extended beyond words to include deductions for trips that involved service quality failures. "Academy provided BestBus $22,570 in credits in 2015 and $45,135 in credits in 2016," including for reasons such as not providing amenities like bottled water. SMF ¶ 99; *see also* Ohana Dep. at 221:9–10 ("[T]hey did deduct some stuff

because they knew it was their fault."). To be sure, Academy maintains that the refunds were given to maintain a positive relationship with BestBus and not because they were required by the TSA. SMF ¶ 101. But for the purpose of lulling, it is enough that a reasonable jury could conclude that the refunds, apologies, and commitments lulled BestBus into inaction with respect to the service quality claims.

### B.  Boston–NYC Route

Having determined that claims relating to Academy's operation of the Go Bus line run between Boston and New York City are barred to the extent they occurred prior to September 13, 2015, the Court begins by clarifying what exactly remains of Plaintiffs' claims in this category. The claim that Academy breached the duty of good faith and fair dealing by purporting to assist BestBus in expanding to the Boston market while simultaneously acquiring a competing route, while sympathetic, does not survive the statute of limitations. The statute of limitations begins to run "when the implied duty of good faith and fair dealing was breached," *Murray*, 953 A.2d at 321, which in this case allegedly occurred in mid-2014 and which Green and Ohana were aware of by October 2014 at the latest, Green Dep. at 148:17–19. Accordingly, the good faith and fair dealing claim related to the Boston run is time-barred and the Court does not consider it.

To the extent Academy's operation of the Boston line run it had acquired from Go Bus was a violation of the TSA, however, that action continued well into the limitations period. Specifically, Green and Ohana claim that Academy's operation of the Go Bus line run between Boston and NYC violated Paragraph 2 of the TSA. 3d Am. Compl ¶ 67. Paragraph 2 reads: "Academy shall serve as [BestBus]'s exclusive motor coach transportation provider, and Academy shall provide such services exclusively for [BestBus] and shall not operate any other "line run" motor coach business in competition with any existing or future [BestBus] lime [sic] run during the term of this Agreement." TSA ¶ 2.

1.  Breach

First, the parties disagree on whether the word "future" in Paragraph 2 precluded Academy from operating the Boston–NYC line run.  Academy claims that "future" "means routes that are listed by the parties in the future (i.e., after the TSA was executed) in an amendment to TSA Schedule A."  Def.'s Mot. at 9 (emphasis omitted).  Green and Ohana advance a much broader understanding: that it referred to any potential line run the companies would want to operate in the future.  Pls.' Opp'n at 12.  In the present posture, the Court need only determine that there is sufficient evidence from which a jury could agree with Plaintiffs.

New Jersey law always considers the intent of the parties when interpreting a contract, and therefore "the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded."  *Atl. N. Airlines v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953).  Ohana testified that the parties drafted the TSA with the intent to expand their line run business together, and that they discussed expansion well beyond what was listed in Schedule A as part of that conversation.  Ohana Dep. at 258:5–8 ("[W]e talked about buying the company still in Miami, Academy, and we talked with Boeing [sic] about doing Miami to DC to New York."); *id.* at 260:13–15 ("The whole purpose of this agreement was to grow.  So next year we're going to have Boston, the next year we're going to have Philly.").  His understanding was that "future" meant that the parties would only expand their line runs together.  *Id.* at 259:3–17 ("Every line run, it's with Academy.  In reality, when Academy couldn't provide me more buses . . . it was a hard pill to swallow, but I always used only Academy and never steal away, and it was hard.").  Green also testified that the exclusivity provision was particularly important in light of the failed purchase negotiations that preceded the TSA, because "[Academy] had a good, solid two-and-a-half years of learning [BestBus's] business, and we felt that there was a chance that they could operate their own line runs, so we were trying to protect ourselves from

that." Green Dep. at 108:21–109:4. Green also understood the exclusivity provision to be mutual and apply to "all line runs, present and future." *Id.* at 109:5–12.

"The construction of contract terms and whether the manner in which they were executed constitutes a breach is an issue of fact best left for a jury." *Zelnick v. Morristown-Beard Sch.*, 137 A.3d 560, 566 (Law. Div. 2015). The Court is satisfied that a reasonable jury could agree with Plaintiffs' interpretation of Paragraph 2 of the TSA when considering the evidence of the circumstances surrounding the formation of the TSA.

## 2. Damages

But Plaintiffs encounter a roadblock on the issue of damages. New Jersey's "New Business Rule" disallows recovery for the "prospective profits of a new business." *RSB Lab'y Servs., Inc. v. BSI, Corp.*, 847 A.2d 599, 609 (N.J. Super. Ct. App. Div. 2004). This longstanding rule considers such prospective lost profits to be "too remote, contingent, and speculative to meet the legal standard of reasonable certainty." *Weiss v. Revenue Bldg. & Loan Ass'n*, 182 A. 891, 893 (N.J. 1936). The original case establishing the New Business Rule, *Weiss*, involved an investor who operated a building as a "rooming house" and would have operated the adjoining building in the same manner but for the breach of contract. *Id.* at 891. Similarly, in *McDonald v. City of Wildwood*, the Appellate Division applied the rule to a company that attempted to provide services in a new market where it "had no longstanding customers or promoters to whom it could turn to guarantee business." No. A-0109-17T4, 2018 WL 6164767, at *4 (N.J. Super. Ct. App. Div. Nov. 26, 2018). In contrast, the Appellate Division has held that the rule was inapplicable to a situation where a business that previously collected samples and sent them to other laboratories expanded its model to include its own in-house laboratory service, "using its same employees, facilities, and customer base." *RSB Lab'y Servs., Inc.*, 847 A.2d at 612.

BestBus's expansion into the Boston market is more like *Weis* and *McDonald* than *RSB*. Although BestBus had experience operating line runs, operating a new route in a new geographic market goes well beyond adding "new equipment and a license."  Pls.' Opp'n at 40 (quoting *RSB Lab'y Servs., Inc.*, 847 A.2d at 602).  It involved a new stop, new employees, new marketing, new competition, and indeed a whole new rebranding of the BestBus service.  Extrapolating from BestBus's prior business record therefore necessarily involves a good deal of speculation.[3]

As BestBus points out, the New Business Rule has been abandoned by most states and widely criticized, including by a plurality of the New Jersey Supreme Court.  *See* Pls.' Opp'n at 39 n.13; *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364, 379 (N.J. 1992), *abrogated on other grounds by Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.*, 640 A.2d 788 (N.J. 1994) (noting in the plurality opinion that "the trend in recent cases has been to award lost profits for a new business when they can be proved with reasonable certainty"); *Bell Atl. Network Servs., Inc. v. P.M. Video Corp.*, 730 A.2d 406, 420 (N.J. Super. Ct. App. Div. 1999) ("While the arguments for abandonment of the 'new business rule' appear to be persuasive, those arguments are not supported by a majority opinion of the Supreme Court; rather, they appear only in the plurality opinion in *Perini*.").  Moreover, the New Jersey Supreme Court may reconsider its adherence to this rule in a case on which it recently granted certiorari.  *See* Pls.' Opp'n at 39 n. 13 (discussing *Schwartz v. Menas*, 2020 WL 6538396, at *3 (N.J. Super. Ct. App. Div. Nov. 6, 2020) (per curiam), cert. granted, 246 N.J. 139 (N.J. 2021)).  Should the legal landscape of New Jersey law change in this respect in the coming months, the Court will entertain a timely motion for reconsideration on this issue.  But in the meantime, it is constrained

---

[3] This does not necessarily mean that Plaintiffs could not meet the more flexible "reasonable certainty" test applied where the New Business Rule does not bar lost profits, which the Court does not consider.

to apply New Jersey law as the New Jersey Supreme Court interprets it, and accordingly finds

that the New Business Rule bars BestBus's claim for damages relating to the Boston route as a

matter of law.

### C. Vamoose

Next, the Court takes up the claims related to Academy's provision of buses to Vamoose

for that company's DC–NYC line run, which began in late 2014 after Academy acquired Go

Bus.  Vamoose operated a line run between points in Lorton, Virginia and Rosslyn, Virginia and

a stop in New York City.  SMF ¶ 139.  It had obtained a large number of its buses from Go Bus

prior to Academy's acquisition of Go Bus.  *Id.*  The BestBus and Vamoose stops in New York

City were about three blocks apart, and Vamoose's Virginia stops were about four miles away

from BestBus's stops in the DC area.  SMF Resp. ¶ 140.  In addition, both companies targeted a

similar demographic of customers in that market who were willing to pay a higher price point for

luxury service.  *See* Green Dep. at 175:18–176:4 (describing how Vamoose and BestBus targeted

similar customers); Ohana Dep. at 52:3–9 (same).

BestBus claims that Academy violated Paragraphs 1 and 2 of the TSA by providing buses

to Vamoose for that company's DC–NYC line run.  The Preamble to the TSA, which is

incorporated into the TSA by Paragraph 1, states that:

> [BestBus] desires to utilize Academy as [BestBus]'s sole and exclusive
> transportation provider for motor transportation services between the points, places
> and locations described in Schedule A (as the same may be amended from time to
> time to meet additional motor coach service requirements) and Academy wishes to
> provide such services exclusively to [BestBus].

TSA at 1.  In addition, Paragraph 2 reads: "Academy shall serve as [BestBus]'s exclusive motor

coach transportation provider, and Academy shall provide such services exclusively for

[BestBus] and shall not operate any other 'line run' motor coach business in competition with

any existing or future [BestBus] li[n]e run . . . ."  TSA ¶ 2.

1.  Breach

The parties appear to agree that Vamoose and BestBus operated routes between different "points, places, and locations" in DC and NYC.  *See* SMF Resp. ¶ 38; Def.'s Mot. at 36–38. They disagree, however, as to whether that difference meant Vamoose was "in competition with" the existing BestBus line runs within the meaning of the TSA.  The Court previously noted that "any bus route from the D.C. metro area to the New York metro area is, to some extent 'in competition with' all other such routes," *Academy II*, 2020 WL 1536219, at *13, and Green and Ohana have provided enough evidence at this stage for a reasonable jury to find that both parties understood the provision this way at the time.

Deposition testimony from both Green and Ohana affirmed their understanding that Vamoose's DC–NYC line run was in competition with BestBus's DC–NYC line run.  Green Dep. at 160:12–15 (listing Vamoose among the companies he considered competitors in 2013); *id.* at 161:13–14 ("We competed in the upscale market with Vamoose . . . ."); Ohana Dep. at 52:1–9 ("Anybody that is in the metro area of DC, Virginia, Maryland is a competitor, yes . . . . Vamoose was the most competitive [of] anybody else. . . .").  Academy expert and former employee David Hall expressed the same understanding.  Dep. of David Hall, Ex. 9 of Pls.' Opp'n at 28:15–16 (agreeing that "in some respects" BestBus competed with Vamoose).  And in a February 2015 email admonishing Academy employees for arriving to a BestBus run with a Vamoose sign, Scullin stated, "Vamoose is not BestBus.  They compete, this is embarrassing, and places us in bad position."  Ex. 8 of Pls.' Opp'n.  Finally, Plaintiffs submit the declaration of the systems analyst for BestBus and Vamoose, who stated that based on ticket sale data, there was a 15% overlap in customers between the two companies from 2013 to 2017.  Decl. Ilan Mazuz, Ex. 41 of Pls.' Opp'n, ¶ 9.  Of course, Academy presents contrary evidence that Ohana and Green did not view Academy's relationship with Vamoose as a breach until it affected their

service quality.  *See* Def.'s Mot. at 38.  But summary judgment is not the appropriate time to weigh competing evidence.  It is enough at this stage that there is sufficient evidence with which a jury could find that Vamoose's line run was "in competition with" BestBus, and thus, that the provision of buses to Vamoose violated paragraphs 1 and 2 of the TSA.

### 2.  Causation and Damages

Academy next argues that because Vamoose could have received comparable buses from other providers and did not introduce new competition into the DC–NYC market, there is no evidence that Academy's alleged breach caused damages to BestBus at all.  Def.'s Mot. at 40–41.  Under New Jersey law, "a party alleging a breach of contract [must] prove that there was a breach which in fact caused some damage," but "[o]nce the fact of damage is established, the mere uncertainty as to the amount will not bar recovery."  *Tannock v. N.J. Bell Tel. Co.*, 537 A.2d 1307, 1310 (N.J. Super. Ct. App. Div. 1988).  "[T]he loss must be a reasonably certain consequence of the breach although the exact amount of the loss need not be certain."  *Donovan v. Bachstadt*, 453 A.2d 160, 166 (N.J. 1982).  Causation may be proved by circumstantial evidence, however, "so long as the proof will justify a reasonable and logical inference as distinguished from mere speculation."  *Ruger Chem. Co. v. Universal Preservachem, Inc.*, No. A-0018-07T3, 2009 WL 790486, at *3 (N.J. Super. Ct. App. Div. Mar. 27, 2009) (quoting *Beyer v. White*, 91 A.2d 606, 609 (N.J. Super. Ct. App. Div. 1952)).

BestBus's theory of causation hinges on the relative quality of service that it received as compared to Vamoose.  *See* Pls.' Opp'n 37–38.  Specifically, it argues that even though the Court has already ruled that BestBus has no claim for breach of the TSA based on relative bus quality, the evidence of relative bus quality is nonetheless relevant to whether Academy's

alleged breach of the exclusivity provision caused any damages.[4]  *Id.*  That is a subtle distinction, but there is some logic to it.  The record demonstrates that Academy pulled from the same overall fleet of buses and drivers, including the newest buses that it purchased each year, and Academy does not argue otherwise.  *See* Decl. Michael Beradesco ¶ 4, Ex. 42 of Def.'s Mot., ECF No. 46-7 ("The terminal had a limited number of buses that were one or two years old, and every customer wanted a late-model bus—including BestBus and Vamoose.  I tried to assign both BestBus and Vamoose late-model buses, and neither customer was made a priority . . . ."); Ex. 43 of Def.'s Mot., ECF No. 46-7 (showing at least some overlap in the bus numbers assigned to Vamoose and BestBus); Ex. 59 of Def.'s Mot. at AE15158, ECF No. 46-7 (asking for confirmation that Academy had assigned BestBus preferred drivers for a holiday weekend).  Because Academy had a finite number of buses and drivers, it is a reasonable inference that the additional demands of the Vamoose line run strained Academy's capacity to BestBus's detriment.

The discussion regarding the respective assignment of buses during the 2015 Thanksgiving holiday is illustrative.  Academy points out that BestBus in fact received all 10 of its newest buses that weekend, and more of its one-year-old buses than Vamoose received.  SMF ¶ 118.  Although BestBus also received more of the older buses as well, Academy claims that this was merely because BestBus used more buses in total, thus "Academy had to dig deeper into its fleet for BestBus's needs."  *Id.*; Def.'s Mot. at 40.  Plaintiffs counter that this misses an important point—*all* of the late-model buses could have been provided to BestBus in the absence of Vamoose's competing demands on Academy's fleet.  SMF Resp. ¶ 118; *see also* Ex. 32 of

---

[4] To be clear, the Court has twice held and continues to adhere to the view that nothing in the TSA required Academy to provide buses of a superior quality to BestBus.  *Academy III*, 485 F. Supp. 3d at 119; *Academy II*, 2020 WL 1536219, at *13.

Pls.' Opp'n (stating in an email from an Academy employee that no spare buses were available in a mechanical emergency because "we were overloaded by Best Bus").  Academy disagrees about the extent to which bus age or quality causally impacted the customer experience or BestBus's revenues.  *See, e.g.*, SMF Reply ¶ 118.  Nevertheless, there is enough evidence from which a jury could find the alleged breach of the exclusivity provision caused at least some damage to BestBus.

Academy also argues that Plaintiff's expert, Frank McGuire, does not establish with reasonable certainty that any such losses were attributable to the alleged breach of the exclusivity provision rather than other alleged breaches or the impacts of the market.  Def.'s Mot. at 35, 42.  Likewise, it argues that the calculation of BestBus's expert is unreliable because it assumed the same rate of growth and costs despite an overall slowing of the line run market.  *Id.* at 43.  These are fair points and may properly be the subject of a motion *in limine* or potentially used to mount a vigorous cross-examination to discredit the expert's testimony at trial.  Still, these points are not so overwhelming that a factfinder could not reasonably apportion damages in a way that is grounded by the evidence, such as by discounting McGuire's totals.  "Once the fact of damage is established, the mere uncertainty as to the amount will not bar recovery."  *Tannock*, 537 A.2d at 1310.

McGuire divided his calculated damages into the "pre-termination" period when the TSA was in effect, the "post-termination" period when the TSA would have remained in effect had it continued until the end of its original 5-year term, and the "first renewal period" of the next five years in which the TSA could have been extended.  Expert Rep. Frank J. McGuire ¶¶ 27–29, Ex. 5 of Def.'s Mot.  Academy argues that even if the Vamoose claims can go forward, the latter two categories should be rejected as a matter of law because any remaining obligations under the

TSA's exclusivity provision were extinguished by the termination of the TSA.  Def.'s Mot. at 27–28.

Green and Ohana provide almost no response to that point other than to argue in a footnote that a survival clause cannot be considered exhaustive if other provisions clearly relate to the post-termination period.  Pls.' Opp'n at 34 n.9.  In the case they cite, the court determined that a survival clause was not exhaustive because another clause relating to the calculation of the final post-termination payment was not included, therefore the right to offset payment against an amount owed likely survived as well.  *Sprint Sols., Inc. v. Mobile Now, Inc.*, No. CV 19-3752, 2020 WL 136285, at *6 (D.D.C. Jan. 13, 2020).  In contrast, it is debatable whether the TSA survival clause was exhaustive, but in any event there is no evidence whatsoever that the parties intended to extend their exclusivity obligations beyond the life of the TSA, nor would such an interpretation make sense.

Still, the function of compensatory damages is to "put the innocent party into the position he or she would have achieved had the contract been completed."  *Totaro, Duffy, Cannova and Co. v. Lane, Middleton and Co.*, 921 A.2d 1100, 1107 (N.J. 2007).  Plaintiffs are correct that there is at least a genuine issue of material fact as to whether the TSA would have continued for its full five-year period had Academy complied with the exclusivity provisions.  *See* Pls.' Opp'n at 40–41; Ohana Dep. at 156:2–5 (testifying that BestBus terminated the TSA because of the alleged breaches).

The same cannot be said for renewal period, however.  In contrast, although the TSA "automatically" renewed in five-year terms absent affirmative action of any party, *see* TSA ¶ 17, there is insufficient evidence from which a jury could conclude that the parties would have renewed the TSA.  Ohana himself testified that he would not have renewed the TSA "if

Academy refused to reduce its bus prices." Ohana Dep. at 159:3–7.[5]  Any conclusion otherwise could only be grounded in pure speculation rather than the evidence.  *See Kurnik v. Cooper Health Sys.*, No. A-4686-06T1, 2008 WL 2829963, at *19 (N.J. Super. Ct. App. Div. July 24, 2008) (rejecting plaintiff's claim for lost wages based on an automatic renewal clause in an employment contract where it appeared the parties would not have extended the contract).

Accordingly, the Court will deny Academy's motion for summary judgment on the Vamoose breach-of-TSA claims.  It will, however, limit Plaintiffs' potential recovery on those claims to the period of time between September 13, 2015 and June 28, 2018: the remaining period not barred by the statute of limitations for which the TSA was in effect or would have been in effect under its original term.

### 3.  Surreply Motion

The Court pauses to address a brief procedural matter.  Plaintiffs' proposed surreply deals with the admissibility and content of two declarations that relate to the Vamoose claims: the Mazuz declaration and the Lastres declaration.  *See* Proposed Surreply at 2–3.  A court determining whether to allow a surreply considers whether the reply raises new arguments, whether the proposed surreply would be helpful to the resolution of the pending motion, and whether the other party would be unduly prejudiced.  *Glass v. Lahood*, 786 F. Supp. 2d 189, 230–31 (D.D.C. 2011).

---

[5] In his later declaration, Ohana stated that "If Academy had done everything that they promised us they would do and that the TSA required them to do, I would have renewed the TSA many times."  Ohana Decl. ¶ 13, Ex. 40 of Pls.' Opp'n.  This assertion is too vague and conclusory to create a genuine issue of material fact with respect to the renewal period.  *See Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 n.4 (D.D.C. 2015), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015) (rejecting affidavits that were "so conclusory and lacking in factual specificity that they cannot create genuine disputes of material fact at summary judgment").  Moreover, it is contradicted by Ohana's own testimony described above.

Plaintiffs initially objected to Academy's reliance on the Lastres declaration on the grounds that Lastres was not identified in Academy's initial disclosures, but Academy demonstrated in its Reply that Lastres was in fact identified in a supplemental disclosure.  Reply at 12.  Conceding their error, Plaintiffs attempt to respond to the substance of the Lastres declaration in the proposed surreply.  Proposed Surreply at 3–4; Pls.' Reply Supp. Surreply Mot. at 2, ECF No. 56.  But "fail[ing] to put forth [a party's] best case in its opposition is not grounds for permitting a surreply."  *United States v. Baroid Corp.*, 346 F. Supp. 2d 138, 144 (D.D.C. 2004).

The "new" arguments in Academy's Reply about the Mazuz declaration responded to the inclusion of that declaration with the Opposition—and thus did "not expand the scope of the issues presented"—making a surreply generally inappropriate.  *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011), *aff'd*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012).  As none of the Court's decisions on Plaintiffs' various arguments depend solely on the admissibility of the Mazuz declaration, the Court need not decide now whether it is admissible and believes that issue would be better resolved through a more fully-briefed motion *in limine* at a later stage.  The proposed surreply would thus not be helpful to the resolution of the pending motion, and the Court denies leave to file the proposed surreply.

### D.  Service Quality

Green and Ohana assert a series of overlapping claims that Academy breached the TSA by failing to provide buses and drivers that met its requirements.  The Court has already considered and rejected some of these claims in its prior opinions on the motions to amend.

This Court previously determined that BestBus's attempt to amend its complaint to include allegations of driver malfeasance in violation of TSA Paragraphs 7 and 8 would be futile.

*Academy II*, 2020 WL 1536219, at *14–16.  Plaintiffs thereafter withdrew "*all* claims relating to driver malfeasance or incompetence."  Pls.' Reply Supp. Mot. Leave File 2d Am. Compl. at 1, ECF No. 22 (emphasis added).  The Third Amended Complaint also does not include claims related to driver professionalism or quality.  *See* 3d Am. Compl.  Nonetheless, Plaintiffs now attempt to argue that "there remains a viable claim that Academy violated Paragraph 11(D) of the TSA," which required Academy's "services"—including drivers—to be performed "consistent with generally applicable industry standards; and . . . in compliance with federal motor carrier rules and regulations."  Pls.' Opp'n at 23 (quoting TSA ¶ 11(D)).

This attempt cannot be allowed.  A "plaintiff cannot further amend his complaint through an opposition brief."  *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 12 n.7 (D.D.C. 2006). That is doubly true where, as here, the plaintiff seeks to argue a theory that it explicitly withdrew and in fact amended its complaint to exclude.  *See Mowrer v. U.S. Dep't of Transp.*, 326 F.R.D. 350, 353 (D.D.C. 2018) (refusing to allow plaintiffs to add a claim after years of litigation in part because the earlier elimination of that claim from the amended complaint "operated as a voluntary dismissal of that claim" (alterations omitted)).  The Court therefore does not consider any arguments regarding driver quality and professionalism.

With respect to bus quality, the Court allowed BestBus to include claims of "breach based on inadequate WiFi, outlets, restrooms, and similar deficiencies," which could plausibly violate the industry standards and federal regulations in its amended complaint.  *Academy II*, 2020 WL 1536219, at *14.  It did so after acknowledging that "it seems as though TSA Schedule C was intended to establish minimum levels of quality for the vehicles BestBus received, but the Schedule was apparently left blank," therefore the only remaining standards incorporated in the TSA were federal regulations and industry standards that were incorporated by reference in

Paragraphs 7 and 11(D) of the TSA.  *Id.* at *13.  When BestBus attempted to include different allegations about relative bus quality, the Court again reiterated that "[w]hen it comes to bus quality, BestBus only has a claim about *absolute* bus quality based on quality deficiencies that fail to meet the quality standard required under the regulations."  *Academy III*, 485 F. Supp. 3d at 119.  Although the focus of those rulings was the "absolute" as opposed to "relative" nature of the claims, they made clear that Academy would not be held to whatever undefined and disputed standard would have appeared in a Schedule C, had it been included.

Now, however, Plaintiffs advance the argument that "Academy violated Schedule C of the TSA by providing BestBus with buses that did not meet its requirements."  Pls.' Opp'n at 15 (capitalization altered).  It urges the Court to consider the history of the parties' prior dealings in order to find a violation of Schedule C with respect to absolute bus quality.  *Id.*  Again, the problem is that BestBus did not allege that Academy violated Schedule C by failing to provide buses that met its requirements.  *See* 3d Am. Compl.  "Plaintiffs cannot use summary judgment briefing to press claims not raised in their complaints."  *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 75 (D.D.C. 2019); *Winder v. District of Columbia*, 555 F. Supp. 2d 103, 108 (D.D.C. 2008), *aff'd sub nom. Winder v. Erste*, 566 F.3d 209 (D.C. Cir. 2009) ("[T]he complaint does not plead a breach of contract claim based on any earlier contracts, and [plaintiff]'s attempt to add such a claim through summary judgment briefing is impermissible.").  The Court therefore considers only the claims for bus quality that incorporate federal regulations or industry standards.

### 1.  Breach

The parties agree that federal law and regulations did not require Wi-Fi or electrical outlets.  SMF ¶ 120.  Although BestBus employees testified to their high expectations for the WiFi service, the rest of the record suggests that functioning WiFi was not an industry standard, either, and if anything, unsatisfactory WiFi was the industry norm.  Defendant's expert, Hall,

noted that not only was there no "industry standard" for WiFi quality at the time, problems with

WiFi technology were common industry-wide and "it was impossible to consistently provide Wi

Fi that met customer expectations."  Expert Rep. David Hall at 12–14, § 3.4.1, Ex. 14 of Def.'s

Mot.  Green and Ohana do not provide contrary evidence that creates a genuine issue of material

fact other than to state that Academy understood functioning WiFi was understood to be a

requirement for the BestBus runs—but that goes beyond the claims for breaches of federal

regulations or industry standards that the Court has determined BestBus can advance.[6]

The Third Amended Complaint includes a claim that Academy violated 49 C.F.R.

§ 374.313(a)–(c), and thus Paragraph 7 of the TSA, by failing to "'maintain a reasonable

temperature on each bus,' to have a 'clean, regularly maintained restroom, free of offensive

odor,' and to 'be kept clean, with all required items in good working order.'"  3d Am. Compl.

¶¶ 64–65 (quoting 49 C.F.R. § 374.313).  Plaintiffs do not elaborate on this point in their

opposition brief but do identify relevant portions of the record that would suggest a breach of

these violations, such as records of specific buses breaking down, missing equipment, and not

being kept clean.  *See, e.g.*, Ex. 24 of Pls.' Opp'n (emails regarding bus breakdowns that

occurred in November 2015); Ex. 32 of Pls.' Opp'n (email from Bolen stating that buses had

been cleaned so that they would not "smell like a dirty rug any longer"); Ex. 37 of Pls.' Opp'n

(emails complaining about equipment failures and Academy's lack of accurate communication

about them); Cohen Dep. at 224:9–10, Ex. 4 of Pls.' Opp'n ("[The buses are] not maintained

correctly.  The bathrooms are not filled up.  The seats are broken."); SMF Resp. ¶ 90 (describing

---

[6] Any claim that the lack of amenities such as ice, bottled water, and hand sanitizer were
a breach of the blank TSA Schedule C fails for the same reason.

one bus that caught fire on the highway despite previous maintenance).  There is therefore

evidence that Academy breached this federal standard on at least some occasions.

### 2.  Causation and Damages

There is also at least some evidence from which a jury could determine that these errors

caused damage to BestBus.  One of the documents produced in discovery was a list of customer

credits, many of which were given as a result of complaints.  *See* Ex. 4A of Pls.' Opp'n.[7]  While

far from the majority, at least some of those complaints reference actionable breaches such as

broken air conditioning, stifling and excessive heat, broken seats, smelly bathrooms, and a

broken windshield defroster.  *Id.*  Plaintiffs have also submitted as evidence complaints from

customers who claimed they would never ride BestBus again as the result of various service

failures as well as sworn declarations from two of those customers testifying that they in fact

never rode BestBus again and stopped recommending it to others.  Ex. 35 of Pls.' Opp'n

(declarations); Ex. 38 of Pls.' Opp'n (collected complaints and email discussions thereof).

Plaintiffs also provided circumstantial evidence showing that about 45% of the customers who

had received a credit for a service failure during the time the TSA was in effect either never used

the credit and never rode BestBus again, or used the credit and then never rode BestBus again.

Pls.' Opp'n at 36 (citing Mazuz Decl., Ex. 41 of Pls.' Opp'n).  And while there is evidence that

Academy provided credits to BestBus for such complaints, there remains a material dispute

---

[7] This document is a summary of credits, not a summary of complaints, as can be seen by
the fact that several credits appear to have been given as promotions.  There is separate dispute
over the total number of complaints received, as Cohen testified that he "did the best [he] could"
to assemble a "representative sample" of "tens of thousands of complaints" during the relevant
period.  Decl. Avi Cohen ¶ 6, Ex. 10 of Pls.' Opp'n, ECF No. 48-4.  A comprehensive list of that
"representative sample" does not appear to have been submitted, but in any case, the list in
Exhibit 4A of complaints that were in fact compensated is on its own sufficient to create a
material issue of fact on this point.

about whether those credits did or could fully compensate for the harm suffered by BestBus for such failures. *Compare* SMF ¶ 98, *with* SMF Resp. ¶ 98; Ohana Dep. at 294:17–20 ("We had a customer base. [That t]akes a lot of time, a lot of money, a lot of advertisement, a lot of buses. Losing a customer and give me a refund deduction, that's a joke.").

There is therefore a reasonable inference that customers who complained about problems such as temperature and broken bus equipment ceased to use BestBus or gave it negative reviews that resulted in lost profits. This is enough for a factfinder to make "a reasonable and logical inference" about causation as opposed to "mere speculation." *Ruger Chem. Co.*, 2009 WL 790486, at *3 (quoting *Beyer*, 91 A.2d at 609). And for the same reasons that the Vamoose claims can go forward despite the uncertainty of the amount of damages, this claim can go forward as well. Academy's concern that McGuire's damage calculations do not distinguish between actionable and non-actionable service quality breaches is a valid one. But there is enough evidence from which a factfinder could logically make that determination, such as by comparing the volume of complaints received for each category. Further, arguments about whether service failures by subsequent providers and the declining line-run industry constituted an intervening cause may well undermine whatever remains of BestBus's service failures claim at trial, but they do not fully eliminate any material dispute of fact.

The Court's reasoning on the Vamoose claims also applies to whether damages for service-quality claims can be awarded in the post-termination or renewal periods. *See* Def.'s Mot. at 36. Because compensatory damages should put BestBus in the same position that it would have been in had Academy not breached the contract, and there is evidence from which a jury could conclude that the TSA would have been completed through its five-year term in the absence of the alleged breaches, Green and Ohana may recover damages for the post-termination

period.  Plaintiffs cannot recover for the renewal period, however, because there is insufficient

evidence from which a factfinder could conclude that the renewal period would have been

extended at all.

 Academy's motion is therefore denied with respect to the service quality claims, but the

Court takes care to note that what remains of this claim is significantly narrower than what

Plaintiffs have argued.  Green and Ohana only have a claim that service failures relating to bus

maintenance and cleanliness in violation of the standard articulated in 49 C.F.R. § 374.313(a)–

(c) caused BestBus damages and lost profits that were not already compensated for by the refund

credits Academy provided during what would have been the original five-year term of the TSA:

June 28, 2013 through June 28, 2018.

### E.  Hours-of-Service Violations

 Green and Ohana raise a separate claim for breach of Paragraphs 7 and 11(D) of the TSA,

under which Academy agreed to comply "with all applicable FMCA laws and regulations

concerning its equipment, employees, and/or independent contractor's status" and represented

that its "services . . . are in compliance with federal motor carrier rules."  TSA ¶¶ 7, 11(D)(ii).

Specifically, they argue that Academy violated the FMCSA hours-of-service regulation, which

prohibits the driver of a passenger bus from driving more than ten consecutive hours without an

eight-hour break.  49 C.F.R. § 395.5(a)(1).  Although the complaint originally relied on

information provided by anonymous Academy employees, 3d Am. Compl. ¶¶ 38–42, Plaintiffs

chose not to seek that testimony after this Court denied the request for a protective order, SMF

Resp. ¶ 174.  Instead, Green and Ohana point to documents obtained from the FMCSA

monitoring system from the relevant period.  Those documents show an "alert" for hours-of-

service violations for every month that the TSA was in effect, SMF Resp. ¶ 173, although

Academy points out that the alert symbol only indicated that drivers were not keeping their logs

current, SMF ¶ 173.  In addition, spreadsheets corresponding to the last three months of the TSA listed seventeen discrete hours-of-service violations.  SMF Resp. ¶ 173.  Green and Ohana also point to internal Academy emails which could be read as suggestive of a lack of serious concern for compliance.  Pls.' Opp'n at 28.

What Plaintiffs do not show is that the alleged hours-of-service violations resulted in any loss to BestBus.  New Jersey law requires a plaintiff to show "that defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs."  *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) (quotations and alterations omitted); New Jersey Model Civil Jury Instr. § 4.10A (same); *accord Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 222 (D.N.J. 2009) ("Under New Jersey law, the following elements are necessary in a breach of contract claim: (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) plaintiff performed its own contractual duties.").

Nothing in the record suggests that any accident occurred as a result of hours-of-service violations.  SMF ¶ 172.  The parties agree that two customer complaints mentioned drivers "appear[ing] tired," but Plaintiffs do not argue that those two drivers had exceeded the hours-of-service limit.  SMF Resp. ¶ 176.  Plaintiffs' expert "did not attribute any damages" to the hours-of-service claim, which he stated were "not relevant to [his] analysis."  Dep. of Frank McGuire at 129:20–130:10, Ex. 11 of Def.'s Mot.

Green and Ohana's only rejoinder to this lack of evidence is that "[a] jury could well conclude that the evidence Plaintiffs have presented with respect to driver malfeasance and improper behavior was the result of HOS violations."  Pls.' Opp'n at 36.  They note that Academy's training manual states—as common sense dictates—that fatigue often results in poorer work performance.  *Id.*  That may be true, but relying on that inference to assume that any

poor driver performance resulting from an hours-of-service violation impacted the customer

experience *and* resulted in a loss to BestBus requires speculation untethered to the evidence.  *See*

*Beyer v. White*, 91 A.2d at 609 (explaining that a showing of proximate cause "may rest upon

legitimate inference, so long as the proof will justify a reasonable and logical inference as

distinguished from mere speculation").  In other words, Plaintiff's proposed inferential chain is

insufficient for a factfinder to "be certain that damage has resulted."  *See Paolicelli v.*

*Wojciechowski*, 333 A.2d 532, 534 (N.J. Super. Ct. App. Div. 1975) (holding that some

uncertainty in the amount of damages did not preclude relief where it was certain that some

damages resulted).  A reasonable jury could not find in Plaintiff's favor on the issue of whether

the alleged hours-of-service violation caused BestBus any damages.[8]  Accordingly, the Court

grants summary judgment to Academy on the hours-of-service violation claims.

### F.  Good Faith and Fair Dealing

"[E]very contract in New Jersey contains an implied covenant of good faith and fair

dealing."  *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997).  The implied

covenant of good faith and fair dealing requires "that 'neither party shall do anything which will

have the effect of destroying or injuring the right of the other party to receive the fruits of the

---

[8] The Court notes that New Jersey law does allow for the award of nominal damages for a
breach of contract "in the absence of actual loss."  *Spiegel v. Evergreen Cemetery Co.*, 186 A.
585, 588 (N.J. 1936); *see also Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*, No. 12-cv-
6179, 2014 WL 3578748, at *7 (D.N.J. July 18, 2014) (collecting cases).  However, Plaintiffs
have not advanced a theory of nominal damages in their complaint or briefing, and the Court
declines to consider it *sua sponte*.  *Cf. Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 71 (1997)
(rejecting the theory that "a claim for nominal damages, extracted late in the day from
[plaintiff]'s general prayer for relief," could defeat mootness); *Dunkin' Donuts Inc. v. Dough
Boy Mgmt., Inc.*, No. CIV.A. 02-243 (JLL), 2006 WL 20521, at *9–10 (D.N.J. Jan. 3, 2006)
(rejecting parties' attempt to rely on a theory of nominal damages after failing to demonstrate
damages at the summary judgment stage because the party had "not explicitly sought nominal
damages and [the opposing party] had no notice that nominal damages were being sought").

contract.'" *Id.* (quoting *Palisades Properties, Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965)).

"Although the implied covenant of good faith and fair dealing cannot override an express term in

a contract, a party's performance under a contract may breach that implied covenant even though

that performance does not violate a pertinent express term." *Wade v. Kessler Inst.*, 798 A.2d

1251, 1259–60 (N.J. 2002) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J.

2001)).

   The Court has already determined that any reliance on the Boston route in support of

BestBus's good faith claim is barred by the statute of limitations.  However, Green and Ohana

also allege that the failures in service quality and the provision of buses to Vamoose breached

this covenant.  The primary dispute is whether there is sufficient evidence that Academy acted

with an improper motive to harm BestBus.  *See* Def.'s Mot. at 39; Pls.' Opp'n at 43–44.  While

obtaining an economic benefit, even at the other party's expense, is not necessarily evidence of

bad faith, the two are not mutually exclusive either.  *See Wilson*, 773 A.2d at 1130 ("Without bad

motive or intention, discretionary decisions that happen to result in economic disadvantage to the

other party are of no legal significance.").  There is sufficient evidence in the record from which

a jury could find that Academy acted with an improper motive.

   In November 2016, after BestBus had notified Academy of its intent to terminate the

TSA, there was a particularly tense meeting in which Ohana refused Tedesco's renewed offer to

purchase BestBus and accused Tedesco of purposefully destroying BestBus's business.  SMF

Resp. ¶ 64 (citing Ohana Dep. at 165:5–166:8 and Green Dep. at 313:19–314:1).  Tedesco then

made a threatening remark regarding the upcoming Thanksgiving weekend and stormed out of

the meeting.  *Id.*

Most egregiously, Academy printed flyers advertising their competing Go Bus route and purposefully left them on the seats of BestBus runs that they were operating during the final days of the TSA.  The flyer appears to have been initially drafted by Academy's Chief Operating Officer Scullin and sent to Academy's Marketing Manager Greg Rhodes on Monday, January 2, 2017, with the instruction to "have it ready to go Wednesday," which would have been January 4, 2017: the day before the TSA expired.[9]  Ex. 31 of Pls.' Opp'n.  The flyer contained nearly the same language as Scullin's email, with the heading "Important News for Best Bus Customers," stating that "Unfortunately, Best Bus has chosen to end our partnership," and advertising the new Go Bus DC–NYC route.  Ex. 63 of Def.'s Mot.  Rhodes then emailed the flyer to additional employees, copying Bolen and stating "[Tedesco] and [Scullin] want to get the word out this way."  Ex. 62 of Def.'s Mot.  Bolen replied and suggested "wait[ing] until the buses leave" so that the BestBus dispatchers would not see them and "attempt to intervene."  *Id.*  Rhodes's response was: "We can do whatever you think is best.  My sense is that [Tedesco] has a little bit of personal interest in crushing [BestBus].  At least that is what he said on text message last week."  *Id.*  Academy's only lukewarm defense to this episode is that there is no evidence the flyers were actually seen by any customers.  SMF ¶ 185; SMF Reply ¶ 181.  "[T]here are ethical norms that apply even to the harsh and sometimes cutthroat world of commercial transactions." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 399 (N.J. 2005).  If Plaintiffs' evidence is credited, such behavior surely violates those norms.

Academy argues that these incidents have no bearing on whether its earlier actions, such as the decision to acquire Go Bus and to assume its responsibilities of providing buses to

---

[9] The Court takes judicial notice of the fact that January 2, 2017 was a Monday and January 4, 2017 was a Wednesday.

Vamoose, were undertaken in bad faith.  *See* SMF Reply ¶ 181; Def.'s Mot. at 30–31.  Indeed, a competing theory of what happened is that Academy's intentions only soured after, and as a result of, BestBus's accusations and termination of the TSA.  However, Plaintiffs argue that these explicit expressions of bad faith must be viewed alongside the run-up to the termination, in which Academy allegedly made false reassurances regarding the impact of the Vamoose run and empty promises to improve its service—and only showed its true colors when BestBus ended the relationship and again refused to sell.  Regardless, now is not the moment to weigh competing characterizations of the evidence.  Because a jury could credit BestBus's more sinister version of events, the Court will deny summary judgment on the good faith and fair dealing claim to the extent it relates to the Vamoose line and the service failures.[10]

### G.  2016 and 2017 Service Rebates

Finally, the TSA provided that Academy would pay BestBus an annual rebate "based upon a percentage amount of the fees paid to Academy" as calculated in Schedule A(2) of the TSA.  TSA ¶ 6.  Academy did not pay BestBus a rebate for either 2016 or 2017.  SMF ¶ 196.

Paragraph 6 of the TSA provides that "[BestBus] shall receive a service rebate from Academy based upon a percentage amount of the fees paid to Academy annually hereunder, calculated in the manner described in Schedule A(2)."  TSA ¶ 6.  The rebate structure was intended to create an incentive "to promote and grow the [BestBus] business, and to utilize the services provided in [the TSA]."  *Id.* at 7.  In other words, the more BestBus utilized Academy's

---

[10] Even under Academy's theory, it is undisputed that the TSA was still in effect when those actions took place.  *See* Def.'s Mot. at 31 (arguing that "Plaintiffs have no evidence . . . of such a plot *before* BestBus ended the TSA" (emphasis added)).  Academy is correct, however, that Plaintiffs have not shown damages resulting from the events that transpired in the final months of the TSA.  *Id.*  Thus, Academy's actions with the flyers will not be actionable unless the jury credits Plaintiffs' broader theory of bad faith.

services, the more it would get back.  Schedule A(2), in turn, set out a matrix of three revenue

brackets that corresponded to a 1, 2, or 2.5% rebate as well as listing the maximum rebate

amount.  *Id.* at 8.  It also stated that "Academy will pay [BestBus] the rebate within sixty (60)

days after the end of the calendar year."  *Id.*  However, the TSA also contains a "survival clause"

which states that "[p]aragraphs 11(A)–(D), 12, 14–24 shall survive termination or expiration of

this Agreement"—which notably does not include either Paragraph 6 or Schedule A(2).  *Id.* ¶ 18.

Academy therefore argues that the rebate provision did not survive the termination of the

TSA, and it was not obligated to pay the rebates.  Def.'s Mot. at 45.  It invokes the principle that

the court "cannot make a better contract for the parties than they made for themselves," citing a

case in which an arbitration clause that was found not to survive the termination of a contract

because it was not included in that contract's survival clause.  Reply at 24 (quoting *Foster*

*Wheeler Passaic, Inc. v. Cnty. of Passaic*, 630 A.2d 280, 285 (N.J. Super. Ct. App. Div. 1993)).

It is far from clear, however, that Academy's understanding of the TSA is in fact the contract

that the parties "made for themselves."  *Id.*  BestBus earned the rebate based on the amounts it

paid to Academy while the TSA was in effect.  That the date for payment was deferred until after

the TSA ended does not negate the vested right to that rebate that BestBus had already earned.

*See Caponegro v. State Operated Sch. Dist. of City of Newark*, 748 A.2d 1208, 1212–13 (N.J.

Super. Ct. App. Div. 2000) (holding that a category of employees not covered by a survival

clause could not be denied their vested right to benefits such as accrued vacation and sick days

that had already been earned); *see also Nitterhouse Concrete Prods., Inc. v. Glass, Molders,*

*Pottery, Plastics & Allied Workers Int'l Union, & Loc. Union 201B, AFL-CIO CLC*, 763 F.

App'x 164, 166 (3d Cir. 2019) (determining that "according to ordinary principles of contract

law," indemnity obligations under a contract expired with the contract "unless . . . the liability

accrued during the contract period" (quotations omitted)).

A holistic reading of the TSA bolsters BestBus's interpretation, not Academy's. *See*

*Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d 1057, 1061 (N.J. Super. Ct. App. Div. 2000)

("[T]he intention of the parties is to be gathered from the language used in the instrument as a

whole."); *Southland Corp. v. Ashland Oil, Inc.*, CIV. No. 88-0700, 1988 WL 125855, at *3

(D.N.J. Nov. 23, 1988) ("To construe a writing properly . . . the writing must be interpreted as a

whole, and its individual terms must be construed in conjunction with the other parts of that

writing."). Also excluded from the survival clause was Paragraph 5 of the TSA, which stated

that BestBus would "pay[] Academy on its invoice for motor coach services within one week of

Academy's presentation of its invoice for such services." TSA ¶ 5. Perhaps unsurprisingly, no

one has argued or apparently even considered that BestBus's obligation to pay for Academy's

services in the final weeks of the TSA was also extinguished merely because the invoices were

due after the TSA expired.

Academy is also incorrect that BestBus needed to provide a "sworn statement" in support

of its interpretation of the contract. *See* Reply at 24. The case Academy cites, *Stockton Univ. v.*

*KK Ventures-Atl. City, LLC*, criticized a party for failing to provide evidence about the parties'

intentions and instead relying solely on a "convoluted explanation" about the presence and

placement of commas in the relevant survival clause, ultimately affirming what it considered

"[t]he only" plausible interpretation "in light of the parties' overall intentions." No. A-1618-

15T3, 2017 WL 931388, at *7–8 (N.J. Super. Ct. App. Div. Mar. 9, 2017). In contrast, here it is

Academy's interpretation that "runs counter to the common sense of the undertaking." *Id.* at *8.

Nor does the testimony of Academy employees regarding why Academy did not pay the rebates bolster its contrary interpretation.  Tedesco confirmed that Academy decided not to pay the rebates "based upon our *review* of the contract terms."  Dep. Francis Tedesco at 96:22–97:1 (emphasis added), Ex. 10 of Def.'s Mot., ECF No. 46-5; *see also* Dep. Thomas Scullin at 120:19–22, Ex. 7 of Def.'s Mot. (reading his prior email requesting the rebate payment that said, "Our attorney is reviewing the validity of your request since the contract was terminated.  I will be in touch with you after hearing from our attorney.").  This evidence may suggest that Academy believed it had identified a potential loophole after the TSA had been terminated, but it says nothing about the intent of the parties at the time the TSA was formed.

Academy next argues that at the very least, no 2017 rebate was owed because BestBus did not reach "the $3.95 million threshold" to qualify for a rebate during the first five days of January 2017 that the TSA remained in effect.  Def.'s Mot. at 45 n.33.  The first line of the chart in Schedule A(2) reads "From $3,950,000.00," which would suggest a minimum threshold.

| **Annual Revenue** | PERCENTAGE | **MAX Rebate Amount** |
| --- | --- | --- |
| From $ 3,950,000.00 | 1.0% | $ 39,500.00 |
| From $ 3,950,000.01 - $4,500,000 | 2.0% | $ 90,000.00 |
| From $4,500,001 - $5,000,000 plus | 2.5% | $125,000.00 |

TSA at 8.

But Green and Ohana correctly note that this language is incongruous with the rest of the chart, which contains ranges for the other two categories and includes a maximum rebate amount—which would be both the maximum and minimum under Academy's reading of the contract.  Pls.' Opp'n at 32.  The first row would also be effectively meaningless under Academy's interpretation, as it would be inapplicable if revenues varied from the $3,950,000

amount by so much as a single cent in either direction.  Accordingly, Plaintiffs urge the Court to apply the doctrine of "scrivener's error" to reform the contract.  *Id.* at 33.  To reform a contract based on scrivener's error, or mutual mistake, New Jersey law requires "that the minds of the parties have met and reached a prior existing agreement, which the written document fails to express."  *Bonnco Petrol, Inc. v. Epstein*, 560 A.2d 655, 660 (N.J. 1989).  In contrast, if one party simply fails to notice or raise an error, they will be held to the contract they signed.  *See Wachovia Bank v. Gadbey Organisation*, No. SOM-L-673-04, 2005 WL 2559780, at *13 (N.J. Super. Ct. Law Div. Oct. 5, 2005) (finding the doctrine of scrivener's error inapplicable where one party failed to notice that a clause had been deleted from the final contract); *Millhurst Milling & Drying Co. v. Auto. Ins. Co.*, 107 A.2d 46, 52 (N.J. Super. Ct. App. Div. 1954) ("Reformation on the ground of mistake is not granted in equity where the mistake is the result of the complaining party's own negligence.").

Academy counters that there is no evidence of any *mutual*, as opposed to unilateral, mistake in the expression of the contract.  Reply at 24 n.28.  That is not quite true.  Ohana stated in his sworn declaration that the use of the word "from" "was not the intent of either party to the TSA."  Decl. Asaf Ohana ¶ 11, Ex. 40 of Pls.' Opp'n.  That may be slim evidence, but a reasonable jury could choose to credit it, particularly where Academy has not offered any testimony to the contrary.[11]  *See Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 908 (3d Cir. 1992) (acknowledging that although a self-serving affidavit "may be insufficient to meet the rigorous

---

[11] Academy also points out that the complaint did not explicitly advance the theory of contract reformation, Reply at 24 n.28, but the complaint did allege that BestBus was owed a $714.89 rebate for 2017 "pursuant to Schedule A(2)," which necessarily put Academy on notice of BestBus's understanding of the chart, *see* 3d Am. Compl. ¶ 58(c), and it requested any "further relief as the Court deems just and equitable," *id.* at 19.

test for establishing a scrivener's error, given the clear and convincing standard of proof," that the affidavit "[n]evertheless . . . create[d] a genuine issue of material fact").[12]

When evaluating whether a genuine dispute of fact exists on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Great Atl. & Pac. Tea Co.*, 762 A.2d at 1062 ("Where . . . the competent evidential materials, viewed in a light most favorable to the party opposing the motion, are sufficient to permit a rational factfinder to resolve disputed issues in favor of the party in opposition, summary judgment should not be granted."). Plaintiffs will have an uphill battle of proving that the use of the word "from" was a scrivener's error and that the parties mutually understood that fact, but they are nonetheless entitled to present that theory to the jury. Accordingly, the Court will deny summary judgment to Academy on the issue of both the 2016 and 2017 rebates.

## V.  MOTIONS TO SEAL

One final procedural matter remains. The parties have filed their respective motions and exhibits in this matter under seal, with only redacted versions available on the public docket. *See* Mot. Seal Def.'s Mot. Summ. J., ECF No. 46; Mot. Seal Pls.' Opp'n, ECF No. 48; Mot. Seal Reply, ECF No. 50; Mot. Seal Surreply, ECF No. 53. Each party consents to the sealing, and as justification they state only that the briefs, depositions, and other exhibits contain material that

---

[12] This allegation stands in marked contrast to the allegation that Ohana would have renewed the TSA "many times" "[i]f Academy had done everything that they promised us," Ohana Decl. ¶ 13, which the Court rejected as too conclusory and contradicted by other parts of his testimony, *supra* n.5. Ohana's recollection and understanding of the parties' contemporaneous interpretation is factually specific and non-conclusory, and entitled to an inference of truth in this posture despite being self-serving. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("[A]s a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion . . . .").

was identified as "confidential" pursuant to the parties' stipulated protective order. *See, e.g.*, Mot. Seal Def.'s Mot. Summ. J. at 1. The stipulated protective order set guidelines by which the parties agreed to produce and share sensitive and proprietary business and personal information. *See* Stipulated Protective Order ¶ 4(a), ECF No. 31.

Now that the briefs and exhibits have been submitted to the Court for the purpose of influencing its decision in an adjudicatory process, however, those documents have become judicial records and accordingly subject to the common law right of access. *United States v. El-Sayegh*, 131 F.3d 158, 163 (D.C. Cir. 1997). That means that notwithstanding the protective order, "[i]n deciding whether to allow civil litigants to file records under seal, the Court must consider 'the rights of the public, an absent third party' to whom the Court ultimately is accountable." *Youngbey v. District of Columbia*, No. 1:09-cv-00596, 2010 WL 11673773, at *1 (D.D.C. Mar. 19, 2010) (citation omitted)); *see also Breiterman v. U.S. Capitol Police*, No. 16-cv-893, 2019 WL 11318341, at *1 (D.D.C. Sept. 20, 2019) (evaluating whether exhibits to a civil summary judgment motion filed under seal pursuant to a protective order should remain sealed under the common law framework); *United States v. Torrens*, 560 F. Supp. 3d 283, 286–288 (D.D.C. 2021) (evaluating a petition for the unsealing of video exhibits covered by a protective order under the common law framework). "In the D.C. Circuit, that duty is dispatched by considering the . . . . six factors derived from its decision in *Hubbard* . . . ." *United States v. All Assets Held at Bank Julius Baer & Co.*, 520 F. Supp. 3d 71, 78 (D.D.C. 2020) (citing *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980)). Under the *Hubbard* test, courts weigh: "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of

prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996).

There is a public need for access to the information because several of the redactions would limit the public's ability to understand the issues in the case. Moreover, much of the redacted information is already discussed, in substance if not in the same exact words, in publicly filed documents in this case such as the various amended complaints, the Court's prior opinions, and sometimes even other non-redacted portions of the same brief. For example, the TSA itself was filed as a sealed exhibit despite having been attached in full to no fewer than five public filings already and quoted extensively in all three of the Court's prior opinions. *See* Ex. 1 of Def.'s Mot. Dismiss, ECF No. 6-2; Ex. 1 of Mot. Leave Am. Compl., ECF No. 11-1; Attachment 2 of Mot. to Am./Correct, ECF No. 20-2; Attachment 2 of Reply to Opp'n to Mot. Am./Correct, ECF No. 22-2; Attachment 2 of Consent Mot. Am./Correct, ECF No. 36-2.

While the parties have both consented to the sealing, they have not asserted any specific grounds for what harm would befall them or anyone else from unsealing the briefing and exhibits in this matter. Some of the redactions, such as the names and phone numbers of customers who submitted complaints, may well be justified. But others clearly sweep too broadly, and the Court cannot discern what possible prejudice could result.

The Court suspects that the parties have reflexively over-redacted all references to anything marked confidential, but in an abundance of caution prefers not to speculate on the private interests at stake without hearing from the parties on the matter. It will therefore hold in abeyance its decision on the motions to seal and order the parties to confer and propose more limited redactions, accompanied by relevant legal analysis to support any portions they believe

should remain redacted.  Furthermore, the Court will file the present opinion under seal and order the parties to submit proposed redactions within thirty days.  The proposed redactions should be consistent with and narrowly tailored to the reasoning above.

## VI.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 47) is **GRANTED IN PART AND DENIED IN PART**, Plaintiffs' Motion for Leave to File a Surreply (ECF No. 54) is **DENIED**, and the Motions to Seal (ECF Nos. 46, 48, 50, 53) are **HELD IN ABEYANCE**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 26, 2022                                        RUDOLPH CONTRERAS
                                                            United States District Judge